UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE SILVERFERN GROUP, INC.,

*Plaintiff,*

- *against* -

ePALS CLASSROOM EXCHANGE, INC.,

*Defendant.*

Case No. 06 CV 15404 (LBS)

---

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTIONS FOR (1) PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR ATTORNEYS' FEES AND (2) DISCOVERY PURSUANT TO FRCP 56(f)**

---

**SCHLAM STONE & DOLAN LLP**
James C. Sherwood (JS-6391)
Andrew S. Harris (AH-1014)
26 Broadway
New York, New York 10004
(212) 344-5400 (telephone)
(212) 344-7677 (facsimile)

*Attorneys for Defendant ePALS Classroom Exchange, Inc.*

Defendant ePALS Classroom Exchange, Inc. ("ePALS")[1] submits this memorandum of law in opposition to Plaintiff Silverfern Group, Inc.'s ("Silverfern") motion for judgment on the pleadings or for summary judgment. ePALS also submits this memorandum in support of its cross-motions for: (1) partial summary judgment dismissing Silverfern's claim for attorneys' fees and expenses and (2) discovery pursuant to Federal Rule of Civil Procedure 56(f).

## PRELIMINARY STATEMENT

This case concerns the damages caused by Silverfern's investment bankers' minimal and inept performance, including its gross negligence in utterly failing in its obligation to familiarize itself with the financial and capitalization structure of its client, ePALS. Silverfern induced ePALS to hire it by claiming, *inter alia*, to have expertise in all facets of selling and merging companies and by promising to thoroughly familiarize itself with ePALS' financial and capitalization structure in anticipation of a deal. Not only did Silverfern receive the information that it requested about ePALS, but also a managing director of Silverfern had sat on the board of directors of ePALS since 2002, making him privy to everything that went on inside the company.

After ePALS had found a merger partner with whom it came to terms and after Silverfern had assured the parties that they were ready for merger, it became apparent on the eve of closing that ePALS had such serious problems with its capitalization structure and financial condition that the transaction could not be completed. Ultimately, the problems were fixed and the transaction closed six weeks later than had been planned. Silverfern's gross negligence in failing to realize these problems damaged ePALS in the form of increased closing costs, lost sales and dilution to ePALS' shareholders.

---

[1] ePALS Classroom Exchange, Inc. was the name of the company that hired Silverfern. In the transaction at issue in this case, it merged on December 15, 2006 with In2Books, Inc. The company formed by that merger was also called ePALS Classroom Exchange, Inc., which is now owned by ePALS, Inc.

Despite the damage caused by its gross negligence, Silverfern, believing that the best defense is a good offense and having won the race to the courthouse and first sued ePALS, now brings a rash pre-discovery summary judgment motion. Silverfern's motion rests on one and only one factual allegation: that no one criticized Silverfern's performance under the contract before the transaction closed. Silverfern claims that this alleged failure constitutes ePALS' election of remedies to continue with the contract, with the consequence that ePALS forever waived its ability to sue for damages for breach of contract.

ePALS' affiants state, however, that *before* the merger closed they criticized both the quality and the quantity of Silverfern's work directly and repeatedly to Silverfern. Since this creates a disputed issue of material fact, Silverfern's motion for summary judgment must be denied. Because Silverfern's claim for account stated cannot stand when the amount owed has been disputed—which is precisely what ePALS' affiants testify that they did—Silverfern's claim for account stated must be denied.

ePALS cross-moves for partial summary judgment on Silverfern's claim that it is entitled to attorneys' fees and expenses should it prevail in this action. This issue is well suited for summary judgment, since it involves a pure question of law, namely, the interpretation of unambiguous contractual language. Under New York law, a court will not depart from the so-called "American rule" that each litigant must pay their own way unless it is unmistakably clear that the contractual language provides otherwise. Courts have readily found that boilerplate indemnification clauses, such as the one at issue here, apply only to litigation with third parties but not to litigation between the contracting parties themselves. Therefore, ePALS respectfully requests that the Court dismiss Silverfern's claim for attorneys' fees and expenses should it prevail in this action.

Finally, because Silverfern moved for summary judgment before any discovery has begun, its motion should be denied pursuant to Rule 56(f). Although granting summary judgment before discovery is strongly disfavored in this Circuit and Silverfern has attempted to cut off ePALS' right to disclosure by only the most cursory of argument and supporting papers, ePALS cross-moves under Rule 56(f) in order to preserve its right to discovery.

## BACKGROUND

ePALS, created in 1996, is an industry leader and pioneer of safe email for children and online classrooms in over one hundred countries which currently connects over 100,000 registered classrooms and schools. In 2004, Jonathan Ewert, then ePALS' Chief Executive Officer, began interviewing investment banks in order to help sell the Company. ePALS was a small company that did not have the personnel to devote to such a transaction and Ewert wanted to hire an investment bank to identify potential buyers, target them, negotiate and close the deal. Tom Burchill, a member of the Board of Directors ("BoD") of ePALS since 2002, introduced Ewert to Kiwi Securities Inc., which then on or about December of 2004 changed to its name to Silverfern. Kiwi's pitch to the ePALS BoD was that it was a boutique firm that would give the Company the hands-on attention of its senior bankers as opposed to larger investment banks which would staff the engagement with a junior banker. Kiwi also pitched that that it had numerous contacts in the technology and Internet field. *See* Declaration of Timothy DiScipio dated March 27, 2007 ("DiScipio Decl.") ¶ 3.

Kiwi presented itself as financial professionals who would scrutinize ePALS' financial condition and capitalization structure from top to bottom *before* seeking transaction partners. Clive Holmes, then as now the Chairman and CEO of Kiwi/Silverfern, sent a letter addressing the scope of work that his firm would perform for ePALS. Under the heading "Identifying and

Reviewing Potential Purchaser/New Investors," Holmes wrote: "A full understanding of your objectives and *a total familiarity with ePALS' business and current capital structure* will lead naturally to the development, with your input, of a list of potential purchasers/new investors." Ex A to the Declaration of Jonathan Ewert dated March 26, 2007 ("Ewert Decl."), at 2 (emphasis added).

In January of 2005, the ePALS BoD voted to engage Silverfern.  Because Burchill was then considering an offer of employment from Silverfern, he was declared an interested director and was recused from voting on this issue.  Soon thereafter, Burchill, who remained on the BoD until the closing of the ePALS' merger, accepted the offer and is currently employed by Silverfern.  Bill Harrison, who was at that time a contract employee of Silverfern (*see* Declaration of Michael Cytrynbaum dated March 26, 2007 ("Cytrynbaum Decl.") ¶ 8; DiScipio Decl. ¶ 14), was assigned to the ePALS engagement. On February 14, 2007, Harrison emailed Ewert a document entitled "Preliminary Due Diligence Request List" requesting all of ePALS' important corporate and financial records and documents, apparently to enable Silverfern to achieve "total familiarity with ePALS' . . . current capital structure" as promised in Holmes' September 22, 2004 letter.[2]

In the summer of 2005, ePALS and Silverfern had five meetings with potential acquirers. Most of the work in setting up and arranging these meetings was performed by Tim DiScipio, the co-founder of ePALS and the Chair of the ePALS BoD.  *See* DiScipio Decl. ¶¶ 4, 7.  After no willing buyers emerged, in the fall of 2005 ePALS decided to put its attempt to sell the company on hold and concentrate on growing the business.  There was little to no contact between Silverfern and ePALS until about July of 2006.  *See id.* ¶ 7; Ewert Decl. ¶ 6.

---

[2] A copy of the February 14, 2006 document request is Exhibit A to the Declaration of Victoria McEachern.

Tim DiScipio, who had cultivated relations with In2Books, Inc. ("I2B") for years, received an expression of interest from I2B in making a deal with ePALS in or about May of 2006. *See id.* Silverfern had no role in introducing the parties or bringing about this interest and only became re-engaged in about July of that year. *See id.*; Ewert Decl. ¶ 6. On July 10, 2006, Doug Wallace, the Chief Financial Officer of I2B and Miles Gilburne, an I2B director, made a presentation to the ePALS BoD as to the desirability of entering into a merger of equals between the two companies. The parties began negotiating shortly thereafter and agreed to basic terms in the period of mid-August to mid-September.

The closing of the merger was scheduled for on or about November 1, 2006. On the eve of closing, it came to light that ePALS had serious problems with its capitalization structure in that a large number of shares in the company had been improperly issued. Because these shares were not duly authorized, ePALS was essentially unsellable until the problem was fixed. Although the terms of the deal had been agreed upon, this defect in ePALS' capitalization structure had to be fixed to permit closing. *See* Affidavit of Edmund Fish dated March 27, 2006 ("Fish Aff.") ¶ 5; Affidavit of Douglas Wallace dated March 27, 2007 ("Wallace Aff.") ¶ 3. These unresolved problems gave leverage to certain shareholders and creditors of ePALS to hold up the transaction and demand better terms for themselves individually. *See* Cytrynbaum Decl. ¶ 4. Resolving the issues caused by the unauthorized shares delayed the closing of the merger, which finally closed on December 15, 2006. Ignorant of any problems that would delay the closing, on October 30, 2006, Bill Harrison emailed Ewert an invoice dated October 23 that requested Silverfern's fee be paid upon closing, which Harrison apparently believed was imminent.

5

Immediately after learning of the problems that aborted the closing, ePALS and I2B had numerous meetings to understand what occurred. Despite representations made by Silverfern that the deal could close (*see* Wallace Aff. ¶ 3), Silverfern had failed to familiarize itself with ePALS capitalization structure and financial condition as it had contractually agreed. Edmund Fish, the CEO of I2B, told Bill Harrison that he had been professionally incompetent and grossly negligent in failing to notice that ePALS had issued unauthorized shares. *See* Fish Aff. ¶ 5. Soon after learning of this problem, Michael Cytrynbaum, a director of ePALS, criticized Silverfern's performance on ePALS' behalf. Cytrynbaum had several conversations before the Closing in which he told Harrison that it was Silverfern's duty as the investment bank charged with selling the company to familiarize itself with the company's capitalization structure and to identify any problems that exist, that Silverfern had failed this duty it owed ePALS, and that this failure had damaged ePALS. *See* Cytrynbaum Decl. ¶ 7.

On November 13, 2006, Ed Fish telephonically joined an ePALS board meeting to which he was invited. Fish addressed the problems caused by the unauthorized shares, the fact of their late discovery, and Silverfern's gross negligence in this matter. *See* Fish Aff. ¶ 6. Fish further said that the most basic obligation of an investment banker is to get the capitalization right and that because Silverfern had failed at this most basic duty it had not earned its fees. *See* Cytrynbaum Decl. ¶ 7; DiScipio Decl. ¶ 10; Fish Aff. ¶ 6. Both Bill Harrison and Tom Burchill of Silverfern were present at that meeting.

On November 24, 2006, Tim DiScipio and ePALS director Bob DiScipio had a call with Holmes and Harrison to discuss the ongoing dispute between the parties. On that call, Tim criticized both the quantity and quality of work that Silverfern had performed since the start of the engagement, including that Silverfern had failed to notice the capitalization problems that

had delayed the merger and that this poor performance should be reflected in the fees Silverfern received. *See* DiScipio Decl. ¶¶ 12-13.

ePALS' directors Werner Paulus and Cytrynbaum were tasked with settling the fee dispute with Silverfern. They authorized Fish to speak to Silverfern on ePALS' behalf to settle the dispute. *See* Cytrynbaum Decl. ¶ 10; DiScipio Decl. ¶ 11; Fish Aff. ¶ 7;  On or about December 12, Fish had a telephone call with Holmes to discuss the final remaining issue before the deal closed in a few days, the unsettled fee dispute. On that call, Holmes told Fish that he had never heard anyone say that Silverfern did not do a good job in its ePALS engagement. *See* Fish Aff. ¶ 8. In response, Fish recounted the instance when he criticized Silverfern at the ePALS board meeting in mid-November and in numerous conversations with Harrison. *See id.* Fish made clear that he stood by those criticisms. *See id.* Holmes said that he had not heard of such criticisms and that his partners would have to agree to any reduction in fee. *See id.*

Ultimately, ePALS and I2B were able to resolve the capitalization problems without any help from Silverfern and the deal closed on December 15, 2006. Subsequently, there were a few missed calls and brief exchanges of words between the parties until Silverfern commenced this action on December 21, 2006. Silverfern filed an amended complaint on January 3, 2007 and then its motion for judgment on the pleadings and summary judgment on February 15, 2007. ePALS answered and counterclaimed on January 24, 2007. To date, there have been no document productions, no interrogatory responses, no admissions and no depositions.

## ARGUMENT

### I.  JUDGMENT ON THE PLEADINGS IS INAPPROPRIATE BECAUSE ALL MATERIAL ISSUES OF FACT ARE CONTROVERTED

It is hard to understand why Silverfern moved for judgment on the pleadings. In its Answer, ePALS has denied each and every one of Silverfern's material factual allegations and premature legal conclusions. Every significant legal and factual issue in this case is controverted.

Moreover, ePALS has stated viable claims and defenses on the face of its Answer and Counterclaim. In a Rule 12(c) motion for judgment on the pleadings, ePALS' counterclaims and defenses are entitled to the same deferential standard of evaluation that a plaintiff's complaint is given under a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir. 2001). When considering a motion to dismiss, a court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the non-movant. *Sec. Inv. Prot. Corp. v. BDO Seidman, LLP,* 222 F.3d 63, 68 (2d Cir. 2000). "Dismissal is inappropriate unless it appears beyond doubt that the [non-movant] can prove no set of facts which would entitle him to relief." *Raila v. United States,* 355 F.3d 118, 119 (2d Cir. 2004). As described in **Point V** below, because each of ePALS' claims and defenses states a viable claim for relief, Silverfern's motion for judgment on the pleadings must be denied with respect to them. Finally, because Silverfern's motion relies on evidence outside the pleadings, it must be treated as a motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court." Fed. R. Civ. P. 12(c).

II.    **SILVERFERN'S MOTION FOR SUMMARY JUDGMENT MUST BE DENIED**

A.    **Legal Standard For Summary Judgment**

"Summary judgment is only warranted upon a showing that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450 (2d Cir. 2007) (internal quotation omitted). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006). "As such, the non-movants [] in this case. . . will have their allegations taken as true, and will receive the benefit of the doubt when their assertions conflict with those of the movant." *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) (internal quotation omitted).

It is also well settled that summary judgment is only to be sparingly granted before discovery has commenced. *See Hellstrom v. U.S. Dep't of Veteran's Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in the rarest of cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery." (internal quotation marks and citation omitted)); *Park Ave. Bank, N.A. v. Bankasi*, No. 93 Civ. 1483, 1995 WL 739514, at *1 (S.D.N.Y. Dec. 13, 1995) ("Summary judgment is strongly disfavored prior to the parties having had an adequate opportunity for discovery.").

B.    **ePALS Notified Silverfern Of Its Deficient Performance And Therefore May Maintain A Counterclaim For Breach Of Contract And All Of Its Defenses Are Preserved**

Silverfern's motion for summary judgment rests on Clive Holmes' claim that no one ever criticized Silverfern's performance. *See* Holmes Aff. ¶ 8. ePALS has submitted affidavits which state that multiple criticisms as to the quantity and quality of Silverfern's work were made directly to Silverfern *before* the transaction closed. *See supra* at pp. 6-7; Cytrynbaum Decl. ¶¶ 7,

9

9-10; DiScipio Decl. ¶¶ 9-10, 12-14; Fish Aff. ¶¶ 5-6, 8.  Because Silverfern was provided with

notice of its non-performance, ePALS may now pursue an action for Silverfern's breach of

contract and recover damages.  "A non-breaching party who elects to continue to perform a

contract may still sue later and recover damages solely for the breach of the agreement, provided

that it gives notice of the *breach* to the breaching party."  *Times Mirror Magazines, Inc. v. Field*

*& Stream Licenses Co.*, 103 F. Supp. 2d 711, 736 (S.D.N.Y. 2000) (citing *ESPN, Inc. v. Office*

*of Com'r of Baseball*, 76 F. Supp. 2d 383, 387 (S.D.N.Y. 1999) ("When a party materially

breaches a contract, the non-breaching party . . . can continue the contract and recover damages

solely for the breach.")).[3]

The sole case that Silverfern's motion relies on, *Lazard Frères & Co., v. Crown Sterling*

*Mgmt., Inc.*, 901 F. Supp. 133 (S.D.N.Y. 1995), is inapposite.  In that case, an investment bank,

Lazard, sued its client, Crown, for failing to pay its fee.  The parties' contract provided that once

a certain transaction closed, Lazard's fee was automatically due regardless of its contributions to

the transaction.  The court granted summary judgment to Lazard finding that Crown had failed to

notify Lazard *before* the transaction closed that its performance was unsatisfactory.  *Id.* at 136.

In *Lazard*, the governing contract explicitly stated that Lazard would get paid if certain

transactions occurred "regardless of whether [Lazard] is responsible for arranging said events"

and  that Lazard's "fees shall be determined as if [Lazard] had actually arranged said

transactions." 901 F. Supp. at 134.  By way of contrast, here the first sentence of Section 2

("Fees") of the Agreement states: "As you know, our fees for services in connection with a

client's sale. . . depend on the outcome of the assignment and are designed to reflect our

contribution to a major corporate objective."  Unlike the *Lazard* contract, Silverfern's contract

does not automatically entitle Silverfern to get paid upon a transaction's occurrence regardless of

---

[3] The parties cite to New York law pursuant to the choice of law provision (Section 9) in the Agreement.

circumstance. Rather, this language states that Silverfern's fees should be commensurate with its "contribution"—or lack thereof—in its engagement. And, in fact, on December 12, 2006, Holmes agreed with Fish's statement that given all the circumstances surrounding the transaction and what Silverfern did on that engagement, Silverfern's fees were not commensurate with its performance. *See* Fish Aff. ¶ 8. Holmes had little choice but to agree. In 2005, its performance consisted of sending out a couple of dozen letters and a similar number of phone calls, which resulted in no meeting for in-person presentation of ePALS to potential suitors. Five such meetings did occur, but all were the result of efforts by Tim DiScipio of ePALS, not of Silverfern. *See* DiScipio Decl. ¶ 4. Silverfern also botched a critical negotiation with a shareholder as the I2B deal proceeded to closing for which it was criticized (*see* DiScipio Decl. ¶ 9), and as discussed at length herein, failed to identify the capitalization problems.

The *Lazard* Court's key factual finding was that no affiant for Crown stated that "he or any other representative considered Lazard in default as of February 1994, nor does Crown indicate that it communicated to Lazard its dissatisfaction prior to the 'disengagement' letter of April 1994." *Id.* at 136. As recounted above and as stated in more detail in the affidavits themselves, here ePALS' affiants have definitively stated that they communicated their "dissatisfaction" with Silverfern prior to the closing. *See* Cytrynbaum Decl. ¶¶ 7, 9; DiScipio Decl. ¶¶ 9-10, 12-14; Fish Aff. ¶¶ 5-6, 8.

Nothing in the Agreement requires that notice of breach must be written rather than oral. Because ePALS provided notice to Silverfern of its breaches before the transaction closed as evidenced by ePALS' supporting affidavits, ePALS preserved its ability to sue for damages for

breach of contract and has similarly preserved all of the defenses which it has asserted.

Therefore, the Court must deny Silverfern's motion for summary judgment.[4]

**III.**    **SILVERFERN'S CLAIM FOR ACCOUNT STATED MUST BE DENIED BECAUSE ePALS MADE TIMELY OBJECTION TO SILVERFERN'S INVOICES**

Silverfern's claim for an account stated in Count Two of its Amended Complaint is

fatally deficient because ePALS has produced evidence that timely objections were made to the

amount that Silverfern invoiced.  A valid claim for an account stated includes either an express

or implied assent to the account that has been rendered.  But, there can be no account stated

"where any dispute about the account is shown to have existed." *Abbott, Duncan & Wiener v.*

*Ragusa*, 214 A.D.2d 412, 413 (1st Dep't 1995) (finding defendants' affidavits asserting that they

disputed the amount billed as well as the quality of the work performed sufficient to defeat

plaintiff's claim for summary judgment); *see also Bendavid v. Bendavid*, No. 97 Civ. 6758, 1997

WL 737678, at * 3 (S.D.N.Y. Nov. 28, 1997) ( "Where, as here, there is evidence that the

defendant disagrees on the amount or fact of a debt, a claim for an account stated is properly

dismissed."); *Erdman Anthony & Assocs., Inc. v. Barkstrom*, 298 A.D.2d 981, 982 (4th Dep't

2002) (upholding denial of summary judgment motion because "the court properly determined

that defendants' oral objections to the purported account stated were sufficient to rebut any

inference of an implied agreement to pay the stated amount").

In his affidavit at paragraph 10, Holmes makes general allegations that Jonathan Ewert

assured him that ePALS would pay Silverfern its fees. Holmes Aff. 10.[5]  Holmes, however,

provides only one specific instance of such assurance, set forth in his affidavit at paragraph 11.

---

[4] As discussed in **Point VII**, *infra*, the Court should also deny summary judgment under Rule 56(f) because defendant has had no opportunity to take discovery.

[5] Holmes also makes general reference to George Ledwith. *See* Holmes Aff. ¶ 10.  Ledwith states that he never had the authority, nor represented to anyone that he had the authority, to speak on ePALS's behalf to Silverfern. *See* Declaration of George Ledwith ¶ 2.

Holmes claims in his affidavit that in a letter to him dated December 1, 2006, Ewert "specifically acknowledged the obligation to Silverfern (listed on the attachment), and even 'certif[ied] that' the amounts listed on the attachment were 'factually correct as of the date of this letter.'" Holmes Aff. ¶ 11, quoting Ex. G. Holmes intentionally misreads Ewert's December 1, 2006 letter and its Attachment A. In fact, while Attachment A to the afore-mentioned lists Silverfern's fee balance as $550,000 (merely repeating the fee per the contract) Attachment A states that the net amount payable to Silverfern at closing is "TBD," or to be determined. Ewert confirms the plain meaning of the language of this letter and its attachment: "In that correspondence I did not agree on behalf of ePALS to pay Silverfern $550,000—in fact in the schedule endorsed in my letter dated December 1, 2006 to Clive Holmes of Silverfern, I listed the Net Amount Payable at Closing to Silverfern as 'TBD,' i.e., 'To Be Determined.'" Ewert Decl. ¶ 7.

ePALS has produced evidence Silverfern was apprised on many occasions well before the transaction closed that its performance was inadequate and that its fees were in dispute. *See* Cytrynbaum Decl. ¶ 9; DiScipio Decl. ¶¶ 9-10, 12-14; Fish Aff. ¶¶ 6, 8. Therefore, Silverfern's claim for an account stated must be denied.

## IV.    SILVERFERN'S CLAIM FOR ATTORNEY'S FEES MUST BE DISMISSED

Under New York Law, courts will not construe an indemnification clause to require the loser to pay attorneys' fees in litigation between the contracting parties unless "unmistakably clear" contractual language requires that result *Hooper Assocs. v. AGS Copmuters, Inc.* ("*Hooper*"), 74 N.Y. 2d 487, 492, 549 N.Y.S.2d 365 (1989). *Accord Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20-21 (2d Cir. 1996) ("Under New York law, the intent to provide for counsel fees as damages for breach of contract must be 'unmistakably clear' in the language of the contract."); (citing *Hooper*); *Coastal Power Int'l, Ltd. v. Transcontinental Capital Corp.,* 182 F.3d 163, 165 (2d Cir. 1999) ("it is particularly important under New York

law" that "the language of the agreement be 'unmistakably clear' regarding whether the parties

to the agreement intend provisions of attorneys' fees to apply to disputes among themselves.")

(citing *Hooper*). Because the *Hooper* test requires a court to determine if contractual language is

"unmistakably clear" on its face, the Court may adjudicate this dispute now as a matter of law.

Because the indemnification clause here at issue here does not contain such "unmistakably clear"

language, Silverfern's claim for attorneys' fees must be dismissed.

The parties' Letter Agreement provides in Section 3 ("Expenses") that legal fees incurred

by Silverfern will require the prior written consent of ePALS "except as otherwise contemplated

by Section 8 below." Section 8 ("Indemnity and Contribution") of the Agreement provides:

> ePALS agrees to indemnify and hold harmless Silverfern and its
> affiliates . . . to the full extent lawful against any and all claims,
> losses, damages, liabilities, costs and expenses as incurred
> (including all reasonable fees and disbursements of counsel. . .) . . .
> arising out of or related to any actual or proposed Transaction or
> Silverfern's engagement hereunder[.]

Silverfern claims in its brief that it is entitled to attorneys' fees "under the express terms of the

agreement (¶ Sections 3 and 8 thereof)." Pl. Mem. at 5. Silverfern fails to cite a single case in

support of this proposition, which is contrary to well established precedent.

The New York Court of Appeals decision in *Hooper*, which has been often cited on this

question, is instructive. There the plaintiff sought indemnification from defendant for legal fees

associated with plaintiff's claims against the defendant. The indemnification provision at issue

there, similar to the one here, obligated defendant to "indemnify and hold harmless [plaintiff] . . .

from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel

fees" arising in the connection with the plaintiff's performance of certain services. 74 N.Y. 2d at

492. The Court of Appeals found that: "The clause in this agreement does not contain language

clearly permitting plaintiff to recover from defendant the attorney's fees incurred in a suit against

14

defendant. On the contrary, it is typical of those which contemplate reimbursement when the indemnitee is required to pay damages on a third-party claim." *Id.* The court added that such general language does not "support an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract." *Id.* Finally, the court noted that its interpretation is supported "by other provisions in the contract which unmistakably refer to third-party claims" and have no logical application to litigation between the contracting parties, such as provisions which require the indemnitee to promptly notify the indemnitor of any claim or litigation and which provide that the indemnitor may assume the defense of the same. *Id.* 492-93.

The *Hooper* "unmistakably clear" test has been widely followed by courts in denying claims—on summary judgment and on motions to dismiss—for indemnification for attorneys' fees in suits between the contracting parties with generic indemnification clauses similar to the one here. *See Bourne Co. v. MPL Commc'n, Inc.*, 751 F. Supp. 55, 57-58 (S.D.N.Y. 1990) (following *Hooper* and granting summary judgment that indemnification is not available); *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 955 F.Supp. 203 (S.D.N.Y. 1997) (same) *Sequa Corp. v. Gelmin, GBJ*, 851 F.Supp. 106 (S.D.N.Y. 1994) (dismissing claim for indemnification); *Bridgestone/Firestone*, 98 F.3d at 21 (dismissing claim for attorneys' fees where provision read: "The [defendant] shall indemnify and save [plaintiff] harmless from any and all claim, demands, or causes of action, any and all costs or expenses, including attorneys' fees, that may be asserted due or arising out of [defendant's] [contractual] activity").

Under the foregoing precedent, general language of indemnity will not suffice to shift the burden of paying attorneys' fees in a suit between parties to the contract. To achieve this result, additional contractual language must make clear the parties' intention. To the contrary, because certain language in Section 8 makes sense only in the context of a suit between Silverfern and a

non-party to the contract, it is far from "unmistakably clear" that the indemnification provision was meant to apply to a suit between ePALS and Silverfern.

*First*, the third and final paragraph of Section 8 provides that:

> Neither party will, without the prior written consent of the other party, settle any litigation relating to Silverfern's engagement hereunder wherein the other party is a named defendant unless such settlement includes . . . [a] release of such other party and its affiliates. . . with respect to all claims asserted in such litigation[.]

This provision has no logical application to this suit—how could either Silverfern or ePALS settle their underlying disputes with each other without the other's consent?[6]

*Second*, the penultimate sentence in the first paragraph of Section 8 also has no logical application to litigation between the parties over fees. That sentence provides that if the "foregoing indemnity is unavailable or insufficient to hold Silverfern. . . harmless, then ePALS" will contribute to the amount paid by Silverfern in proportion to the "relative benefits" received by and "fault" of ePALS and Silverfern in connection with the matters on which such losses arise. It is difficult to conceive of how this provision which requires ePALS to make some proportionate contribution to Silverfern's losses which are not indemnified can apply to this or any other litigation in which the parties are adverse.

Because these provisions "unmistakably refer to third-party claims" and the indemnification language as a whole does not evince an "unmistakable intention" to indemnify, the Court must summarily dismiss Silverfern's claim to be contractually entitled to attorneys' fees in this action. *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199-200 (2d Cir. 2003) (internal quotations and citations omitted).

---

[6] But if construed as being applicable to this suit, this provision's language that a precondition to one party's settling any litigation is that the counter-party must be released from "all claims asserted in such litigation" would suggest that Silverfern and ePALS contracted so as not to allow them to agree on any partial settlement of claims asserted in litigation between them, an absurd result.

16

**V.   ePALS HAS STATED VALID CLAIMS THAT SILVERFERN IS LIABLE FOR ITS GROSS NEGLIGENCE.**

   **A.   Silverfern Breached The Express Terms Of The Contract**

   The parties contracted that Silverfern would familiarize itself with ePALS' financial condition and capitalization structure, yet Silverfern failed to perform according to the express terms of the contract.  Reflecting investment bankers' common practice in this type of engagement, Holmes wrote in a letter addressing the scope of work that his firm would perform for ePALS that: "A full understanding of your objectives and *a total familiarity with ePALS' business and current capital structure* will lead naturally to the development, with your input, of a list of potential purchasers/new investors." Ex A to Ewert Decl. (emphasis added). The language of the Agreement indicates that Silverfern would indeed perform these services. Section 1 of that Agreement specifies the "Services to be Rendered."  There, Silverfern agreed that it would, *inter alia*: "*familiarize* itself . . . with the business, operations, financial conditions and prospects of ePALS;" (¶ a) (emphasis added); advise ePALS in "developing and implementing a general strategy for accomplishing a Transaction." (¶ e.)  However, Silverfern failed to familiarize itself with the most basic financial condition and capitalization structure of ePALS—who owns the company and whether that ownership can readily be sold or is defective and in need of repair before seeking a deal partner.  Any strategy for accomplishing a transaction on behalf of ePALS is doomed from the start if the company is in no condition to be sold.

   Despite its promises, Silverfern failed to notice the serious problems with ePALS' capitalization structure which led to a delay in the merger.[7]  Silverfern's evidence that it has performed under the contract consists entirely of the mere fact that the transaction closed,

---

[7] Silverfern began to research ePALS' capital structure in its February 14, 2005 Preliminary Due Diligence Request List (Ex A. to McEachern Decl.) which sought, *inter alia*, ePALS' corporate book, bylaws, operating and contribution agreements, capitalization table, board minutes, and shareholder agreements.

coupled with self-serving generalizations by Holmes—who did no substantive work on the engagement other than asking for fees. *See* Holmes Aff. ¶ 5, Pl.'s 56.1 Statement ¶ 3. Silverfern omits mention of the delay in closing, despite the fact that Cytrynbaum, Tim DiScipio and Fish told Silverfern that it was at fault in missing the problems that led to that delay. *See* Cytrynbaum Decl. ¶ 7; DiScipio Decl. ¶¶ 10, 12-13; Fish Aff. ¶¶ 5-6, 8. It is undisputed that the transaction closed, but it closed in spite of Silverfern's breach and not because of any performance on Silverfern's part.

Because Silverfern's failure to perform resulted in a six-week delay in the merger, this breach was material going to the root of ePALS' purpose behind entering into the contract. *See, e.g., Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F.Supp.2d 711, 731 (S.D.N.Y. 2000) ("a breach is material if it defeats the object of the parties in making the contract and deprives the injured party of the benefit that it justifiably expected") (internal quotation omitted) (collecting cases); *Wechsler v. Hunt Health Sys., Ltd.*, 330 F.Supp.2d 383, 414 (S.D.N.Y. 2004) (same).

## B.   Silverfern Materially Breached Its Duty Of Good Faith In Performing The Contract

To the extent that the Agreement provided Silverfern with discretion in how it would fulfill its contractual obligations, that discretion is limited by the duty of good faith that is implied by New York law into every contract. For example, while Section 1(a) of the Agreement states that: "Silverfern will familiarize itself *to the extent it deems appropriate and feasible* with the business, operations, financial condition and prospects of ePALS," (emphasis added) this did not grant Silverfern unfettered license. "Rather, the subjective standard is circumscribed by an implied covenant of good faith and fair dealing." *Mickle v. Christie's, Inc.*, 207 F. Supp. 2d 237, 249 (S.D.N.Y. 2002). "[T]he good faith performance of a contract

emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party while bad faith may be overt or may consist of inaction[.]" *Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991) (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 205, cmts. a, d). Among the types of bad faith which have been recognized in judicial decisions are, "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance. . ." *Id.* To the extent that Silverfern exercised its discretion to decide that it did not have to do anything to determine if ePALS was in saleable condition, Silverfern acted in bad faith. Silverfern's "slacking off" was unfaithful to the agreed purpose behind the contract and unfaithful to the expectations that it knew ePALS had. Moreover, Silverfern's half-hearted performance in 2005 as detailed in Tim DiScipio's Affidavit (*see* ¶¶ 4-7), embodies "slacking off" and cost ePALS a wasted year in its quest for a sale.

### C.   Bill Harrison Breached His Assumed Duty Of Ensuring That The Capitalization Of ePALS Was In Order

By working on, presenting and verifying issues concerning the capitalization structure of the merged company, Harrison assumed the duty of ensuring that the capitalization structure of ePALS was in sound shape and ePALS relied on Harrison to fulfill this duty. As an employee and agent of Silverfern, Harrison's gross negligence in failing to properly fulfill his assumed duty and the liability for the damages he caused is imputed to Silverfern. The New York Court of Appeals has held that "an assumed duty. . . may arise once a person undertakes a certain course of conduct upon which another relies . . . Put differently, the question is whether defendant's conduct placed plaintiff in a more vulnerable position than plaintiff would have been in had defendant done nothing " *Heard v. City of New York*, 82 N.Y.2d 66, 72, 623 N.E.2d 541, 544 (1993) (internal quotations and citations omitted); see also *Tavarez v. Lelakis*, 143 F.3d 744, 747 (2d Cir. 1998) (assumed duties arise where "(1) the failure to exercise due care increases the

risk of harm to the plaintiff or (2) the harm is suffered because of the plaintiff's reliance on the undertaking"). Here, the evidence shows that Harrison was intimately involved in the capitalization structure of both ePALS and of the merged company. For example, the affidavit of Doug Wallace describes how Harrison provided capitalization tables and analysis of ePALS to I2B on many occasions. *See* Wallace Aff. ¶¶ 3, 7-8. In an email exchange with Ewert beginning on November 28, 2006, Harrison wrote that while he could not state whether the pro forma capitalization was correct in writing because ePALS was not paying for a formal opinion letter he would verbally offer his opinion whether it was correct. In fact, Harrison often represented that the capitalization numbers were correct. *See* Wallace Aff. ¶ 7. Further evidence of Harrison's assumed duty is found in the ePALS board minutes of November 28, 2006, in which Harrison verified that the share exchange mechanics for the proposed transaction were correct.[8]

### D. Silverfern Is Liable For Its Breach Of The Professional Duty Of Due Care It Owed ePALS

Silverfern owed ePALS a duty of due care because it portrayed itself as a financial and business professional in advising and assisting mergers, a duty it breached through its gross negligence in failing to notice the serious problems in ePALS' capitalization structure. In essence, this is a claim for professional malpractice. The New York Court of Appeals has held that a "legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship. Professionals ...may be subject to tort liability for failure to exercise reasonable care... In these instances, it is policy, not the parties' contract, that gave rise to a duty of due care." *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551-52, 593 N.E.2d 1365, 1369

---

[8] "Mr. Ewert then asked Bill Harrison of Silverfern to provide commentary with respect to how the exchange of shares contemplated by the Exchange Agreement would take place. Mr. Harrison stated that he had discussed the exchange mechanics with Doug Wallace from In2Books and that it was their opinion that the mechanics contained in the Merger Agreement were accurate and correct." 11/28/2006 Minutes of ePALS Board of Directors at 2. McEachern Decl., Ex. B.

(1992); *William Wrigley, Jr. Co. v. Waters*, 890 F.2d 594, 602 (2d Cir. 1989) ("It is well settled under New York law that negligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract. . . [B]ecause defendants held themselves out as experts. . . they were required to act with due care and thus their liability arises out of a duty imposed by law.")[9]; *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 18 (2d Cir. 2000) (recognizing economic recovery for "liability for the violation of a professional duty" so as not to "bar recovery in many types of malpractice actions").

It is undisputed that Silverfern presented itself to ePALS as being able to provide expert advice and handling of all aspects of the contemplated transaction for which Silverfern was hired, as indicated by the scope of work letter which Holmes sent to Ewert on September 22, 2004. Ironically, Holmes also wrote in that letter: "Our experience has shown time and again that anticipation and solution of problems between the time the agreement is reached among the parties and the closing materially increases the chances of bringing the transaction to a timely and ultimately successful conclusion." Ex. A to Ewert Decl., at 4.   ePALS relied on Silverfern's professionalism to shepherd the deal through completion, including that Silverfern would understand ePALS' capitalization structure and promptly identify any problems in it that could threaten a transaction.  This is the most basic professional judgment that investment bankers are expected to exercise when they are engaged to sell a company.  *See* Cytrynbaum Decl. ¶ 6, Fish Aff. ¶ 6.  Furthermore, once the problems came to light, Silverfern did nothing to help resolve them.  Therefore, Silverfern is liable for its gross negligence in utterly failing to exercise any due care that it owed to ePALS as a professional.

---

[9] This legal principle refutes the vacuity of Silverfern's attempt to transform ePALS' alleged failure to give notice of breach of contract into a basis for denying all of ePALS' claims.  That is, assuming *arguendo* that ePALS could not pursue its breach of contract claim, it could still recover on its claims that sound in tort.

**VI.    ePALS IS ENTITLED TO RECOUPMENT FOR ITS DAMAGES CAUSED BY SILVERFERN**

Assuming *arguendo* that Silverfern is entitled to some of the fees it claims, what portion of those fees, if any, Silverfern should receive cannot be determined until it is balanced against the damages that Silverfern has caused.[10] ePALS has suffered at least four types of damages caused by the six-week delay in closing: *First*, ePALS suffered higher transaction costs in that it had to pay its professionals more than anticipated to fix the capitalization problems in an expedited fashion. *Second*, ePALS suffered lost sales during a key period in the fall when educators make purchases for the January semester and for the following school year. *Third*, ePALS suffered higher costs in not being able to realize cost efficiencies for six weeks because it had to maintain duplicative facilities and personnel until the merger was effected. *Fourth*, fixing some of the problem from the unauthorized shares resulted in the greater dilution of shares that ePALS stockholders would have in the merged company. *See* Cytrynbaum Decl. ¶ 5; DiScipio Decl. ¶ 9; Wallace Aff. ¶¶ 4-6.

In its Answer and Counterclaim ePALS asserted the affirmative defense of recoupment because it is likely to be proven at trial that ePALS suffered as much as—if not more than—what Silverfern claims it should be paid and therefore Silverfern is only entitled to payment for the balance of the competing claims. "Recoupment means a deduction from a money claim through a process whereby cross demands arising out of the same transaction are allowed to compensate one another and the balance only to be recovered." *In re McMahon*, 129 F.3d 93, 96 (2d Cir. 1997) (internal citations omitted).   Here, Silverfern's claim for payments and ePALS' claims for damages clearly both arise out of the same transaction, namely, the services that Silverfern

---

10 "As a general rule, every breach of contract gives rise to a claim for damages." *Cary Oil Co., Inc. v. MG Refining and Marketing, Inc.*, 90 F.Supp.2d 401, 408 (S.D.N.Y. 2000) (citing Restatement (Second) Of Contracts § 236, cmt. a (1981)).

(mis)performed on behalf of ePALS. Therefore, ePALS is entitled to assert this defense. "Recoupment permits a transaction which is made the subject of a suit by a plaintiff to be examined in all of its aspects, and judgment to be rendered that does justice in view of the one transaction as a whole." *In re Malinowski*, 156 F.3d 131, 133 (2d Cir. 1998) (internal citation omitted).

Courts have found that the defense of recoupment precludes the granting of summary judgment to a claimant seeking money when there is an opposing monetary claim that has arisen from the same contract so as to allow a court or jury to address the transaction as a whole. *See, e.g.*, *Enrico & Sons Contracting, Inc. v. Bridgemarket Assocs.* 252 A.D.2d 429, 675 N.Y.S.2d 351, 353 (1st Dep't 1998) ("The recoupment claims goes to the heart of the parties' bargain and, indeed, is akin to a defense of lack or failure of consideration. As such, it is inextricably linked to the issues underlying plaintiff's breach of contract claims, and its assertion, once permitted, ought to have precluded the grant of summary judgment as to those claims of contractual breach."); *Gateway Co., Inc. v. Officemax, Inc.*, 176 F. Sup. 2d 211 (S.D.N.Y. 2001) (denying plaintiff summary judgment on claim to payment because of unresolved factual issues as to the amount of recoupment defendant might be entitled). Similarly, here Silverfern's failure to notice the defects in ePALS' capitalization structure goes to "the heart of the parties' bargain." It would be both inefficient and unfair to have ePALS pay Silverfern today what Silverfern will have to repay ePALS tomorrow. Therefore, Silverfern should not receive any payment for what it alleges that ePALS owes until after the trier of fact has the opportunity to view the transaction as a whole and balance whatever amount Silverfern may be owed with the harm it caused, and that ePALS may recoup.

VII.  **BECAUSE NO DISCOVERY HAS BEEN TAKEN, THE COURT SHOULD DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT UNDER FRCP 56(f) AND ORDER THAT DISCOVERY PROCEED**

As indicated above, ePALS has denied Silverfern's allegations and has stated valid defenses and claims for relief against Silverfern. At this early stage of the litigation, ePALS does not have all the facts it needs to prove and dispute such claims, yet ePALS has a reasonable belief that discovery from Silverfern will produce triable issues of fact. Therefore, the Court should deny Silverfern's motion for summary judgment and grant ePALS' cross-motion for discovery.

Rule 56(f) provides: "[s]hould it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit . . . discovery to be had or may make such other order as is just." "Rule 56(f) is a safeguard against premature grants of summary judgment and should be applied with a spirit of liberality." *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 665 (S.D.N.Y. 2000). Thus, an affidavit that asserts that plaintiff is "presently unable to present facts to support [its] opposition to [summary judgment] since no discovery has yet been had" regarding its claim is sufficient. *Argus Inc. v. Eastman Kodak Co.*, 552 F. Supp. 589, 600 (S.D.N.Y. 1982).

A core aspect of Rule 56 is that it is predicated upon the parties' opportunity to gather and present competing evidence. The Rule states that summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Second Circuit has often stated, "summary judgment should only be granted [i]f *after discovery*, the

24

nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Hellstrom*, 201 F.3d at 97 (internal quotation marks omitted). ePALS' Rule 56(f) affidavit explains why discovery taken from Silverfern can reasonably be expected to create material issues of fact, and we respectfully refer the Court to that affidavit.

## CONCLUSION

For the reasons stated herein, the Court should deny Silverfern's motion for judgment on the pleadings and deny Silverfern's motion for summary judgment. The court should grant ePALS' cross-motions: (1) for partial summary judgment that Silverfern is not contractually entitled to recover attorneys' fees and costs in this action and (2) for discovery pursuant to Rule 56(f), and grant to ePALS such other and further relief as it deems appropriate.

Dated: New York, New York
      March 27, 2007

**Respectfully submitted,**
**SCHLAM STONE & DOLAN LLP**

By: _____
      James C. Sherwood (JS-6391)
      Andrew S. Harris (AH-1014)
      26 Broadway
      New York, New York 10004
      (212) 344-5400 (telephone)
      (212) 344-7677 (facsimile)

*Attorneys for Defendant ePALS Classroom*
*Exchange, Inc.*