UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------X
THE SILVERFERN GROUP, INC.,                      :
                                                 :
                    Plaintiff,                   :        Case No. 06 CV 15404 (LBS)
                                                 :
         v.                                      :
                                                 :        DECLARATION OF
ePALS CLASSROOM EXCHANGE, INC.,                  :        TIMOTHY DiSCIPIO
                                                 :
                    Defendant.                   :
-----------------------------------------------------------X
```

Pursuant to 28 U.S.C. § 1746 TIMOTHY DiSCIPIO hereby declares :

1.      I am a director and Chief Marketing Officer of ePALS, Inc, the entity formed by the merger of In2Books ("I2B") and ePALS Classroom Exchange, Inc. ("ePALS") on December 15, 2006. I submit this declaration based on personal knowledge and submit it in opposition to plaintiff's motion for judgment on the pleadings and for summary judgment.

2.      I was one of the founders of ePALS. Before the merger closed on December 15, 2006, I was a member of the Board of Directors of ePALS and was its Chairman. Until the fall of 2006, I was also Chairman of the Board of ePALS.

3.      In January, 2005, the Board of ePALS approved the hiring of Silverfern as investment bankers to assist ePALS in selling the company. In making the hiring decision, I was particularly impressed with Silverfern's claimed expertise in identifying prospective dotcom and other technology acquirers, based both on its promised extensive analysis of ePALS and potential partners and also on Silverfern's many well-placed contacts at companies who were potential merger partners. They had indicated a transaction for a client that had just sold to Yahoo. Silverfern also promised that if we retained Silverfern we would receive attentive

service from a senior investment banker, in contrast to larger investment banks, which would fob us off on a junior banker. They assigned Bill Harrison to work on the deal.

4.    In 2005, Silverfern drafted a "teaser," which was a short-form description of ePALS' business, and sent letters to 24 prospective suitors. Only five companies invited ePALS to make a management presentation; of those five invitations, all were the result of leads that were generated by me, and not by Silverfern.

5.    In September, 2005, Silverfern told us that ePALS was not generating enough income to interest another company in buying it, and recommended that it cease marketing itself and try to improve its financial results. I immediately disagreed with Bill Harrison on the phone call, and indicated that that general viewpoint applying to all five companies was not true at all, and that I'd heard specifically from each one of them, as they were close industry contacts, in terms of their interest and issues, and that our financial results were not the issue at all.   The issue was that Silverfern had failed to adequately present what ePALS was about and its growth prospects.

6.    In my view, there were a variety of reasons for lack of success in marketing the company, but in great part it resulted from Silverfern's failure to adequately represent ePALS, including by broadening the number of prospects / suitors to whom we could market ePALS' strengths in person, an area in which it had claimed to have expertise, and from the manner in which ePALS was represented by Silverfern.

7.    In fact, I believe that Silverfern did not use  any of their list of contacts to help ePALS in substantive discussions; rather, as I recall, I generated all of the leads that resulted in face to face meeting about the potential acquisition of ePALS. Beginning before Silverfern was retained, I had kept up communications with I2B about ePALS and its potential. In May and

June, 2006, ePALS and I2B talked in earnest about a merger, and reached oral agreement. Once that oral agreement was reached between myself, Jonathan Ewert (then the Chief Executive Officer of ePALS) and Miles Gilburne (a director of I2B), in or about July, 2006, Jonathan, asked Silverfern to become involved again to act as an investment banker and make this transaction happen.

8.     The parties scheduled a closing date for no later than November 1, 2006, a date early enough so the merged company would be able to sell its combined product line to schools buying for the January semester.

9.     In October, 2006, the ePALS' Board was conducting delicate negotiations with a shareholder and creditor concerning his conversion of debt to equity. The company's offer to the shareholder was turned down. Without waiting for the company and its board to strategize on next steps, or to get that shareholder/creditor's feedback about the previous pending offer, and without obtaining permission from the Board to do so, Bill Harrison of Silverfern communicated a substantially higher offer to the shareholder/creditor. This mistake raised the price of settlement with this shareholder/creditor, delayed closing, cost ePALS money, and caused Board members to criticize Harrison for his misconduct at that time.

10.     Shortly before the anticipated November 1, 2006 closing date, ePALS discovered that it could not show that a substantial amount of ePALS stock that had been issued to its shareholders had been duly authorized by ePALS' Board. I2B refused to proceed with the merger until this problem was corrected. Ed Fish, the Chief Executive Officer of I2B, pointed out at an ePALS Board meeting that Silverfern as the investment banker should have recognized this problem sooner, and should bear some of the costs resulting from this mistake.

11.    Even before the unauthorized stock issue was disclosed, ePALS was intent on reining in the professional fees for this transaction. ePALS directors Michael Cytrynbaum and Werner Paulus together with Ed Fish were delegated to settle the Silverfern claim for fees.

12.    I recall a telephone conversation a few weeks before the December 15, 2006 closing date in which I criticized Silverfern's performance to Clive Holmes, the Silverfern CEO. My brother, Bob DiScipio, who was an ePALS director, was also on the call, as was Bill Harrison. I complained that I and others at ePALS did most of their work, setting up every meeting with potential investors. I complained that I, not Silverfern, brought I2B to the table after nurturing that relationship for years, and that Silverfern got involved only after the parties had reached verbal agreement and it was a done deal. I complained about the results of Silverfern's investment banking: the oral agreement was for a merger of equals, and the deal wound up with ePALS' shareholders owning only 30% of the merged entity. I also complained that Silverfern had failed to notice the capitalization problems that delayed the closing.

13.    In that conversation, Clive Holmes stated that this was the first time he had heard anyone criticize the quantity and quality of Silverfern's work and stated his belief that Silverfern would receive its fees. I responded that in light of the circumstances their fees would need to be reworked.

14.    In a conversation I had with Bill Harrison before the December 15, 2006 closing, I complained to Bill that in light of the fact that I did most of the prospecting work including communication, strategy and travel to market ePALS, his position that Silverfern would not compromise its claim for fees was outrageous. He also indicated in this conversation that he was a consultant to Silverfern, not an employee.

15.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 27, 2007

Timothy DiScipio