UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
THE SILVERFERN GROUP, INC.,        :
        :
        Plaintiff,        :    Case No. 06 CV 15404 (LBS)
        :
        v.        :
        :    **DECLARATION OF**
ePALS CLASSROOM EXCHANGE, INC.,    :    **JONATHAN EWERT**
        :
        Defendant.        :
-------------------------------------------------------------X

        Pursuant to 28 U.S.C. § 1746, **JONATHAN EWERT** hereby declares:

    1.    I was the Chief Executive Officer of ePALS Classroom Exchange, Inc., the defendant in this case (hereinafter referred to as "ePALS"). I make this declaration based on my personal knowledge in opposition to plaintiff's motion for judgment on the pleadings or in the alternative for summary judgment against ePALS.

    2.    I became CEO of ePALS in 2003. In the fall of 2004, I worked on hiring an investment banking firm to assist ePALS in identifying and reviewing a company that would be a good acquirer or merger partner for ePALS. Among the investment banking firms I considered was Kiwi Securities Inc., which later changed its name to Silverfern.

    3.    On September 22, 2004, the Chairman and CEO of Kiwi, Clive Holmes, sent me a "scope of work and fee proposal relating to the services which Kiwi will provide to ePALS Classroom Exchange, Inc. ('ePALS') during our engagement by ePALS on a sale/strategic alternatives assignment." A true copy of that proposal is annexed hereto as Exhibit A.

4.      In or about January, 2005 ePals retained Silverfern (formerly known as Kiwi) as its investment bankers.

5.      During the period from January 2005 to September 2005, efforts were made to identify prospective merger partners for ePALS.  Those efforts resulted in about five meetings with prospective purchasers of ePALS, but no firm offers.

6.      In or about April or May, 2006, Tim DiScipio, the Chairman and one of the founders of ePALS, solicited and received an expression of interest in ePALS from In2Books ("I2B").  Silverfern played no role in making this introduction.  I2B and ePALS s discussed an acquisition whereby the stockholders of I2B and ePALS would each own stock in the surviving entity.  Silverfern became reinvolved with ePALS in or about July, 2006.

7.      In late November and early December 2006, I wrote certain letters to Silverfern in an effort to negotiate a reduction of their fee.  The terms of the letters I wrote were dictated by Silverfern as a pre-condition to even discussing their fees.  In that correspondence I did not agree on behalf of ePALS to pay Silverfern $550,000 – in fact, in the schedule endorsed in my letter dated December 1, 2006 to Clive Holmes of Silverfern (annexed as Ex. G to the affidavit of Clive Holmes dated February 15, 2007), I listed the Net Amount Payable at Closing to Silverfern as "TBD," *i.e.*, "To Be Determined."

8.      I declare under penalty of perjury that the foregoing is true and correct. Executed on March 26, 2007

JONATHAN EWERT

Exhibit A

**KIWI SECURITIES INC.**

MERGERS & ACQUISITIONS                   NEW YORK • LONDON                   MEMBER: NASD

<u>Via Email</u>

September 22, 2004

Mr. Jonathan Ewert
Chief Executive Officer
ePALS Classroom Exchange, Inc.
70 Soundview Drive
Easton, CT 06612

Dear Jonathan:

**Introduction**

You have asked us to provide you a scope of work and fee proposal relating to the services which Kiwi Securities Inc. ("KSI") will provide to ePALS Classroom Exchange, Inc. ("ePALS") during our engagement by ePALS on a sale/strategic alternatives assignment.

In our experience, the best means of maximizing value in most dispositions/investments is a controlled process designed to generate a high level of interest simultaneously among a limited number of parties. Understanding both the current competitive landscape and your strong desire not to "market" ePALS via a traditional auction process, it remains our view that an essential element of a successful outcome for ePALS will be to fully explore all strategic alternatives which the stakeholders of ePALS might consider, including both potential acquirer(s) and alternative transaction structures (such as the "Trojan Horse" approach we discussed in our meeting on Monday). Such a process is most effective both from the standpoint of the Client and from the standpoint of potential buyers/new investors when it is closely directed by an intermediary with experience in similar transactions. We believe this procedure is appropriate for ePALS.

**Scope of Work**

The specific services we provide in this type of engagement can vary considerably depending upon the specific nature and evolution of an individual transaction. We believe, however, that several aspects of our role will be particularly important in executing either the sale or a new investment into ePALS – we have outlined these below. These services have in common the assumption of a close working relationship with ePALS' top management and designated working group. As we discussed, this will be particularly important in light of the balance and coordination required between the business discussions you will have with potential business partners, and how and when those discussions are parlayed into meaningful negotiations with the appropriate decision makers on the corporate development side of those partners.



# PROJECT CONNECT
## Scope of Work & Fee Proposal

**Defining Objectives.**    The initial step in a sale/strategic alternatives assignment is to understand the objectives and priorities of our Client. Both our approach to an assignment and our ultimate advice in its execution are heavily influenced by this understanding. While we believe that we now have a basic understanding of your goals for this transaction, we encourage you as we proceed to be candid and detailed as to all relevant objectives of which we should be aware. We recognize that such conversations are extremely confidential, and we assure you that they will be treated accordingly.

**Analytical Phase.**    As a second step in this assignment, we propose to prepare an analysis of the alternatives available to you. This analysis will reflect, among other factors, ePALS's financial and operating record, an appraisal of ePALS's prospects, and our experience with transactions of a comparable nature. In addition to analyzing a potential sale of the Company, we will consider the attractiveness to ePALS of introducing new investors/business partners to accelerate the near-term growth of the company, and the potential impact of such intermediate financing rounds/actions on transaction timing and the likelihood of an ultimately successful exit given current market and competitive conditions.

**Transaction Structure Formulation.**    We will analyze various forms of combination and investment structures, including consideration of the financial, accounting, tax and legal effects of the various options, and advise the Board as to the most suitable method of satisfying your objectives.

**Identifying and Reviewing Potential Purchasers/New Investors.**    A full understanding of your objectives and a total familiarity with ePALS's business and current capital structure will lead naturally to the development, with your input, of a list of potential purchasers/new investors. This list must reflect a blend of your objectives, the business and financial fundamentals of the Company, and the objectives of the potential purchasers/new investors, including the importance of the various elements of value, as well as regulatory and accounting considerations. Our experience in this area, particularly with respect to suggesting possible purchasers/new investors whose interest is "real", should be helpful in the development of an effective list of potential participants for ePALS, and in ensuring that only viable transaction alternatives are ultimately pursued.

**Valuation.**    A clear understanding of all of the elements of value is a key step in the development of the strategic alternatives process. With respect to ePALS, our value judgments would be based upon a thorough study of the Company's financial and operating record; a comparison of its performance (both financial and operational, such as market penetration and user adoption) with other companies with significantly comparable businesses in its industry; comparison of the terms of transactions of a similar nature; an appraisal of the future prospects of the business (including its – often very different – prospects in the hands of each prospective acquirer considered individually); and other factors that are relevant. Among other factors would be a full understanding of regulatory, tax, accounting and legal issues as they might relate to various forms of the transaction.

**Firm Consensus.**    At the appropriate point in our work, we will caucus among our senior Partners as well as others within our Firm who have particular experience bearing upon the assignment, and discuss our conclusions concerning valuation. From this discussion a consensus will be developed as to the value potentially realizable for the transaction. These views will then be reviewed with you in full so that the final valuation reflects the perspective of all parties concerned.

**Execution of the Selling/Investment Process.**

As stated above, the objectives of the execution phase of this assignment will be to stimulate and build elements of competition while maintaining discipline and credibility in the process. The first step in this process will be, at an appropriate juncture in coordination with your business discussions as we have



## PROJECT CONNECT
### Scope of Work & Fee Proposal

outlined (and following execution of our Non-Disclosure Agreement), for a small and very select group of potential acquirers to be invited to attend Management Presentations and to conduct preliminary due diligence on ePALS. Our experience in the kind of information which potential acquirers/new investors (AOL, Yahoo!, others) will need to see to propel them to a premium valuation will be extremely valuable to ePALS at this juncture, as it will avoid unnecessary time and effort spent on due diligence which while ultimately necessary before closing will not materially impact preliminary views on value. The information supplied will form the basis for subsequent final and binding proposals from these parties, and will include detailed and specific instructions for the form and timing of the submission of qualified acquisition/investment proposals for your consideration. We will, of course, assist you in analyzing these proposals and negotiating with the potential purchasers/new investors to select the most attractive offer for you.

**Negotiating the Transaction.** During the analytical phase of an assignment, we develop a judgment as to acquisition values and a thorough understanding of the legal and financial implications of various forms of transactions. Such knowledge, combined with our perspective as a third party, can be very valuable in negotiations, particularly if important decisions must be made rapidly and under pressure, as is often the case in sale and acquisition negotiations.

Our experience in negotiating successful transactions for companies (such as ePALS) which may have a considerable premium placed on their acquisition value versus stand-alone will be critical in negotiating with any potential third party on behalf of ePALS. For example, if it develops that ePALS and a potential purchaser/new investor have greatly differing initial assessments as to value, such experience can help in bridging early disagreements (often by explaining the business, as opposed to purely financial, value created by combining the companies) and in preventing a premature termination of discussions before negotiations have reached a meaningful stage. It is also our experience that an intermediary is often of considerable assistance in maintaining momentum throughout the negotiation process.

It was precisely this experience which led to our achieving such a satisfactory result for our client FareChase, Inc. in its recent sale to Yahoo!, through our explaining that it was the business that FareChase put Yahoo! into, not just the technology represented by FareChase itself, which was the value which had to be paid for in acquiring the company. We believe that our understanding of your product, supported by the recognized and established ePALS brand, will allow us to assist you in successfully portraying and negotiating to a similarly premium-valued outcome based on leverage into the consumer space for potential acquirers.

However, depending on your instructions, our visibility during negotiations can vary from our most senior bankers personally conducting the principal discussions to providing "backstage" advice to ePALS as to strategy and tactics. Regardless of our role, we seek to obtain the best terms available for you in light of all the factors involved.

**Coordination of Technical Details.** Following an agreement in principle with a purchaser/investor, we would assist ePALS in organizing and coordinating the activities of any other experts and advisors and would attend to the numerous technical details required to close a transaction. These tasks are often the most time consuming part of a transaction, requiring anticipation of problems and experienced coordination of attorneys, accountants and other experts, as appropriate, while at the same time requiring sensitive handling of details to ensure that the understanding between the principals is not unnecessarily affected.

Our experience has shown time and again that the anticipation and solution of problems between the time the agreement is reached among the parties and the closing materially increases the chances of bringing the transaction to a timely and ultimately successful conclusion.



# PROJECT CONNECT
## Scope of Work & Fee Proposal

**Fee Structure**

As we have previously discussed, our goal in establishing a fee structure for an assignment is to align our incentives as closely as possible with those of our Client, and to have our aggregate fee be reflective of the value which we will add to the transaction.

Retainer Fee

For an assignment such as we have discussed for ePALS, we would propose a Retainer Fee structured as follows:

1. $50,000 on the signing of our Engagement Letter; and

2. In the event that Project Connect should extend in duration longer than six (6) months from the date of our engagement by you, we would propose an additional Monthly Retainer of $10,000 per month from the date of the six (6) month anniversary of our engagement through the earlier of Closing or other termination of our engagement.

Expense Reimbursement

Reimbursement of our reasonable out of pocket expenses incurred in connection with our engagement by you for Project Connect is to be made on a monthly basis.

Success Fees

Our fees for services in connection with a Client's divestiture/strategic alternatives program depend on the outcome of the assignment and are designed to reflect our contribution to a major corporate objective. In the event a transaction is consummated, we would propose success fees for Project Connect to closely align our interests to those of ePALS' owners.

A. Sale/Divestiture Success Fee

Upon the successful conclusion of a transaction, we would charge a Success Fee, against which our Retainer Fee (including monthly retainer fee(s), if any) would be credited, as follows:

1. A minimum fee of US$600,000; plus
2. A fee of one and one-half percent (1.50%) of any aggregate value realized between $30 million and $50 million; plus
3. A fee of one and three-quarters percent (1.75%) of any aggregate value realized between $50 million and $75 million; plus
4. A fee of two percent (2.00%) of any aggregate value realized between $75 million and $100 million; plus
5. A fee of two and one-half percent (2.50%) of any aggregate value realized between $100 million and $150 million; plus
6. A fee of five percent (5.00%) of any aggregate value realized in excess of $150 million.

B. New Investor Success Fee

Although such an outcome would appear unlikely in light of your objectives, in the event a business partner did contribute cash to a business partnership with ePALS, upon the successful completion of a private placement with a new investor, we would charge a Success Fee, against which our Retainer Fee



## PROJECT CONNECT
### Scope of Work & Fee Proposal

---

(including monthly retainer fee(s), if any) would be credited calculated as five percent (5.00%) of the aggregate investment made by such investor, but in no event less than US$250,000.

### Kiwi Securities' Qualifications

Since the mergers and acquisitions field is highly specialized we believe that Clients' needs are best served by way of a specialized firm such as KSI, whose only businesses are Mergers and Acquisitions ("M&A") accompanied by Private Equity Fundraising, which provides unparalleled exposure to the financial sponsor community. KSI is a firm of dedicated M&A Professionals, including six senior M&A Partners. We have over 185 closed transactions to our record. Major valuation judgments or strategic matters are considered by all senior Partners of the firm, so that advice rendered to a Client represents a consensus judgment of an experienced group of investment banking professionals.

We believe that our "inverted pyramid" structure, with our high ratio of experienced senior bankers on our team, makes Kiwi Securities unique in the Middle Market, and that it is our uniqueness which qualifies our firm to deliver Clients unparalleled competitive advantage in considering the hiring of an advisor for a divestiture transaction.

### Senior Bankers, with World Class Experience, on each and every deal

KSI is a firm of Senior Investment Bankers. Our Managing Directors on average each have over a decade of hands-on deal experience on Wall Street, and have excelled in their fields, having run a number of departments including Mergers & Acquisitions, Capital Goods, and Technology, Media and Telecom, for a number of the World's foremost financial institutions based in New York.

KSI's competitive advantage revolves around having its most senior bankers staffed on every deal it undertakes. We deliver real-world, senior experience and often most importantly, real-world counsel to our Clients. We pride ourselves in being at the negotiating table and at our Client's disposal every step of every transaction. We will not "bait and switch" as some of our larger competitors have been known to do, meaning that the team that you see is the team that you, the Client, gets to execute your transaction from beginning to end. Our recent successes for Clients (2x expectations in a Technology Co divestiture to Yahoo!, 3x expectations in a Service Co divestiture, 1½x expectations in a Distribution Co divestiture to Thai Union of Bangkok) have shown that it is this deal experience which makes the critical difference in negotiating win-win transactions on terms favorable to the seller and acceptable to the buyer.

### Independence, Coupled with Unprecedented Reach

Kiwi Securities is independently owned. This is important in as much as our Partners can reach into relationships at the highest levels of any potential acquirer, either through our own extensive contacts, or by calling a former colleague at any of the major Wall Street banks with whom we have developed relationships (and with whom we no longer compete) over the last 10 to 15 years.

Additionally, we have intimate and current knowledge of the companies, such as AOL, Microsoft and Yahoo! to name some obvious names, who may be prime candidates for a competitive acquisition of ePALS. As discussed in our meeting, we have just closed an important sale transaction with Yahoo! and other recent transaction experience has seen us in active dialog with other candidates. In short, it is our combined experience working for larger firms which now gives us the skills we need to be highly effective in the middle market – namely: hands on knowledge in how to successfully approach, position and ultimately to sell smaller and growing companies to very large, corporate acquirers. These skills will be critical in assisting ePALS in its discussions and positioning with potential acquirers.



## PROJECT CONNECT
### Scope of Work & Fee Proposal

In summary, Jonathan, the steps outlined above cover the more technical aspects of our services. Perhaps equally important is the benefit of our counsel when problems develop or events take an unforeseen turn, as they often do in major sale/strategic alternative assignments these days. We view our role as assisting in completing a premium transaction on a satisfactory basis, and we are fully prepared to participate in the difficult financial and business decisions sometimes required to accomplish that objective.

Additionally I would like to reiterate that as a boutique firm focused solely on Mergers & Acquisitions advice in the Middle Market, this assignment is right in our sweet spot – it will receive primary attention from our most senior bankers, including personal attention from myself. We view this opportunity as important for our firm, and will treat both this assignment, and our relationship with ePALS, accordingly.

We would be pleased to discuss any aspect of this letter or our services as laid out herein with you in more detail at your convenience.

Sincerely,

Clive R. Holmes
Chairman and Chief Executive Officer