UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X
THE SILVERFERN GROUP, INC.,      :     CIVIL ACTION NO.
                                       :     06 CV 15404 (LBS)
                Plaintiff,     :
                                         :
     v.                            :
                                       :     **AFFIDAVIT**
ePALS CLASSROOM EXCHANGE,     :
INC.,                               :
                                       :
                Defendant.     :
-----------------------------------------------------X

STATE OF NEW YORK  )
                       )     ss.:
COUNTY OF NEW YORK)

       Thomas F. Burchill, being duly sworn, deposes and says:

       1.    I was a Managing Director of The Silverfern Group, Inc. ("Silverfern") until May 10, 2006, and since then have been Managing Partner of SCIP Capital Management, LLC, an affiliate of Silverfern, plaintiff herein.  I was a member of the Board of Directors of ePALS Classroom Exchange, Inc. ("ePALS") during the time prior to its December 15, 2006 merger.  I have personal knowledge of and am fully familiar with the facts set forth herein, and submit this affidavit in further support of Silverfern's motion for summary judgment.

       2.    As a member of ePALS' Board of Directors during the pertinent time period, and a Managing Director of Silverfern (and, later, Managing Partner of SCIP Capital Management, LLC) from and after March, 2005, I recused myself from any and all decisions having to do with the retention of

Silverfern and the advisory assignment in its entirety. Nevertheless, as a member of the ePALS' Board of Directors, I was kept fully advised of all facts and circumstances having to do with the ePALS' merger transaction.

3.    I am advised that, for purposes of Silverfern's instant summary judgment motion, the Court will not be concerned with resolving factual disputes, but rather, only with discerning whether any genuine disputes of material fact exist. I have read and considered the affidavits, declaration and other materials submitted by defendant in opposition to Silverfern's motion. The reasons given by defendant for its after-the-fact refusal to pay Silverfern are entirely concocted, without any contemporaneous or other documentary support, at odds with the terms of Silverfern's retention and the agreement between it and its client, and contrary to the actual facts as shown by undisputed documentary evidence.

4.    There never was any dispute that Silverfern would be, and was entitled to be, paid upon the closing of the projected merger. While Silverfern's engagement dated back to January, 2005, it was never terminated and when, in mid-2006, the In2Books merger began to go forward, Silverfern's renewed involvement was solicited by its client and Silverfern was expressly and purposely included in all material discussions and negotiations. As is common in the investment banking field, the terms of Silverfern's engagement required an up front cash payment (in this case $50,000) upon execution of the Agreement in January, 2005, and payment of an additional fee to Silverfern in the event of a closing, without regard to the exact nature of Silverfern's

involvement in procuring or participating in the transaction. <u>See</u> Amended Complaint, Exhibit A. Thus, it is of no moment here, and never was, whether Silverfern did or did not introduce ePALS to In2Books. Silverfern's engagement was in the nature of an exclusive agency, and this was understood by all parties to the transaction.

5.    Thus, prior to the originally scheduled November, 2006 closing, it was generally recognized that Silverfern's fee would be due at closing. This was confirmed in numerous writings, and it was even the subject of negotiation as to the source of funding to pay that fee. <u>See</u>, Exhibits "A" and "B" hereto. Exhibit A is an email "chain" culminating in Bill Harrison's August 20, 2006 email to Clive Holmes, Kevin Murphy and me; Exhibit B is another email "chain", culminating in Bill Harrison's September 13, 2006 email to Messrs. Holmes, Murphy and me, with attachment; both emails show the parties to the transaction recognizing that Silverfern was owed its fee and making provisions for paying it at closing, as the Agreement required. In fact, the Merger Agreement that ePALS and its merger partners signed in late November, 2006 (*after* all problems and issues to which defendant alludes in its opposition to Silverfern's instant motion had been raised and resolved), confirms that as of November 28, 2006 it remained the intent and understanding of all merger partners that Silverfern's fee would be earned and payable at closing. Annexed hereto as Exhibit "C" is a true copy of the November 28, 2006 Merger Agreement for the merger that closed December 15, 2006. The Merger Agreement (signed by Messrs. Fish (on behalf of the In2Books partners), and

Ewert on behalf of ePALS) provided, *inter alia*, that Silverfern's fee would be "payable by reason of the consummation of the Merger" (see Sections 2.17, 3.17 and 9.1 thereof).

6.    As defendant points out, the projected November, 2006 closing was delayed.  This delay was occasioned when ePALS' successor-counsel, Wilson Sonsini Goodrich & Rosati, advised in late October, 2006, only a week or so prior to the scheduled closing, that it would be unable to render an opinion at closing confirming that all shares of ePALS were properly authorized, issued and outstanding.[1]  It is important to recognize that nothing in Silverfern's January, 2005 Agreement required it to verify any of the information provided to it by its client regarding capitalization or otherwise.  Indeed, it would not generally be the role of any investment banker, like Silverfern, to engage in such legal due diligence to discover such an issue.  Consistent therewith, the express provisions of Silverfern's Agreement (see January, 2005 agreement at page 2, bottom paragraph and section 5) make clear that (i) it was neither Silverfern's role nor its responsibility to conduct any due diligence in order to verify "Information" provided by its client, including the due and proper authorization and issuance of ePALS stock, and that (ii) Silverfern's client would rely on its lawyers for such diligence, advice and analysis.

7.    In any event, far from the debacle suggested by defendant in its opposition, the due authorization of ePALS shares was a technical matter

---

[1] The Wilson, Sonsini firm was not ePALS' original counsel.  Rather, the law firm of Dechert Price had originally been engaged.  Dechert's services were terminated and it now seems as if ePALS is seeking to make Silverfern responsible for Dechert's or other counsel's professional negligence.

which merely needed to be remedied by a "ratification" by ePALS' Board of Directors, which ePALS' counsel drafted (see Exhibit "D", email "chain" ending in Mr. Ewert's October 31, 2006 email to me, with attached draft "ratification") and which in due course was expeditiously completed and executed.

8.      I attended all meetings of ePALS' Board of Directors (telephonic and otherwise) during the period October, 2006 through December 15, 2006. At no time did anyone – and this includes Edmund Fish (**who was not Silverfern's client**), Victoria McEachern, Douglas Wallace (**also not then an employee or officer of Silverfern's client**), Michael Cytrynbaum, Timothy Discipio, Jonathan Ewert, and George Ledwith – during those board meetings, or otherwise, state or suggest to me or in my presence that Silverfern was responsible for any defect in ePALS' capitalization or for not discovering such defect; that the discovery of those issues had caused damage to ePALS for which Silverfern was or could be argued to be responsible; or that Silverfern should not be paid its fee upon closing exactly as always had been discussed, contemplated and agreed. (I was aware of the request in late November, 2006 that Silverfern voluntarily agree to reduce its fees as an accommodate to its client; no one said or indicated to me, or in my presence that such reduction was related to the value or quality of Silverfern services.)  In fact, in two separate memos to ePALS Board of Directors, Ed Fish made clear that problematic negotiations with an ePALS shareholder (Mr. Carpenter) were the impediment to an earlier closing.  Conspicuous by its absence from these memos is any reference to or mention of any purported problem with or

5

relating to Silverfern.    See, Ed Fish's memos dated October 12, 2006 and
November 12, 2006, Exhibits "E" and "F" hereto.

9.    Thus, it is not surprising to me that, both merger partners having
expressly agreed in their November 28, 2006 Merger Agreement that
Silverfern's fee was "payable by reason of the consummation of the Merger,"
defendant is unable, in opposition to Silverfern's motion, to point to or produce
a shred of documentary evidence that anyone ever claimed or asserted, prior to
the filing of this lawsuit, that Silverfern was not entitled to be paid its fee upon
the closing in accordance with the Agreement.

_____
Thomas F. Burchill

Sworn to before me this
___ day of April, 2007

_____
Notary Public

CONCETTA DE MARIA
Notary Public, State of New York
No. 4633709
Qualified in Westchester County
Commission Expires May 31, 20/0

# EXHIBIT "A"

## Tom Burchill

| | |
|---|---|
| **From:** | Bill Harrison |
| **Sent:** | Sunday, August 20, 2006 11:46 PM |
| **To:** | Clive Holmes; Kevin Murphy; TBurchill |
| **Subject:** | FW: Silverfern Success Fee |

The email below was sent to Vern informing him ePALS is responsible for paying the balance of our fee and that it is a condition to close

-----Original Message-----
From: Jonathan Ewert [mailto:jonathan@ewert.com]
Sent: Sunday, August 20, 2006 10:48 PM
To: 'Werner Paulus'
Cc: 'George Ledwith'
Subject: RE: Silverfern Success Fee

Vern

I checked on Clive's schedule for a call with you on Monday or Tuesday. Clive will not be able to make a call because he will be in Australia next week. But he's fine as long as the below language is in the merger doc.

We anticipate that the legal fees for both ePALS and In2Books will approximate $225,000. That leaves $125,000 to pay Silverfern. Their fee at closing is $550,000 therefore ePALS will be responsible for the balance ($425,000).

We will plan to insert this as part of the next turn.

JPE

-----Original Message-----
From: Bill Harrison [mailto:wharrison@silfern.com]
Sent: Thursday, August 17, 2006 10:56 PM
To: jonathan@ewert.com
Cc: Clive Holmes
Subject: Silverfern Success Fee

Jonathan,

As we discussed this evening, The Silverfern Group would like the following language inserted into the merger agreement:

The Company shall have paid all fees and expenses relating to this Agreement (including but not limited to the fees of the Company's advisor The Silverfern Group, Inc.) in cash on or prior to the closing.

This language should also be included for In2Books to ensure that ePALS' shareholders are not burdened with debt or accounts payable that should have been paid by In2Books' shareholders prior to closing:

The Parent shall have paid all fees and expenses relating to this Agreement in cash on or prior to the closing.

This language needs to be modified to take into consideration the $350,000 that is being allocated to pay transaction fees. If you do not think it is appropriate to include the recommended language above then I think we should schedule a call with Clive to discuss what actions are being taken to ensure

4/5/2007

that we are paid our fee in full at closing.

Thank you.

Bill

William J. Harrison

Managing Director

The Silverfern Group, Inc.

Tel: (212) 209-8880

Mobile: (917) 596-5533

Fax: (212) 209-8861


The Silverfern Group, Inc.

150 East 52nd Street

32nd Floor

New York, NY 10022

wharrison@silfern.com <mailto:wharrison@silfern.com>

www.silfern.com

The Silverfern Group, Inc. is a US Broker-Dealer. Member NASD.

This e-mail may contain confidential and/or privileged information. If you
are not the intended recipient (or have received this e-mail in error)
please notify the sender immediately and destroy this e-mail. Any
unauthorized copying, disclosure or distribution of the material in this
e-mail is strictly forbidden.

# EXHIBIT "B"

## Tom Burchill

| | |
|---|---|
| **From:** | Bill Harrison |
| **Sent:** | Wednesday, September 13, 2006 5:23 PM |
| **To:** | Clive Holmes; Kevin Murphy; TBurchill |
| **Subject:** | FW: In2B Revised Proposal |
| **Attachments:** | ePALS Estimated Closing Costs.xls |

below is an update on the ePALS transaction. In short, things are proceeding and will hopefully close in 2-4 weeks

**From:** George Ledwith [mailto:gledwith@verizon.net]
**Sent:** Wed 9/13/2006 3:48 PM
**To:** Bill Harrison
**Subject:** RE: In2B Revised Proposal

Thanks, Bill. I have spoken to Vern and he is willing to proceed on this basis.

George

**From:** Bill Harrison [mailto:wharrison@silfern.com]
**Sent:** Wednesday, September 13, 2006 12:46 PM
**To:** gledwith@verizon.net
**Subject:** In2B Revised Proposal

George:

After about 2 weeks of negotiations surrounding the handling of Vern's debt, closing costs, what closing costs In2B is going to pay and other obligations of ePALS (Carpenter, Savidis) we have a final proposal from In2B. We negotiated aggressively on Vern's behalf and pushed In2B to the point where I believe we have found the limits in this transaction. First I want to apologize for the movement in the proposals that I have run by you. There have been many moving parts in the negotiations, including:

- what costs should be included as closing costs vs. what costs are incurred in the ordinary course of ePALS operations
- what is the correct updated balance of the closing costs
- how to handle the Carpenter and Savidis obligations
- how to handle ePALS unaccredited investors
- how will Vern's debt of $1 million be treated if In2B decides to give away SchoolMail for free; Vern's debt is supposed to paid out of receipts of SchoolMail
- how can Vern put money into ePALS to cover closing costs

**Vern's Debt**

The terms of how we are handling Vern's $1.5 million of debt have not changed materially but there are some terms that we had to clarify. The major terms are the same: $500,000 is rolled into the bridge at closing and $1.0 million is paid from the recognized receipts of SchoolMail sales. The term we needed to improve was the impact on repaying Vern's debt if In2B decided to give away SchoolMail for free. This decision will likely be based on the overall positive impact it would have on In2B which will also benefit Vern as a shareholder but our focus was ensuring that Vern's debt was paid in full as quickly as possible. In2B is currently evaluating the strategy of free SchoolMail and there is a possibility they may implement it sometime in 2007. The terms of Vern's $1.0 million of debt is not much different from the original proposal:

- Vern is paid based on the recognized receipts of SchoolMail sales for the first six months
- If during those six months SchoolMail is given away for free then Vern's debt would be repaid as if SchoolMail was sold at its current price (In2B will base repayment under this scenario on units sold)
- Any unpaid balance remaining after six months will continue to accrue interest and will be paid in full at the end of 2 years

**Closing Costs**

4/5/2007

There has been a lot of movement on these numbers. The biggest issue has been how to handle ePALS' unaccredited investors. US securities laws dictate that if you are issuing shares these shares must either be registered with the SEC or issued to accredited investors. If we decided to issue shares to unaccredited investors it would result in a protracted legal and disclosure process (I will not get into detail but if we did not buy the shares of the unaccredited shareholders it would delay the closing by 60-90 days and would add significant legal costs to the transaction.) This delay was unacceptable to In2B and stated they would walk from the deal if the closing was delayed by that length of time. Jonathan and Vicki have begun the process of re-qualifying ePALS 73 shareholders to calculate the number of accredited shareholders so that we know how many shares need to be repurchased at closing. Jonathan currently estimates that the cost of repurchasing the shares of unaccredited shareholders will range from $50,000 to $250,000. A benefit to Vern by funding this repurchase is that it is accretive to his current ownership (to be clear ePALS is purchasing the shares and not Vern).

In the attached spreadsheet I have calculated the range of estimated closing costs and Vern's required contribution at closing. Our current estimate of Vern's contribution is approximately $400,000. As we already discussed, In2B agreed to increase the bridge by $300,000 to help cover ePALS' closing costs and In2B refused to increase that amount. What they did agree to was the money that Vern invests to cover closing costs will be a note on In2B balance sheet that will be pari-passu with Miles debt. This debt will earn interest at the same rate as Miles debt and will be paid-off within 2 years of closing.

In the attached spreadsheet we have calculated the best case and worse case scenarios for the amount of money Vern needs to contribute at closing. We are proceeding on the basis that these terms are acceptable to Vern. It is likely that we will have a finalized merger agreement by early next week and will hopefully have all of the other legal documents completed by next Friday. Following ePALS' Board approval we will send information to ePALS' shareholders so that they can vote on the transaction. If we stay on schedule we anticipate the deal will close around the end of September/early October.

Please call me if you would like to discuss the attached closing cost estimates or any other terms of the merger.

Thank you
Bill


William J. Harrison
Managing Director
The Silverfern Group, Inc.

**Tel: (212) 209-8880**
Mobile: (917) 596-5533
Fax: (212) 209-8861

The Silverfern Group, Inc.
150 East 52nd Street
32nd Floor
New York, NY 10022
wharrison@silfern.com
www.silfern.com

The Silverfern Group, Inc. is a US Broker-Dealer. Member NASD.

This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly forbidden.

4/5/2007

ePALS Estimated Closing Costs

| Description | Best Case | Worst Case | |
|---|---|---|---|
| Wilson Sonsini | $75,000 | $100,000 | |
| Silverfern Fee Balance | 550,000 | 550,000 | |
| Silverfern out of pocket expenses | 5,000 | 7,000 | |
| Interlinks Data Room | 8,000 | 10,000 | |
| Gordon Kushner | 17,000 | 25,000 | |
| Gowlings Canadian HR Counsel | 20,000 | 25,000 | |
| McClarty Financial Statement Prep | 25,000 | 30,000 | |
| Bob DiScipio | 0 | 20,000 | |
| Buyout of Unaccredited Investors | 50,000 | 250,000 | (worst case is unknown; just an estimate based on Jonathan's calculations) |
| **Total Closing Expenses** | 750,000 | 1,017,000 | |
| | | | |
| I2B Contribution | (475,000) | (475,000) | |
| | | | |
| **Vern's Obligation at Closing** | **$275,000** | **$542,000** | |

# EXHIBIT "C"

**MERGER AGREEMENT**

**Dated as of November 28, 2006**

**by and among**

**IN2BOOKS, INC.**

**I-EP ACQUISITION CORP.**

**and**

**EPALS CLASSROOM EXCHANGE, INC.**

**TABLE OF CONTENTS**

PAGE

ARTICLE 1     THE MERGER ................................................................................................ 2
1.1     The Merger................................................................................................ 2
1.2     Effective Time ......................................................................................... 2
1.3     Effect of Merger....................................................................................... 2
1.4     Certificate of Incorporation and Bylaws of Surviving Corporation ..................... 2
1.5     Directors and Officers of the Surviving Corporation ......................................... 2
1.6     Merger Consideration ............................................................................... 3
1.7     Capital Stock of Merger Sub...................................................................... 5
1.8     Exchange Procedures ............................................................................... 5
1.9     Closing ................................................................................................... 6
1.10    Appraisal Rights....................................................................................... 6
1.11    Further Assurances.................................................................................... 6
1.12    Stock Restrictions ..................................................................................... 6
1.13    Stock Transfer Books................................................................................ 7
1.14    Tax Consequences .................................................................................... 7
ARTICLE 2     REPRESENTATIONS AND WARRANTIES OF THE COMPANY ........... 7
2.1     Existence and Good Standing ..................................................................... 7
2.2     Capital Stock ........................................................................................... 8
2.3     Corporate Power, Authority and Enforceability ............................................. 8
2.4     No Violations; Consents and Approvals....................................................... 8
2.5     Litigation................................................................................................. 9
2.6     Financial Statements; Cash on Balance Sheet; Title to Assets ............................. 9
2.7     Absence of Undisclosed Liabilities ............................................................ 10
2.8     Indebtedness............................................................................................ 10
2.9     Compliance with Applicable Laws; Permits................................................... 10
2.10    Contracts; No Defaults.............................................................................. 10
2.11    Intellectual Property.................................................................................. 12
2.12    Absence of Certain Changes and Events ...................................................... 13
2.13    Books and Records ................................................................................... 14
2.14    Employee Benefits .................................................................................... 14
2.15    Employees................................................................................................ 15

TABLE OF CONTENTS
(CONTINUED)

PAGE

| | | |
|---|---|---|
| 2.16 | Insurance | 16 |
| 2.17 | Brokers' and Finders' Fees | 16 |
| 2.18 | Taxes | 17 |
| 2.19 | Warranties; Product Complaints | 19 |
| 2.20 | Obligation to Related Parties | 19 |
| 2.21 | Disclosure | 20 |
| ARTICLE 3 | REPRESENTATIONS AND WARRANTIES OF THE PARENT AND MERGER SUB | 20 |
| 3.1 | Existence and Good Standing | 20 |
| 3.2 | Capital Stock | 20 |
| 3.3 | Corporate Power, Authority and Enforceability | 21 |
| 3.4 | No Violations; Consents and Approvals | 21 |
| 3.5 | Litigation | 22 |
| 3.6 | Financial Statements; Cash on Balance Sheet; Title to Assets | 23 |
| 3.7 | Absence of Undisclosed Liabilities | 23 |
| 3.8 | Indebtedness | 23 |
| 3.9 | Compliance with Applicable Laws; Permits | 23 |
| 3.10 | Contracts; No Defaults | 23 |
| 3.11 | Intellectual Property | 25 |
| 3.12 | Absence of Certain Changes and Events | 26 |
| 3.13 | Books and Records | 27 |
| 3.14 | Employee Benefits | 27 |
| 3.15 | Employees | 29 |
| 3.16 | Insurance | 29 |
| 3.17 | Brokers' and Finders' Fees | 30 |
| 3.18 | Taxes | 30 |
| 3.19 | Warranties; Product Complaints | 31 |
| 3.20 | Obligation to Related Parties | 32 |
| 3.21 | Disclosure | 32 |
| 3.22 | Merger Sub | 32 |
| ARTICLE 4 | COVENANTS AND AGREEMENTS OF PARENT, MERGER SUB AND THE COMPANY | 32 |

297864 v16/RE

TABLE OF CONTENTS
(CONTINUED)

PAGE

| | | | |
|---|---|---|---|
| 4.1 | Public Announcements | | 32 |
| 4.2 | Qualification as Reorganization | | 32 |
| 4.3 | Employee Benefits | | 33 |
| ARTICLE 5 | CONDITIONS TO PARENT'S AND MERGER SUB'S OBLIGATIONS | | 33 |
| 5.1 | Accuracy of Representations and Warranties | | 33 |
| 5.2 | Performance of Agreements | | 34 |
| 5.3 | Good Standing and Other Certificates | | 34 |
| 5.4 | No Litigation | | 34 |
| 5.5 | Opinion of the Company's Counsel | | 34 |
| 5.6 | Governmental and Other Approvals and Consents | | 34 |
| 5.7 | Dissenters | | 34 |
| 5.8 | Recapitalization | | 34 |
| 5.9 | [Investor Questionnaires | | 35 |
| 5.10 | Non-Competition Agreements; Release Agreements | | 35 |
| 5.11 | Offer Letters; Proprietary Information and Inventions Assignment Agreements | | 35 |
| 5.12 | Expenses | | 35 |
| 5.13 | FIRPTA | | 35 |
| 5.14 | Bridge Financing | | 35 |
| 5.15 | Exchange of Certain Indebtedness | | 35 |
| 5.16 | Amendment to Certain Company Indebtedness | | 35 |
| 5.17 | New Paulus Loans | | 35 |
| 5.18 | Indebtedness Extinguished | | 35 |
| 5.19 | Voting Agreement | | 36 |
| 5.20 | Board Composition | | 36 |
| 5.21 | Stockholder Rights Agreement | | 36 |
| 5.22 | Option Matters | | 36 |
| 5.23 | Paulus Indemnification Agreement | | 36 |
| 5.24 | Stockholder Approval | | 36 |
| ARTICLE 6 | CONDITIONS TO THE COMPANY'S OBLIGATIONS | | 36 |
| 6.1 | Accuracy of Representations and Warranties | | 36 |

297864 v16/RE

TABLE OF CONTENTS
(CONTINUED)

| | | | |
|---|---|---|---|
| 6.2 | Performance of Agreements | | 36 |
| 6.3 | Good Standing and Other Certificates | | 37 |
| 6.4 | No Litigation | | 37 |
| 6.5 | Opinion of the Parent's Counsel | | 37 |
| 6.6 | Governmental and Other Approvals and Consents | | 37 |
| 6.7 | Bridge Financing | | 37 |
| 6.8 | Participation Rights | | 38 |
| 6.9 | Exchange of Certain Indebtedness | | 38 |
| 6.10 | Amendment to Certain Indebtedness | | 38 |
| 6.11 | New Paulus Loans | | 38 |
| 6.12 | Forgiveness of Indebtedness | | 38 |
| 6.13 | Voting Agreement | | 38 |
| 6.14 | Board Composition | | 38 |
| 6.15 | Stockholder Rights Agreement | | 38 |
| 6.16 | Option Matters | | 38 |
| 6.17 | Restated Certificate of Incorporation; Recapitalization | | 38 |
| 6.18 | Stockholder Approval | | 38 |
| 6.19 | Services Agreement | | 38 |
| ARTICLE 7 | SURVIVAL OF REPRESENTATIONS; ESCROW AND INDEMNITY | | 39 |
| 7.1 | Survival of Representations | | 39 |
| 7.2 | Indemnification | | 39 |
| 7.3 | Indemnification Procedures | | 40 |
| 7.4 | Limitation on Liability | | 42 |
| 7.5 | Indemnification; Payment Mechanics | | 42 |
| 7.6 | Sole Remedy | | 43 |
| 7.7 | Holder Representative; Power of Attorney | | 43 |
| ARTICLE 8 | MISCELLANEOUS | | 44 |
| 8.1 | Definitions of Certain Terms | | 44 |
| 8.2 | Specific Performance | | 51 |
| 8.3 | Arbitration | | 51 |

297864 v16/RE

**TABLE OF CONTENTS**
(CONTINUED)

| | | |
|---|---|---|
| 8.4 | Governing Law | 52 |
| 8.5 | Further Assurances | 52 |
| 8.6 | Table of Contents; Captions | 52 |
| 8.7 | Notices | 52 |
| 8.8 | Assignment; Parties in Interest | 53 |
| 8.9 | Counterparts | 54 |
| 8.10 | Entire Agreement | 54 |
| 8.11 | Amendments | 54 |
| 8.12 | Severability | 54 |
| 8.13 | Third Party Beneficiaries | 54 |
| 8.14 | Waiver of Jury Trial | 54 |
| 8.15 | Interpretation | 54 |

## Index to Exhibits and Disclosure Schedules

<u>Exhibits</u>

Exhibit A – Certificate of Incorporation of Parent
Exhibit B – Form of Exchange Agreement

<u>Disclosure Schedules</u>

| | |
|---|---|
| Schedule 2.1 | Existence and Good Standing |
| Schedule 2.4 | No Violations; Consents and Approvals |
| Schedule 2.5 | Litigation |
| Schedule 2.6 | Financial Statements; Cash on Balance Sheet; Title to Assets |
| Schedule 2.7 | Absence of Undisclosed Liabilities |
| Schedule 2.8 | Indebtedness |
| Schedule 2.9 | Compliance with Applicable Laws; Permits |
| Schedule 2.10 | Contracts; No Defaults |
| Schedule 2.11 | Intellectual Property |
| Schedule 2.12 | Absence of Certain Changes and Events |
| Schedule 2.13 | Employee Benefits |
| Schedule 2.15 | Employees |
| Schedule 2.16 | Insurance |
| Schedule 2.18 | Taxes |
| Schedule 2.19 | Warranties; Product Complaints |
| Schedule 3.2 | Capital Stock |
| Schedule 3.4 | No Violations; Consents and Approvals |
| Schedule 3.5 | Litigation |
| Schedule 3.6 | Financial Statements; Cash on Balance Sheet; Title to Assets |
| Schedule 3.7 | Absence of Undisclosed Liabilities |
| Schedule 3.8 | Indebtedness |
| Schedule 3.9 | Compliance with Applicable Laws; Permits |
| Schedule 3.10 | Contracts; No Defaults |
| Schedule 3.11 | Intellectual Property |
| Schedule 3.12 | Absence of Certain Changes and Events |
| Schedule 3.14 | Employee Benefits |
| Schedule 3.15 | Employees |
| Schedule 3.16 | Insurance |
| Schedule 3.18 | Taxes |

## MERGER AGREEMENT

THIS MERGER AGREEMENT (this "*Agreement*") is made and entered into as of November 28, 2006, by and among IN2BOOKS, INC., a Delaware corporation (the "*Parent*"), I-EP ACQUISITION CORP., a Delaware corporation and wholly-owned subsidiary of Parent (the "*Merger Sub*"), and EPALS CLASSROOM EXCHANGE, INC., a Delaware corporation (the "*Company*"). Capitalized terms used in this Agreement and not otherwise defined herein are defined in Section 9.1 below.

WITNESSETH:

WHEREAS, the respective Boards of Directors of Parent, Merger Sub and the Company have each determined that the merger of Merger Sub with and into the Company, with the Company as the surviving corporation (the "*Merger*"), is advisable and in the best interests of their respective stockholders, and such Boards of Directors have approved this Agreement and the Merger, upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the holders of the requisite number of outstanding shares of the Company's capital stock and Merger Sub's capital stock, respectively, have approved the Merger, upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Parent and the Company intend that the Merger qualify as a tax-free reorganization within the meaning of Section 368(a) of the Code;

WHEREAS, Parent, Merger Sub and the Company desire to make certain representations, warranties, covenants and agreements in connection with the transactions contemplated hereby;

WHEREAS, in connection with the Merger and immediately prior to the Effective Time (as defined herein), Parent will consummate a recapitalization (the "*Parent Recapitalization*"), whereby each share of its outstanding preferred stock shall be converted into 1.1196 shares of common stock of Parent ("*Parent Common Stock*");

WHEREAS, immediately following the Merger the board of directors of Parent will consist of Steve Arnold, Antoinette Bush, Jean Case, Robert DiScipio, Tim DiScipio, Ed Fish, Miles Gilburne, Werner Paulus, William Raduchel and Nina Zolt; and

WHEREAS, contemporaneously following the Effective Time Parent will consummate a bridge financing pursuant to which it will raise at least $2,800,000.

NOW, THEREFORE, in consideration of the premises, covenants and agreements set forth in this Agreement and of other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

297864 v16/RE

# ARTICLE 1

# THE MERGER

**1.1** <u>The Merger</u>. Upon the performance of all covenants and obligations and the fulfillment of all conditions to the obligations of the parties contained herein (other than such covenants, obligations and conditions as shall have been waived in accordance with the terms hereof or by their terms are to be performed after the Effective Time), and in accordance with the Delaware General Corporation Law, as amended (the "***Delaware Code***"), at the Effective Time (as defined below), Merger Sub shall be merged with and into the Company; the separate existence of Merger Sub shall cease; and the Company shall be the surviving corporation (sometimes referred to herein as the "***Surviving Corporation***") and shall continue its corporate existence under the Laws of the State of Delaware. The name of the Surviving Corporation shall be "***ePals Inc.***"

**1.2** <u>Effective Time</u>. The Merger shall be effected by the filing of a certificate of merger with the Secretary of State of Delaware in accordance with the provisions of Section 251 of the Delaware Code. The Merger shall become effective at the time set forth in such certificate of merger, which shall be filed contemporaneously with the closing conducted pursuant to Section 1.9 below (the "***Closing***"). The time and date when the Merger shall become effective is referred to in this Agreement as the "***Effective Time***."

**1.3** <u>Effect of Merger</u>. At the Effective Time, the effect of the Merger shall be as provided in the applicable provisions of the Delaware Code. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time all the property, rights, privileges, powers and franchises of the Company and Merger Sub shall vest in the Surviving Corporation, and all debts, liabilities and duties of the Company and Merger Sub shall become the debts, liabilities and duties of the Surviving Corporation.

**1.4** <u>Certificate of Incorporation and Bylaws of Surviving Corporation</u>. At the Effective Time (a) the certificate of incorporation of the Company in effect immediately prior to the Effective Time shall be amended to read in its entirety as the Certificate of Incorporation of Merger Sub reads as in effect immediately prior to the Effective Time and in a form acceptable to both Parent and the Company and such amended certificate of incorporation shall be the certificate of incorporation of the Surviving Corporation until thereafter amended as provided by law and such certificate of incorporation; provided, however, that Article I of such certificate of incorporation of Merger Sub shall be amended to read as follows: "The name of this corporation is ePals Classroom Exchange, Inc. and (b) the bylaws of Merger Sub in effect immediately prior to the Effective Time and in a form acceptable to both Parent and the Company shall be the bylaws of the Surviving Corporation until thereafter amended.

**1.5** <u>Directors and Officers of the Surviving Corporation</u>.

**(a)** The individuals set forth on a schedule to be mutually agreed by Parent and the Company on or before the Closing Date shall be the directors of the Surviving Corporation as of the Effective Time, until the earlier of their respective resignation or removal or otherwise ceasing to be a director or until their respective successors are duly elected and qualified.

297864 v16/RE .

(b)     The individuals set forth on a schedule to be mutually agreed by Parent and the Company on or before the Closing Date shall be the officers of the Surviving Corporation as of the Effective Time, until the earlier of their resignation or removal or otherwise ceasing to be an officer or until their respective successors are duly elected and qualified.

**1.6**     Merger Consideration.   At the Effective Time, by virtue of the Merger and without any action on the part of the holders of shares of common stock of the Company, including shares of preferred stock of the Company converted into common stock in connection with the Merger (the "***Company Stock***"):

(a)     Each share of Company Stock (other than shares of Company Stock that are held by Non-Accredited Investors, treasury shares and Dissenting Shares (as defined below)) issued and outstanding immediately before the Effective Time shall be converted into (i) the Per Share Closing Common Stock Merger Consideration, payable to the holder thereof, without interest, upon surrender of the certificate(s) representing such Company Stock or an affidavit of loss with respect thereto, in each case in accordance with Section 1.8 and (ii) upon the Expiration Date (as defined below) and any extension thereto pursuant to Section 7.1 hereof and after the final resolution of any claim made prior to the Expiration Date but resolved subsequent thereto (as applicable), the Per Share Contingent Merger Consideration (as defined below), payable to the holder thereof, without interest in accordance with the terms hereof.   The Per Share Closing Common Stock Consideration and the Contingent Merger Consideration shall collectively be referred to herein as the "***Common Stock Merger Consideration***".  As of the Effective Time, all shares of Company Stock so converted shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and each holder of a certificate or certificates representing any such shares of Company Stock shall cease to have any rights with respect thereto, except to receive the Common Stock Merger Consideration applicable thereto, in accordance with Section 1.8.

(b)     Subject to Section 1.8, each share of Company Stock issued and outstanding immediately prior to the Effective Time that is held by a Non-Accredited Investor (other than treasury shares and Dissenting Shares) shall be converted into the right to receive a cash payment equal to the Cash Consideration.   The Cash Consideration, together with the Common Stock Merger Consideration being referred to herein as, the "***Merger Consideration***".   As of the Effective Time, all shares of Company Stock so converted shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and each holder of a certificate or certificates representing any such shares of Company Stock shall cease to have any rights with respect thereto, except to receive the Cash Consideration applicable thereto, in accordance with Section 1.8.

(c)     At the Effective Time, each option to purchase shares of capital stock of the Company that is then outstanding, whether vested or unvested (a "***Company Option***"), shall be assumed by Parent in accordance with the terms (as in effect as of the date of this Agreement) of the Company's 2000 Equity Incentive Plan (the "***Stock Plan***") and the stock option agreement by which such Company Option is evidenced.   All rights with respect to Company Stock under outstanding Company Options shall thereupon be converted into rights with respect to Parent Common Stock.   Accordingly, from and after the Effective Time, (i) each Company Option assumed by Parent may be exercised solely for shares of Parent Common Stock, (ii) the number of

3

shares of Parent Common Stock subject to each such assumed Company Option shall be equal to the number of shares of Company Stock that were subject to such Company Option immediately prior to the Effective Time multiplied by the Per Share Closing Common Stock Merger Consideration (the "*Conversion Ratio*"), rounded down to the nearest whole number of shares of Parent Common Stock, (iii) the per share exercise price for the Parent Common Stock issuable upon exercise of each such assumed Company Option shall be determined by dividing the exercise price per share of Company Stock subject to such Company Option, as in effect immediately prior to the Effective Time, by the Conversion Ratio, and rounding the resulting exercise price up to the nearest whole cent and (iv) all restrictions on the exercise of each such assumed Company Option shall continue in full force and effect, and the term, exercisability, vesting schedule and other provisions of such Company Option shall otherwise remain unchanged and shall continue to have, and be subject to, the same terms and conditions as set forth in the Company's Stock Plan and/or stock option agreement by which such Company Option is evidenced immediately prior to the Effective Time; *provided, however*, that each such assumed Company Option shall, in accordance with its terms, be subject to further adjustment as appropriate to reflect any stock split, reverse stock split, stock dividend, recapitalization or other similar transaction effected by Parent after the Effective Time.  The Company and Parent shall take all action that may be necessary to effectuate the provisions of this Section 1.6(c).  Following the Closing, Parent will send to each holder of an assumed Company Option a written notice setting forth (i) the number of shares of Parent Common Stock subject to such assumed Company Option and (ii) the exercise price per share of Parent Common Stock issuable upon exercise of such assumed Company Option.   It is the intention of the parties that the Company Options assumed by Parent qualify following the Effective Time as incentive stock options as defined in Section 422 of the Code to the extent that such Company Options qualified as incentive stock options immediately prior to the Effective Time.  Parent shall take all necessary corporate action to reserve for issuance a sufficient number of shares of Parent Common Stock for delivery upon exercise of Company Options assumed in accordance with this Section 1.6(c).

(d)     Each share of Company Stock that is owned by the Company, if any, shall automatically be canceled and retired and shall cease to exist, and no Parent Common Stock shall be delivered in exchange therefor.

1.7     Capital Stock of Merger Sub.  At the Effective Time, by virtue of the Merger and without any action on the part of the holder of shares of common stock of Merger Sub ("*Merger Sub Common Stock*"), each share of Merger Sub Common Stock issued and outstanding immediately prior to the Effective Date shall be converted into and exchanged for one validly issued, fully paid and nonassessable share of common stock of the Surviving Corporation.  Each stock certificate of Merger Sub evidencing ownership of any such shares shall continue to evidence ownership of such shares of capital stock of the Surviving Corporation.

1.8     Exchange Procedures.

(a)     As soon as practicable after the Effective Time (or earlier if reasonably practicable), Parent shall distribute to the holders of record of Company Stock as of the Effective Time (or as anticipated as of the Effective Time) a form of letter of transmittal and instructions for its use in effecting the surrender of the certificates representing the Company Stock in exchange for the Merger Consideration applicable thereto.  Upon surrender of a certificate or certificates

4

representing any Company Stock to Parent (other than certificates representing shares of Company Stock held by the Company) together with a properly executed letter of transmittal, in accordance with the instructions thereto, and such other documents as may reasonably be required by Parent, the holder of such certificate or certificates shall be entitled to receive in exchange therefor the Closing Common Stock Merger Consideration or Cash Consideration, as applicable, that such holder has the right to receive pursuant to Section 1.6, to be distributed to such holder following the Effective Time. Parent shall cause such Merger Consideration to be delivered to each holder of Company Stock as promptly as reasonably practicable (but in no event later than ten (10) business days) following the delivery by such holder of Company Stock of certificates representing shares of Company Stock and a properly executed letter of transmittal in respect thereof; provided, that if such required delivery by a holder of Company Stock occurs prior to the Effective Time, the holder's applicable Merger Consideration will be delivered no later than ten (10) business days following the Effective Time. No interest will be paid or will accrue on any Merger Consideration. In the event of a transfer of ownership of Company Stock which is not registered in the transfer records of the Company, the applicable Merger Consideration may be paid with respect to such Company Stock to such a transferee if the certificate or certificates representing such shares of Company Stock is presented to Parent, accompanied by all documents required to evidence and effect such transfer prior to the Effective Time and to evidence that any applicable stock transfer Taxes have been paid.

        **(b)**     Notwithstanding anything to the contrary in Section 1.8(a) above, if any certificate or certificates representing any Company Stock shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such certificate or certificates to be lost, stolen or destroyed and, if required by the Parent, the posting by such Person of a bond in such reasonable amount as the Parent may direct as indemnity against any claim that may be made against it with respect to such certificate or certificates, Parent will deliver in exchange for such lost, stolen or destroyed certificate or certificates representing any Company Stock the applicable Merger Consideration with respect to the shares of Company Stock formerly represented thereby pursuant to this Agreement.

        **(c)**     Parent shall be entitled to deduct and withhold from the aggregate Merger Consideration otherwise payable pursuant to this Agreement to any holder of shares of Company Stock such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code, or any provision of state, local or foreign Tax Law. To the extent that amounts are so withheld by the Parent, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the shares of Company Stock in respect of which such deduction and withholding was made by Parent, and such amounts shall be delivered by Parent to the applicable taxing authority.

     **1.9**    <u>Closing</u>. Consummation of the Merger and the other transactions contemplated by this Agreement shall take place at the offices of Cooley Godward LLP on the day on which all of the conditions set forth in Article 5 and Article 6 shall have been satisfied or waived, or at such other time and date as Parent and the Company shall determine (the "***Closing Date***").

     **1.10**   <u>Appraisal Rights</u>. Any shares of Company Stock which immediately prior to the Effective Time are held by stockholders who have properly exercised and perfected, and have not withdrawn or otherwise forfeited, appraisal rights in accordance with Delaware Code Section

5

262 ("***Dissenting Shares***") shall not be converted into the applicable Merger Consideration at the Effective Time as provided in Section 1.6 above; rather, the holders of Dissenting Shares shall be entitled to receive consideration determined pursuant to Delaware Code Section 262; *provided, however*, that if any such holder shall have failed to perfect or shall withdraw or lose such holder's appraisal rights, such holder's shares of Company Stock thereupon shall be deemed to have been converted into the applicable Merger Consideration as provided in Section 1.6 above, and such shares shall no longer be Dissenting Shares. The Company agrees that, except with the prior written consent of Parent, or as required under the Delaware Code, the Company will not voluntarily make any payment with respect to, or settle or offer to settle, any purchase demand by a holder of Dissenting Shares. Each holder of Dissenting Shares who becomes entitled to payment for such shares pursuant to Delaware Code Section 262 shall receive payment therefor from the Surviving Corporation from funds provided by Parent (but only after the amount of the payment required therefor shall have been agreed upon or finally determined pursuant to the Delaware Code).

**1.11**    Further Assurances.  At and after the Effective Time, the officers and directors of the Surviving Corporation will be authorized to execute and deliver, in the name and on behalf of the Company or Merger Sub, any deeds, bills of sale, assignments or assurances and to take and do, in the name and on behalf of the Company or Merger Sub, any other actions and things to vest, perfect or confirm of record or otherwise in the Surviving Corporation any and all right, title and interest in, to and under any of the rights, properties or assets acquired or to be acquired by the Surviving Corporation as a result of, or in connection with, the Merger.

**1.12**    Stock Restrictions.  The holders of shares of Parent Common Stock issued in the Merger in exchange for Company Stock and the holders of shares of Parent Common Stock issuable upon exercise of assumed Company Options will agree to be subject to certain restrictions on sale and transfer, as a condition to the issuance of the Parent Common Stock to such holders. The Company hereby assigns to Parent, upon the Effective Time, any right of repurchase or similar right it has with respect to any shares of Company Stock or options or warrants exercisable therefor or any shares of Parent Common Stock or convertible securities to be issued in respect thereof in accordance with the terms hereof.

**1.13**    Stock Transfer Books.  At the Effective Time, the stock transfer books of the Company shall be closed and there shall not be any further registration of transfers of any shares of capital stock thereafter on the records of the Company.  If, after the Effective Time, certificates for Company Stock are presented to Parent, they shall be canceled and exchanged for the applicable Merger Consideration as set forth herein.

**1.14**    Tax Consequences.  For federal income tax purposes, the Merger is intended to constitute a reorganization within the meaning of Section 368(a) of the Code. The Parties to this Agreement adopt this Agreement as a "plan of reorganization" within the meaning of Sections 1.368-2(g) and 1.368-3(a) of the United States Treasury Regulations.

297864 v16/RE .

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

In order to induce Parent and Merger Sub to enter into this Agreement and consummate the transactions contemplated hereby, the Company hereby makes to Parent and Merger Sub the following representations and warranties as of the Closing Date, subject to such exceptions as are disclosed in the disclosure letter supplied by the Company to Parent and dated as of the Closing Date (the "*Company Disclosure Schedules*"). The disclosures in the Company Disclosure Schedules shall be arranged in sections corresponding to the sections contained in Article 2 hereof and the disclosures in any section of the Company Disclosure Schedules shall qualify only (a) the corresponding section in Article 2 hereof and (b) other sections in Article 2 hereof to the extent that it is apparent (notwithstanding the absence of a specific cross reference) from reading of the disclosure that such disclosure is applicable to such other sections. For purposes of this Article 2, unless the context clearly requires, all references to the Company shall mean the Company and any subsidiaries of the Company.

**2.1**    Existence and Good Standing.  The Company is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under Contracts (as defined in Section 2.4). The Company is duly qualified to do business as a foreign corporation and is in good standing under the Laws of the State of Connecticut. To the Knowledge of the Company, the Company is not required to be qualified to do business as a foreign corporation under the Laws of any other state or other jurisdiction as a result of the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it. The Company is not in violation of any of the provisions in the Company's Certificate of Incorporation, as amended (the "*Company Charter*") or the Company's bylaws, each as amended to date. The Company does not own or control any equity security or other interest of any other Person. The Company is not a participant in any joint venture, partnership or similar arrangement. Except as set forth in Schedule 2.1, since its inception, the Company has not consolidated or merged with, acquired all or substantially all of the assets of, or acquired the stock of or any interest in any Person.

**2.2**    Capital Stock.  The Company has an authorized capitalization consisting of the number and types of shares of capital stock set forth in Schedule 2.2, with the par value per share stated therein. The Company has issued and outstanding the number and types of shares of capital stock set forth in Schedule 2.2; no other shares of capital stock are issued or outstanding; and there are no outstanding options, warrants, rights (preemptive or otherwise), calls, commitments, conversion rights, rights of exchange, plans or other agreements of any character providing for the purchase, issuance or sale of any securities of the Company, other than as set forth in Schedule 2.2. Set forth on Schedule 2.2 are the following for each holder of capital stock and stock options of the Company: the date of issuance or grant, the type of option, the vesting commencement date, the date of exercise or purchase, the total number of vested stock options as of the date of this Agreement and a brief description of the vesting schedule and any acceleration provisions. With respect to each stock option set forth on Schedule 2.2 that is purported to be an incentive stock option for purposes of Section 422 of the Code, the Company

7

has treated such option as an incentive stock option and is aware of no reason that any such option fails to qualify as an incentive stock option under Section 422 of the code or otherwise cannot be treated as an incentive stock option under these provisions of the Code. All of the issued and outstanding shares of capital stock of the Company have been duly authorized and validly issued, are fully paid and non-assessable, were issued in accordance with the registration or qualification provisions of the Securities Act and any relevant state securities Laws or pursuant to valid exemptions therefrom, and none of such shares have been issued in violation of the preemptive rights, rights of first refusal or other similar rights of any Person.

**2.3**    <u>Corporate Power, Authority and Enforceability.</u>  The Company has all requisite corporate power and authority to enter into and deliver this Agreement and the agreements, documents and instruments contemplated hereby (collectively, the "***Transaction Documents***"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The Company's execution, delivery and performance of this Agreement and the other Transaction Documents and the Company's consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all corporate action required by applicable Law or the Company's Organizational Documents.  This Agreement and the other Transaction Documents to which the Company is a party constitute the valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms, except as enforcement may be limited by general equitable principles (whether raised in a proceeding at Law or in equity), or by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws of general application relating to or affecting creditors' rights (including without limitation, the effect of statutory or other Laws regarding fraudulent conveyances or transfers and preferential transfers).

**2.4**    <u>No Violations; Consents and Approvals.</u>

**(a)**    The execution and delivery of this Agreement, the Transaction Documents and the consummation by the Company of the transactions contemplated hereby and thereby will not result in a violation or breach of, conflict with, constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation, payment or acceleration) under, or result in the creation of any Lien on the Company Stock or any of the properties or assets of the Company under (1) any provision of the Company Charter or bylaws of the Company; (2) any Law or Order applicable to the Company or by which any of its properties or assets may be bound; or (3) any of the terms, conditions or provisions of any note, bond, mortgage, indenture, guarantee, license, Permit, agreement, understanding, arrangement, contract, commitment, lease, franchise agreement or other instrument or obligation (whether oral or written) (each, including all amendments thereto, a "***Contract***") to which the Company is a party, or by which the Company or any of its properties or assets is bound; except, in the case of clauses (2) and (3) above, for such violations, breaches, conflicts or defaults which could not reasonably be expected to have a Material Adverse Effect on the Company.

**(b)**    Except as set forth on <u>Schedule 2.4</u>, no consent, approval, or authorization of, or declaration, filing or registration with, any Governmental or Regulatory Authority or any other Person will be required to be made or obtained by the Company in connection with the execution, delivery, and performance of this Agreement and the other Transaction Documents and

the consummation of the transactions contemplated hereby and thereby, the absence of which could reasonably be expected to have a Material Adverse Effect on the Company.

**2.5**    Litigation.

**(a)**    Except as set forth on Schedule 2.5, there is no action, suit or proceeding of any nature pending or threatened in writing against the Company, its properties or any of its officers or directors nor, to the Knowledge of the Company, is there any reasonable basis therefor. To the Company's Knowledge, there is no investigation pending or threatened against the Company, its properties or any of its officers or directors by or before any Governmental or Regulatory Authority. Since January 1, 2002, no Governmental or Regulatory Authority has at any time challenged or questioned in writing the legal right of the Company to own its assets or conduct its operations as presently or previously conducted

**(b)**    There is no claim, action, suit, judicial or administrative proceeding, arbitration or investigation pending or, to the Company's Knowledge, threatened against the Company that seeks to restrain, prohibit or otherwise enjoin this Agreement or the other Transaction Documents or the consummation of the transactions contemplated hereby and thereby.

**2.6**    Financial Statements; Cash on Balance Sheet; Title to Assets.

**(a)**    As set forth on Schedule 2.6, the Company has delivered to the Parent true and correct copies of the Company's (i) unaudited balance sheet as of December 31, 2005 and the related statements of operations, statements of cash flow, and statements of stockholders' equity and (ii) unaudited balance sheet as of June 30, 2006 (the "*Balance Sheet Date*") and the related statement of operations, statement of cash flow, and statement of stockholders' equity (the financial statements referred to in clauses (i) and (ii) above and the accompanying notes thereto, collectively the "*Financial Statements*").   The Financial Statements have been prepared in accordance with generally accepted accounting principles in the United States, consistently applied ("*GAAP*"), throughout the periods involved and fairly present the financial condition of the Company as of their respective dates and the results of operations and cash flows of the Company for the periods indicated, except that the unaudited interim Financial Statements do not reflect year-end adjustments, nor do they contain the materials and disclosures to be found in notes to financial statements prepared in accordance with GAAP.

**(b)**    The Company has good and valid title to all properties and assets reflected in the Financial Statements (except for properties sold or disposed of in the ordinary course of business and properties and assets leased by the Company), free and clear of all Liens, other than Permitted Encumbrances. The Company does not own any real property.

**2.7**    Absence of Undisclosed Liabilities.   Except (a) for liabilities and obligations incurred in the ordinary course of business since the Balance Sheet Date or (b) as otherwise reflected in the Financial Statements or on Schedule 2.7, the Company has no liabilities or obligations of any nature, whether known or unknown, direct, indirect, accrued, contingent or otherwise, except for such liabilities or obligations which are not required to be disclosed on a balance sheet in accordance with GAAP.   The Company does not utilize "off balance sheet" arrangements.

9

**2.8**    Indebtedness.    Schedule 2.8 sets forth as of the date hereof all outstanding Indebtedness of the Company or for which the Company has commitments.  For the purposes of this Agreement, "***Indebtedness***" shall mean (a) any liabilities for borrowed money or amounts owed in excess of $25,000; (b) all guaranties, endorsements and other contingent obligations in respect of Indebtedness of others, whether or not the same are or should be reflected in the Company's balance sheet (or the notes thereto); and (c) the present value of any lease payments in excess of $25,000 due under leases required to be capitalized in accordance with GAAP.  The Company is not in material default with respect to any Indebtedness.

**2.9**    Compliance with Applicable Laws; Permits.

**(a)**    Except as set forth on Schedule 2.9(a), since January 1, 2002, the Company is, and at all times has conducted its business, in compliance in all material respects with all applicable Laws.

**(b)**    To the Company's Knowledge, the Company has all Permits necessary to conduct and operate its business, except for Permits the absence of which could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Schedule 2.9(b) contains an accurate and complete list of all Permits used in the operation of the business of the Company or otherwise held by the Company.  All of the Permits are in full force and effect, not subject to any current material default or current right of cancellation, termination or revocation.

**2.10**    Contracts; No Defaults.  Except as set forth on Schedule 2.10, as of the date hereof, the Company is not a party to, or bound by, any:

**(a)**    collective bargaining agreement;

**(b)**    employment or consulting agreement, or any non-competition or other agreement with present or former officers, directors, or stockholders, or persons affiliated with such persons, which is not terminable on 60 or fewer days notice by the Company without liability for any penalty or severance payment;

**(c)**    indenture, mortgage, note, installment obligation, agreement or other instrument, in each case relating to Indebtedness;

**(d)**    partnership, joint venture or other similar agreement or arrangement;

**(e)**    sales representation, distribution or other similar agreement; or any agreement with any Person to create "works for hire" or otherwise for development or custom work or for the provision of services on behalf of the Company, which either exceeds $50,000 or is related to the contribution, creation or development of any Intellectual Property Asset that is material to the Company;

**(f)**    agreement for the purchase of supplies, materials or services providing for annual payments in excess of $25,000;

10

(g)     agreement for the sale of goods or services providing for annual payments in excess of $25,000;

(h)     agreement for capital expenditures in excess of $25,000;

(i)     agreement containing covenants that in any way purport to restrict the Company's business activity or limit the freedom of the Company to engage in any line of business or to compete with any Person;

(j)     agreement affecting the ownership of, leasing of, title to, use of any leasehold or other interest in any real or personal property (except for personal property leases and installment and conditional sales agreements having aggregate remaining payments of less than $25,000);

(k)     any contract, lease or agreement with any school district, school or similar entity or authority in excess of $10,000;

(l)     any stock redemption or purchase agreements or other agreements affecting or relating to the capital stock of the Company, including, without limitation, any agreement with any stockholder of the Company which includes anti-dilution rights, registration rights, voting arrangements, operating covenants or similar provisions;

(m)     any acquisition, merger or similar agreement (other than this Agreement);

(n)     agreement (except as otherwise set forth in (a) through (m) above) entered into other than in the ordinary course of business that provides for annual payments in excess of $25,000 or is otherwise material to the Company.

All such agreements are valid, binding and enforceable against the Company, and to the Company's Knowledge, the other parties thereto in accordance with their terms, except as enforcement may be limited by general equitable principles (whether raised in a proceeding at Law or in equity), or by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws of general application relating to or affecting creditors' rights. The Company has provided true and correct copies of all such agreements, including any amendments, supplements and modifications thereto (whether written or oral), and the Company is not in material default thereunder. The Company has not received written notice of any breach, termination or intention to terminate or not renew any agreement or arrangement described in this Section 2.10.

**2.11**     Intellectual Property.

(a)     Schedule 2.11 contains a complete and accurate list of all Patents owned by the Company ("***Company Patents***"), registered Marks owned by the Company ("***Company Marks***") and registered Copyrights owned by the Company ("***Company Copyrights***"). Except as set forth on Schedule 2.11:

(i)     the Company owns or possesses adequate and enforceable rights to use, without payment to a third party, all of the Intellectual Property Assets necessary for the

11

operation of the Company Business, free and clear of all mortgages, pledges, charges, liens, security interests, or other encumbrances or similar agreements;

   **(ii)** to the Company's Knowledge, all Company Patents, Company Marks and Company Copyrights owned by the Company which are issued by or registered with, as applicable, the U.S. Patent and Trademark Office, the U.S. Copyright Office or in any similar office or agency anywhere in the world are currently in compliance with formal legal requirements (including without limitation, as applicable, payment of filing, examination and maintenance fees, proofs of working or use, timely post-registration filing of affidavits of use and incontestability and renewal applications) and are valid and enforceable; and the Company is not aware of any unauthorized or prior use of such Company Marks and has taken all commercially reasonable steps to maintain the value and enforceability of such Company Marks, and the Company is further not aware of any use of the Company Marks or any confusingly similar Marks within any field outside of the field in which the Company Business operates;

   **(iii)** there are no pending, or, to the Company's Knowledge, threatened claims (including licensing letters) against the Company or any of its employees alleging that any use or exploitation of the Company Intellectual Property Assets or the activities performed in connection with the Company Business, infringes with the rights of third parties under any Intellectual Property Assets ("***Third Party Rights***");

   **(iv)** to the Company's Knowledge, neither the activities performed in connection with the Company Business nor any use or exploitation of the Company Intellectual Property Asset infringes or conflicts with any Third Party Right;

   **(v)** the Company has not received any written communications alleging that the Company has violated or, by conducting the Company Business, would violate any Third Party Rights or that any of the Company Intellectual Property Assets is invalid or unenforceable;

   **(vi)** to the Company's Knowledge, no current or former employee or consultant of the Company owns any rights in or to any of the Company Intellectual Property Assets;

   **(vii)** to the Company's Knowledge, there is no violation or infringement by a third party of any of the Company Intellectual Property Assets;

   **(viii)** the Company has required all Company employees and consultants and all other persons with access to Trade Secrets owned by the Company or used in the Company Business ("***Company Trade Secrets***") to execute a binding confidentiality agreement, copies or forms of which have been provided to Parent and, to the knowledge of the Company, there has not been any breach by any party to such confidentiality agreements;

   **(ix)** (A) the Company has not directly or indirectly granted any rights, licenses or interests in the source code of the Products, and (B) the Company has not provided or disclosed the source code of the Products to any person or entity other than third parties engaged to develop, maintain, revise, and/or enhance the source code for the benefit of the Company;

12

**(x)**    a list of the Company's Products are provided on <u>Schedule 2.11(a)(x)</u>; the Products that are currently provided to third parties on standard commercial terms perform substantially in accordance with their documented specifications and as Company has warranted to its customers;

**(xi)**    to the Company's Knowledge, the Products do not contain any "viruses", "time-bombs", "key-locks", or any other devices intentionally created that could disrupt or interfere with the operation of the Products or the integrity of the data, information or signals they produce in a manner adverse to the Company or any licensee or recipient; and

**(xii)**    to the Company's Knowledge, the Company has complied with all applicable regulations relating to the collection, storage and onward transfer of all personally identifiable information collected by the Company or by third parties having authorized access to Company's databases or other records.

**2.12**    <u>Absence of Certain Changes and Events</u>.  Except as set forth on <u>Schedule 2.12</u>, since the Balance Sheet Date, the Company has conducted its business only in the ordinary course and there has not been any:

**(a)**    change in the Company's ownership;

**(b)**    amendment to the Company's Charter or bylaws;

**(c)**    material payment (except in the ordinary course of business) or increase by the Company of any bonus, salary or other compensation to any officer, director or employee or entry into any employment, severance or similar Contract with any officer, director or employee, except as may be required by Law;

**(d)**    adoption of, amendment to or increase in the payments to or benefits under, any Plan, except as may be required by Law;

**(e)**    damage to or destruction or loss of any asset of the Company having a replacement cost in excess of $25,000, whether or not covered by insurance;

**(f)**    entry into, termination of or receipt of notice of termination of (i) any license, distributorship, supply, dealer, sales representative, joint venture, credit or similar Contract to which the Company is a party, or (ii) any Contract or transaction involving a total remaining commitment of at least $25,000;

**(g)**    sale (other than sales of inventories in the ordinary course of business), lease or other disposition of any material asset or property of the Company or the creation of any Lien (other than Permitted Encumbrances) on any asset;

**(h)**    cancellation or waiver of any claims or rights with a value to the Company in excess of $25,000;

13

(i)     indication by any customer or supplier of an intention to discontinue or change the terms of its relationship with the Company in any respect involving an amount in excess of $25,000;

(j)     material change in the accounting methods used by the Company;

(k)     payment or declaration of any dividend, distribution or other entitlement (whether in cash, stock or property) in respect of any of the Company Stock;

(l)     Contract by the Company to do any of the foregoing; or

(m)     any other circumstance or event which has had or is reasonably likely to have a Material Adverse Effect.

2.13    Books and Records.  The books of account and other financial records of the Company, all of which have been made available to the Parent, are complete and correct in all material respects and represent actual, bona fide transactions and have been maintained in accordance with commercially reasonable business practices.  The minute books of the Company, all of which have been made available to the Parent, contain accurate and complete records of all meetings held of, and action taken by, the board of directors of the Company, and no meeting of the board of directors has been held for which minutes have not been prepared or are not contained in such minute books.

2.14    Employee Benefits.

(a)     Schedule 2.14(a) sets forth all Company Plans.  There are no other Plans under which the Company has any material liability, whether or not previously sponsored by the Company or any predecessor of the Company.  True and correct copies of all Company Plans have been made available to the Parent.  The Company has never maintained, sponsored, contributed to, participated in or had any obligation to fund any of the following Plans or arrangements:  (i) an employee benefit plan subject to Title IV of ERISA or Section 412 of the Code (e.g., defined benefit pension plans) or a Canadian defined benefit pension plan; (ii) a multiemployer plan as defined under Section 3(37) or 4001(a)(31) of ERISA or Section 414(f) of the Code; (iii) an employee benefit plan that provides medical or other welfare benefits to retirees except as required by ERISA, the Code or other applicable Law, including, but not limited to, the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended; (iv) a multiple employer plan within the meaning of Section 413(c) of the Code or Sections 4063, 4064 or 4066 of ERISA; (v) a multiple employer welfare arrangement ("*MEWA*") within the meaning of Section 3(40)(A) of the Code; (vi) a voluntary employees beneficiary association ("*VEBA*") within the meaning of Code Section 501(c)(9); or (vii) a qualified defined contribution or defined benefit plan (including without limitation any plan under Section 401(k) of the Code) or a Canadian defined contribution pension plan.

(b)     Each of the Company Plans has been adopted and is, and to the Company's Knowledge, at all times has been, operated in material compliance with its terms and all applicable Laws (including, where applicable, ERISA and Code) and each Company Plan that is intended to be tax-qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service as to its qualified status that takes into consideration all statutes

14

and legal requirements with respect to which the service has required determination letters (and to the Company's Knowledge, there is no reasonable basis for the loss of such tax-qualified status). None of the Company Plans (nor any Plans in which Company employees participate) nor any trusts relating thereto have engaged in any transaction in connection with which the Company or any fiduciaries of any Plans or related trusts is or could be subject either to a civil penalty or other liability under Sections 502(i), 406 or 409 of ERISA or other Laws or a Tax imposed by Section 4975 of the Code or other Laws, and to the Company's Knowledge, no event has occurred and no condition exists with respect to any Plans that would be reasonably likely to subject the Company to any other Tax or penalty under the Code or other Laws or civil penalty or other liability under ERISA or other Laws. Neither the Company nor any Subsidiary, nor any fiduciary with respect to any Company Plan is subject to any pending or threatened claim, dispute or proceeding brought by any participant, service provider or governmental entity involving any Company Plan and no Company Plan is the subject of any disclosed governmental inquiry, audit, investigation or proceeding. The Company has made all contributions required to be made to any Company Plan, and the liability for such contributions has been accrued and reported on the Company's financial statements. Each Company Plan that is required to file annual returns on a Form 5500 have filed such reports with the applicable agencies.

(c)     Except as set forth on Schedule 2.14(c), the consummation of the transactions contemplated by this Agreement and the other Transaction Documents will not (i) entitle any current or former employee, officer, director or independent contractor of the Company to severance pay, unemployment compensation or any other material payment, (ii) accelerate the time of payment or vesting (including the vesting of stock options or restricted shares), or increase the amount of payments or compensation due any such individual or accelerate the termination or lapse of any repurchase rights, or (iii) result in any prohibited transaction described in Section 406 of ERISA or Section 4975 of the Code for which an exemption is not available.

(d)     Except as set forth on Schedule 2.14(d), to the Knowledge of the Company, no Company Plan or grant, award or right under such Company Plan is a nonqualified deferred compensation plan within the meaning of Section 409A(d)(1) of the Code. The Company has made a reasonable, good faith attempt to comply with paragraphs (2), (3) and (4) of Section 409A, and IRS Notice 2005-1, and Notice 2006-4 with respect to any nonqualified deferred compensation plan sponsored or maintained by the Company.

2.15    Employees.

(a)     Schedule 2.15 contains a complete and accurate list of the following information for each current employee, leased employee, temporary employee, independent contractor and consultant of the Company, including each employee on leave of absence or inactive status: name; job title; date of hiring or engagement (and date of commencement of employment, if different); current base salary or consultant compensation and target annual bonus, if applicable. The Company is not involved in any proceeding, audit, or inquiry related to a potential misclassification of an employee as a consultant or independent contractor arising under applicable wage and hour or tax withholding laws or statutes. At all times while engaged by the Company, all independent contractors and consultants of the Company were reasonably believed by the Company to be independent contractors to, and not employees of, the Company for purposes of all applicable federal and state Laws relating to wages and hours, all applicable federal

15

and state income tax withholding requirements, and any other Law or Order implicating the relationship between the Company and any independent contractor or consultant. Each former employee of the Company whose employment was terminated by the Company and who is receiving severance or termination pay has entered into an agreement with the Company providing for the full release of any claims against the Company.

(b)    To the Company's Knowledge, no officer, director, agent, employee, consultant or contractor of the Company is bound by any Contract that purports to limit the ability of such officer, director, agent, employee, consultant or contractor (i) to engage in or continue or perform any conduct, activity, duty or practice relating to the business of the Company or (ii) to assign to the Company or to any other Person any rights to any invention, improvement or discovery developed while acting in any capacity for or on behalf of the Company. No former or current employee of the Company is a party to, or is otherwise bound by, any Contract that in any way has materially adversely affected, affects or reasonably could be expected to materially affect the ability of the Company or the Parent to conduct the business as heretofore carried on by the Company.

(c)    There is no collective bargaining or similar agreement with any labor unions or associations representing employees of the Company. To the Company's Knowledge, no employee intends to terminate his or her employment with the Company. To the Company's Knowledge, there have been no claims of discrimination or harassment that have been made against the Company or a Company employee before a Governmental or Regulatory Authority regarding actions or omissions of a Company employee during the course of his or her employment with the Company.

2.16    Insurance. Schedule 2.16 sets forth a complete and accurate list of all insurance policies carried by the Company and all insurance loss runs and workers' compensation claims received for the past two (2) policy years. The Company has delivered to Parent true, complete and correct copies of all current insurance policies, all of which are in full force and effect. All premiums due and payable under all such policies have been paid, and the Company is otherwise in compliance with the terms of such policies. There have been no written threatened terminations of, or written threatened material premium increases with respect to, any of such policies.

2.17    Brokers' and Finders' Fees. Except for the Banker's Fees, the Company has not incurred, nor will it incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or investment bankers' fees or any similar charges in connection with this Agreement or any transaction contemplated hereby.

2.18    Taxes.

(a)    The Company and each Subsidiary have filed all Tax required to be filed, and such Tax Returns are true, correct and complete in all material respects.

(b)    The Company and each Subsidiary have paid in full all Taxes owed by it. The charges, accruals and reserves for Taxes with respect to the Company and each Subsidiary (excluding any provision for deferred income taxes) reflected on the Financial Statements are

16

adequate to cover all unpaid Taxes through the dates of the Financial Statements. Neither the Company nor any Subsidiary has any Liability for unpaid Taxes accruing after the Balance Sheet Date except for Taxes arising in the ordinary course of business subsequent to the Balance Sheet Date.

(c)    Except as disclosed in Schedule 2.18, the Company has never had an interest in any "foreign business entity" as such term is defined in Section 6038 of the Code.

(d)    The Company and each Subsidiary have withheld and paid over to the proper Governmental or Regulatory Authorities all Taxes required to have been withheld and paid over and complied in all material respects with all information reporting and backup withholding requirements, including maintenance of required records with respect thereto, in connection with amounts paid to any employee, independent contractor, creditor, or other third party and in connection with any amounts of income or gain allocated to any stockholder of the Company.

(e)    The Tax Returns of the Company and each Subsidiary have never been audited by any Governmental or Regulatory Authority nor is any such audit in process, pending or threatened in writing. No deficiencies have been asserted in writing with respect to Taxes of the Company or any Subsidiary, and neither the Company nor any Subsidiary has received notice in writing or expects to receive notice that it has not filed a Tax Return or paid Taxes required to be filed or paid by it. Neither the Company nor any Subsidiary is a party to any action or proceeding for assessment or collection of Taxes, and no such event has been asserted or threatened in writing against the Company, any Subsidiary or any of their assets. No waiver or extension of any statute of limitations is in effect with respect to Taxes or Tax Returns of the Company or any Subsidiary. Neither the Company nor any Subsidiary has consented to extend to a date later than the date hereof the time in which any Tax may be assessed or collected by any Governmental or Regulatory Authority. To the Knowledge of the Company, no claim has ever been made by any Governmental or Regulatory Authority (i) in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction; or (ii) in a jurisdiction where any Subsidiary does not file Tax Returns that such Subsidiary is or may be subject to taxation by that jurisdiction. Schedule 2.18 includes a list of all jurisdictions in which the Company and each Subsidiary is required to either file a Tax Return or pay Taxes.

(f)    There are no Liens (other than Permitted Encumbrances) on the assets of the Company or any Subsidiary relating to or attributable to Taxes owing by the Company.

(g)    There is no basis for the assertion of any claim relating or attributable to Taxes owing by the Company or any Subsidiary, which if adversely determined, would result in any Lien (other than Permitted Encumbrances) on the assets of the Company or any Subsidiary or otherwise reasonably be expected to have a Material Adverse Effect on the Company.

(h)    None of the Company's nor any Subsidiary's assets is treated as "tax exempt use property" within the meaning of Section 168(h) of the Code.

(i)    There are no Contracts, plans or arrangements, including, but not limited to, the provisions of this Agreement or the other Transaction Documents, covering any employee or former employee of the Company or any Subsidiary that, individually or collectively, could give

17

rise to the payment of any amount (or portion thereof) that would not be deductible pursuant to Sections 280G, 404 or 162 of the Code.

(j)     Neither the Company nor any Subsidiary is, or has been at any time, a party to a Tax sharing, Tax indemnity or Tax allocation agreement, and neither the Company nor any Subsidiary has assumed the Tax liability of any other Person under any Contract.

(k)     Each of the Company and each Subsidiary has disclosed on its Tax Returns any Tax reporting position taken in any Tax Return which could result in the imposition of penalties under Section 6662 of the Code or any comparable provisions of state, local or foreign law.  Neither the Company nor any Subsidiary has consummated or participated in, and none of them are currently participating in any transaction which was or is a "Tax shelter" transaction as defined in Sections 6662 or 6111 of the Code or the Treasury Regulations promulgated thereunder.

(l)     Neither the Company nor any Subsidiary nor any predecessor of the Company or any Subsidiary has ever been a member of a consolidated, combined, unitary or aggregate group of which the Company or any predecessor of the Company was not the ultimate parent corporation.

(m)     Neither the Company nor any Subsidiary has any Liability for the Taxes of any Person (other than the Company or any Subsidiary) under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or foreign law) as a transferee or successor, by Contract or otherwise.

(n)     The Company has never entered into an intercompany transaction resulting in deferred gain or loss within the meaning of Section 1.1502-13 of the Treasury Regulations.

(o)     Neither the Company nor any Subsidiary will be required to include in income, or exclude any item of deduction from, Taxable income for any Taxable period (or portion thereof) ending after the Closing Date as a result of any (i) change in method of accounting for a Taxable period ending on or prior to the Closing Date; (ii) "closing agreement" described in Section 7121 of the Code (or any corresponding or similar provision of state, local, or foreign Tax law); (iii) intercompany transactions or any excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local, or foreign Tax law); (iv) installment sale or open transaction disposition made on or prior to the Closing Date; or (v) prepaid amount received on or prior to the Closing Date.

(p)     Neither the Company nor any Subsidiary has incurred a dual consolidated loss within the meaning of Section 1503 of the Code.

(q)     Each of the Company and each Subsidiary has in its possession official foreign government receipts for any Taxes paid by it to any foreign Tax Authorities.

(r)     The Company for itself and for its Subsidiaries has provided to Parent all material documentation relating to any applicable material Tax holidays or incentives.  The Company and its Subsidiaries are in compliance with the requirements for any applicable material Tax holidays or incentives and none of the Tax holidays or incentives will be jeopardized by the transaction contemplated in this Agreement.

18

**(s)**    Neither the Company nor any Subsidiary is nor have any of them ever been a "United States real property holding corporation" within the meaning of Section 897 of the Code, and the Company and each Subsidiary has filed with the Internal Revenue Service all statements, if any, which are required under Section 1.897-2(h) of the Treasury Regulations.

**(t)**    Neither the Company nor any Subsidiary has constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock qualifying for Tax-free treatment under Section 355 of the Code (i) in the two years prior to the date of this Agreement or (ii) in a distribution that could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in conjunction with the Merger.

**2.19**    Warranties; Product Complaints.  No product manufactured, acquired, distributed or sold by the Company is subject to any guarantee, warranty, right of return or other indemnity beyond the Company's applicable standard terms and conditions in effect at the time of sale. The Company has no Knowledge of any reason why claim expenses should significantly increase as a percentage of sales in the future. Except as set forth on Schedule 2.19, the Company has not received any material complaints related to the Company's products, including but not limited to, complaints regarding security or functionality.

**2.20**    Obligation to Related Parties.    There are no obligations of the Company to officers, directors, stockholders, or employees of the Company other than (a) for payment of salary for services rendered, (b) reimbursement for reasonable expenses incurred on behalf of the Company and (c) for other standard employee benefits made generally available to all employees (including stock option agreements outstanding under any stock option plan approved by the board of directors of the Company).  None of the officers, directors or, to the Company's Knowledge, key employees or stockholders of the Company or any members of their immediate families, is indebted to the Company or has any direct or indirect ownership interest in any Person with which the Company is affiliated or with which the Company has a business relationship, or any firm or corporation that competes with the Company, other than (i) passive investments in publicly traded companies (representing less than 1% of such company) which may compete with the Company and (ii) service as a board member of a company due to a person's affiliation with a venture capital fund or similar institutional investor in such company. No officer, director or stockholder, or any member of their immediate families, is, directly or indirectly, interested in any material contract with the Company (other than such contracts as relate to any such person's ownership of capital stock or other securities of the Company).

**2.21**    Disclosure.  To the Company's Knowledge, no representation or warranty or other statement made by the Company in this Agreement, any other Transaction Document, the Company Disclosure Schedules, the Financial Statements or any certificate delivered pursuant to the transactions contemplated by this Agreement and the other Transaction Documents contains any untrue statement or omits to state a material fact necessary to make such representation or warranty or other statement, in light of the circumstances in which it was made, not misleading.

# ARTICLE 3

# REPRESENTATIONS AND WARRANTIES OF THE PARENT AND MERGER SUB

297864 v16/RE .

In order to induce the Company to enter into this Agreement and consummate the transactions contemplated hereby, the Parent and Merger Sub hereby make to the Company the following representations and warranties as of the Closing Date, subject to such exceptions as are disclosed in the disclosure letter supplied by Parent and Merger Sub to the Company and dated as of the Closing Date (the "***Parent Disclosure Schedules***") .  The disclosures in the Parent Disclosure Schedules shall be arranged in sections corresponding to the sections contained in Article 3 hereof and the disclosures in any section of the Parent Disclosure Schedules shall qualify only (a) the corresponding section in Article 3 hereof and (b) other sections in Article 3 hereof to the extent that it is apparent (notwithstanding the absence of a specific cross reference) from reading of the disclosure that such disclosure is applicable to such other sections.

**3.1**    Existence and Good Standing.  Each of Parent and Merger Sub is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under Contracts.  Parent is duly qualified to do business as a foreign corporation and is in good standing under the Laws of Washington, D.C.  To the Knowledge of Parent, Parent is not required to be qualified to do business as a foreign corporation under the Laws of any other state or other jurisdiction as a result of the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it.  Neither Parent nor Merger Sub is in violation of any of the provisions of their respective Certificates of Incorporation, as amended, or bylaws, each as amended to date.  Other than Merger Sub, Parent does not own or control any equity security or other interest of any other Person.  Parent is not a participant in any joint venture, partnership or similar arrangement.  Since its inception, Parent has not consolidated or merged with, acquired all or substantially all of the assets of, or acquired the stock of or any interest in any Person.

**3.2**    Capital Stock.

**(a)**    Parent has an authorized capitalization consisting of the number and types of shares of capital stock set forth in Schedule 3.2, with the par value per share stated therein.  Parent has issued and outstanding the number and types of shares of capital stock set forth in Schedule 3.2; no other shares of capital stock are issued or outstanding; and there are no outstanding options, warrants, rights (preemptive or otherwise), calls, commitments, conversion rights, rights of exchange, plans or other agreements of any character providing for the purchase, issuance or sale of any securities of Parent, other than as contemplated by this Agreement or set forth in Schedule 3.2.  Set forth on Schedule 3.2 are the following for each holder of capital stock and stock options of Parent:  the date of issuance or grant, the type of option, the vesting commencement date, the date of exercise or purchase, the total number of vested stock options as of the date of this Agreement and a brief description of the vesting schedule and any acceleration provisions.  With respect to each stock option set forth on Schedule 3.2 that is purported to be an incentive stock option for purposes of Section 422 of the Code, Parent has treated such option as an incentive stock option and is aware of no reason that any such option fails to qualify as an incentive stock option under Section 422 of the code or otherwise cannot be treated as an incentive stock option under these provisions of the Code.  All of the issued and outstanding shares of capital stock of Parent have been duly authorized and validly issued, are fully paid and non-assessable, were issued in accordance with the registration or qualification provisions of the Securities Act and any

20

relevant state securities Laws or pursuant to valid exemptions therefrom, and none of such shares have been issued in violation of the preemptive rights, rights of first refusal or other similar rights of any Person.

**(b)**    Merger Sub has an authorized capitalization consisting of 1,000 shares of common stock, $0.001 par value per share, all of which are issued and outstanding and are held by Parent.    There are no outstanding options, warrants, rights (preemptive or otherwise), calls, commitments, conversion rights, rights of exchange, plans or other agreements of any character providing for the purchase, issuance or sale of any securities of Merger Sub.  All such outstanding shares have been duly authorized and validly issued and are fully paid and nonassessable.

**3.3**    Corporate Power, Authority and Enforceability.  Each of Parent and Merger Sub has all requisite corporate power and authority to enter into and deliver this Agreement and the Transaction Documents, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Parent's and Merger Sub's execution, delivery and performance of this Agreement and the other Transaction Documents and Parent's and Merger Sub's consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all corporate action required by applicable Law or their respective Organizational Documents.  This Agreement and the other Transaction Documents constitute the valid and legally binding obligations of Parent and Merger Sub, as applicable, enforceable against each of them, as applicable, in accordance with their respective terms, except as enforcement may be limited by general equitable principles (whether raised in a proceeding at Law or in equity), or by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws of general application relating to or affecting creditors' rights (including without limitation, the effect of statutory or other Laws regarding fraudulent conveyances or transfers and preferential transfers).

**3.4**    No Violations; Consents and Approvals.

**(a)**    The execution and delivery of this Agreement and the Transaction Documents as contemplated hereby and thereby and the consummation by Parent and Merger Sub, as applicable, of the transactions contemplated hereby and thereby will not result in a violation or breach of, conflict with, constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation, payment or acceleration) under, or result in the creation of any Lien on the Parent's Capital Stock or any of the properties or assets of Parent under  (1) any provision of the certificate of incorporation or bylaws of Parent; (2) any Law or Order applicable to Parent or by which any of its properties or assets may be bound; or (3) any of the terms, conditions or provisions of any Contract to which Parent is a party, or by which Parent or any of its properties or assets is bound; except, in the case of clauses (2) and (3) above, for such violations, breaches, conflicts or defaults which could not reasonably be expected to have a Material Adverse Effect on Parent.

**(b)**    The execution and delivery of this Agreement and the Transaction Documents and any other instruments and agreements to be executed and delivered by Merger Sub as contemplated hereby and thereby and the consummation by Merger Sub of the transactions contemplated hereby and thereby will not result in a violation or breach of, conflict with, constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of

21

termination, cancellation, payment or acceleration) under, or result in the creation of any Lien on the Merger Sub's Stock or any of the properties or assets of Merger Sub under (1) any provision of the certificate of incorporation or bylaws of Merger Sub; (2) any Law or Order applicable to Merger Sub or by which any of its properties or assets may be bound; or (3) any of the terms, conditions or provisions of any contract to which Merger Sub is a party, or by which Merger Sub or any of its properties or assets is bound; except, in the case of clauses (2) and (3) above, for such violations, breaches, conflicts or defaults which could not reasonably be expected to have a Material Adverse Effect on Merger Sub.

(c)     Except as set forth on Schedule 3.4, no consent, approval, or authorization of, or declaration, filing or registration with, any Governmental or Regulatory Authority or any other Person will be required to be made or obtained by Parent or Merger Sub in connection with the execution, delivery, and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, the absence of which could reasonably be expected to have a Material Adverse Effect on the Parent.

3.5     Litigation.

(a)     Except as set forth on Schedule 3.5, there is no action, suit or proceeding of any nature pending or threatened in writing against Parent or Merger Sub, their respective properties or any of their respective officers or directors nor, to the Knowledge of Parent, is there any reasonable basis therefor. To Parent's Knowledge, there is no investigation pending or threatened against Parent or Merger Sub, their respective properties or any of their respective officers or directors by or before any Governmental or Regulatory Authority. No Governmental or Regulatory Authority has at any time challenged or questioned in writing the legal right of Parent to own its assets or conduct its operations as presently or previously conducted.

(b)     There is no claim, action, suit, judicial or administrative proceeding, arbitration or investigation pending or, to Parent's Knowledge, threatened against Parent or Merger Sub that seeks to restrain, prohibit or otherwise enjoin this Agreement or the other Transaction Documents or the consummation of the transactions contemplated hereby and thereby.

3.6     Financial Statements; Cash on Balance Sheet; Title to Assets.

(a)     As set forth on Schedule 3.6, Parent has delivered to the Company true and correct copies of Parent's unaudited balance sheet as of June 30, 2006 (the "***Parent Balance Sheet Date***") and the related income statement, statement of cash flow, and statement of stockholders' equity (the financial statements referred to in this subsection (a) and the accompanying notes thereto, collectively the "***Parent Financial Statements***"). The Parent Financial Statements have been prepared in accordance with GAAP, throughout the periods involved and fairly present the financial condition of Parent as of their respective dates and the results of operations and cash flows of Parent for the periods indicated, except that the unaudited interim Parent Financial Statements do not reflect year-end adjustments, nor do they contain the materials and disclosures to be found in notes to financial statements prepared in accordance with GAAP.

(b)     Parent has good and valid title to all properties and assets reflected in the Parent Financial Statements (except for properties sold or disposed of in the ordinary course of

22

business and properties and assets leased by Parent), free and clear of all Liens, other than Permitted Encumbrances. Parent does not own any real property.

**3.7** _Absence of Undisclosed Liabilities._ Except (a) for liabilities and obligations incurred in the ordinary course of business since June 30, 2006 or (b) as otherwise reflected in the Parent Financial Statements or on Schedule 3.7, Parent has no liabilities or obligations of any nature, whether known or unknown, direct, indirect, accrued, contingent or otherwise, except for such liabilities or obligations which are not required to be disclosed on a balance sheet in accordance with GAAP. Parent does not utilize "off balance sheet" arrangements.

**3.8** _Indebtedness._ Schedule 3.8 sets forth as of the date hereof all outstanding Indebtedness of Parent or for which Parent has commitments. Parent is not in material default with respect to any Indebtedness.

**3.9** _Compliance with Applicable Laws; Permits._

**(a)** Except as set forth on Schedule 3.9(a), each of Parent and Merger Sub is, and at all times has conducted its business, in compliance in all material respects with all applicable Laws.

**(b)** To Parent's Knowledge, each of Parent and Merger Sub has all Permits necessary to conduct and operate its business, except for Permits the absence of which could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Schedule 3.9(b) contains an accurate and complete list of all Permits used in the operation of the business of Parent or otherwise held by Parent. All of the Permits are in full force and effect, not subject to any current material default or current right of cancellation, termination or revocation.

**3.10** _Contracts; No Defaults._ Except as set forth on Schedule 3.10, as of the date hereof, neither Parent nor Merger Sub is a party to, or bound by, any:

**(a)** collective bargaining agreement;

**(b)** employment or consulting agreement or any non-competition or other agreement with present or former officers, directors, or stockholders, or persons affiliated with such persons, which is not terminable on 60 or fewer days notice by Parent or Merger Sub, as applicable, without liability for any penalty or severance payment;

**(c)** indenture, mortgage, note, installment obligation, agreement or other instrument, in each case relating to Indebtedness;

**(d)** partnership, joint venture or other similar agreement or arrangement;

**(e)** sales representation, distribution or other similar agreement; or any agreement with any Person to create "works for hire" or otherwise for development or custom work or for the provision of services on behalf of the Parent, which either exceeds $50,000 or is related to the contribution, creation or development of any Intellectual Property Asset that is material to Parent;

23

(f)     agreement for the purchase of supplies, materials or services providing for annual payments in excess of $25,000;

(g)     agreement for the sale of goods or services providing for annual payments in excess of $25,000;

(h)     agreement for capital expenditures in excess of $25,000;

(i)     agreement containing covenants that in any way purport to restrict Parent's or Merger Sub's business activity or limit the freedom of Parent or Merger Sub to engage in any line of business or to compete with any Person;

(j)     contract, lease or agreement with any school district, school or similar entity or authority in excess of $10,000;

(k)     agreement affecting the ownership of, leasing of, title to, use of any leasehold or other interest in any real or personal property (except for personal property leases and installment and conditional sales agreements having aggregate remaining payments of less than $25,000); and

(l)     any stock redemption or purchase agreements or other agreements affecting or relating to the capital stock of, including, without limitation, any agreement with any stockholder of Parent or Merger Sub, as applicable, which includes anti-dilution rights, registration rights, voting arrangements, operating covenants or similar provisions;

(m)     any acquisition, merger or similar agreement (other than this Agreement);

(n)     agreement (except as otherwise set forth in (a) through (m) above) entered into other than in the ordinary course of business that provides for annual payments in excess of $25,000 or is otherwise material to Parent or Merger Sub.

All such agreements are valid, binding and enforceable against Parent or Merger Sub, as applicable, and to Parent's Knowledge, the other parties thereto in accordance with their terms, except as enforcement may be limited by general equitable principles (whether raised in a proceeding at Law or in equity), or by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws of general application relating to or affecting creditors' rights. Parent has provided true and correct copies of all such agreements, including any amendments, supplements and modifications thereto (whether written or oral), and neither Parent nor Merger Sub, as applicable, is in material default thereunder. Parent has not received written notice of any breach, termination or intention to terminate or not renew any agreement or arrangement described in this Section 3.10.

3.11    Intellectual Property.

(a)     Schedule 3.11 contains a complete and accurate list of all Patents owned by Parent ("**Parent Patents**"), registered Marks owned by the Parent ("**Parent Marks**") and registered Copyrights owned by the Parent ("**Parent Copyrights**"). Except as set forth on Schedule 3.11:

24

# EXHIBIT "C"
# Cont'd

(i)    the Parent owns or possesses adequate and enforceable rights to use, without payment to a third party, all of the Intellectual Property Assets necessary for the operation of the Parent Business, free and clear of all mortgages, pledges, charges, liens, security interests, or other encumbrances or similar agreements;

(ii)    to Parent's Knowledge, all Parent Patents, Parent Marks and Parent Copyrights owned by Parent which are issued by or registered with, as applicable, the U.S. Patent and Trademark Office, the U.S. Copyright Office or in any similar office or agency anywhere in the world are currently in compliance with formal legal requirements (including without limitation, as applicable, payment of filing, examination and maintenance fees, proofs of working or use, timely post-registration filing of affidavits of use and incontestability and renewal applications) and are valid and enforceable, and Parent is not aware of any unauthorized or prior use of such Parent Marks and has taken all commercially reasonable steps to maintain the value and enforceability of such Parent Marks, and Parent is further not aware of any use of the Parent Marks or any confusingly similar Marks within any field outside of the field in which the Parent Business operates;

(iii)    there are no pending, or, to Parent's Knowledge, threatened claims (including licensing letters) against Parent or any of its employees alleging that any use or exploitation of Parent Intellectual Property Assets or the activities performed in connection with the Parent Business, infringes with Third Party Rights;

(iv)    to Parent's knowledge, neither the activities performed in connection with the Parent Business nor any use or exploitation of the Parent Intellectual Property Assets infringes or conflicts with any Third Party Right;

(v)    Parent has not received any written communications alleging that Parent has violated or, by conducting the Parent Business, would violate any Third Party Rights or that any of Parent Intellectual Property Assets is invalid or unenforceable;

(vi)    to Parent's Knowledge, no current or former employee or consultant of Parent owns any rights in or to any of Parent Intellectual Property Assets;

(vii)    to Parent's Knowledge, there is no violation or infringement by a third party of any of Parent Intellectual Property Assets;

(viii)    Parent has required all Parent employees and consultants and all other persons with access to Trade Secrets owned by Parent or used in the Parent Business (the "*Parent Trade Secrets*") to execute a binding confidentiality agreement, copies or forms of which have been provided to the Company and, to the knowledge of Parent, there has not been any breach by any party to such confidentiality agreements;

(ix)    (A) Parent has not directly or indirectly granted any rights, licenses or interests in the source code of the Parent Products, and (B) Parent has not provided or disclosed the source code of the Parent Products to any person or entity other than third parties engaged to develop, maintain, revise, and/or enhance the source code for the benefit of Parent;

25

(x)      a list of the Parent Products is provided on Schedule 3.11(a)(x); the Parent Products that are currently provided to third parties on standard commercial terms perform substantially in accordance with their documented specifications and as Parent has warranted to its customers;

(xi)      to Parent's Knowledge, the Parent Products do not contain any "viruses", "time-bombs", "key-locks", or any other devices intentionally created that could disrupt or interfere with the operation of the Parent Products or the integrity of the data, information or signals they produce in a manner adverse to Parent or any licensee or recipient; and

(xii)      to the Parent's Knowledge, Parent has complied with all applicable regulations relating to the collection, storage and onward transfer of all personally identifiable information collected by Parent or by third parties having authorized access to Parent's databases or other records.

3.12      Absence of Certain Changes and Events.  Except as set forth on Schedule 3.12, since the Parent Balance Sheet Date, Parent has conducted its business only in the ordinary course and there has not been any:

(a)      change in Parent's ownership;

(b)      amendment to Parent's certificate of incorporation or bylaws (except the amendment and restatement of Parent's certificate of incorporation in the form attached hereto as **Exhibit A**) and the amendment of Parent's Bylaws in the form approved by Parent's Board of Directors;

(c)      material payment (except in the ordinary course of business) or increase by Parent of any bonus, salary or other compensation to any officer, director or employee or entry into any employment, severance or similar Contract with any officer, director or employee, except as may be required by Law;

(d)      adoption of, amendment to or increase in the payments to or benefits under, any Plan, except as may be required by Law;

(e)      damage to or destruction or loss of any asset of Parent having a replacement cost in excess of $25,000, whether or not covered by insurance;

(f)      entry into, termination of or receipt of notice of termination of (i) any license, distributorship, supply, dealer, sales representative, joint venture, credit or similar Contract to which Parent is a party, or (ii) any Contract or transaction involving a total remaining commitment of at least $25,000;

(g)      sale (other than sales of inventories in the ordinary course of business), lease or other disposition of any material asset or property of Parent or the creation of any Lien (other than Permitted Encumbrances) on any asset;

26

**(h)**    cancellation or waiver of any claims or rights with a value to Parent in excess of $25,000;

**(i)**    indication by any customer or supplier of an intention to discontinue or change the terms of its relationship with Parent in any respect involving an amount in excess of $25,000;

**(j)**    material change in the accounting methods used by Parent;

**(k)**    payment or declaration of any dividend, distribution or other entitlement (whether in cash, stock or property) in respect of any of the capital stock of Parent;

**(l)**    Contract by Parent to do any of the foregoing; or

**(m)**    any other circumstance or event which has had or is reasonably likely to have a Material Adverse Effect.

**3.13**    Books and Records. The books of account and other financial records of Parent, all of which have been made available to the Company, are complete and correct in all material respects and represent actual, bona fide transactions and have been maintained in accordance with commercially reasonable business practices. The minute books of Parent, all of which have been made available to the Company, contain accurate and complete records of all meetings held of, and action taken by, the board of directors of Parent, and no meeting of the board of directors has been held for which minutes have not been prepared or are not contained in such minute books.

**3.14**    Employee Benefits.

**(a)**    Schedule 3.14(a) sets forth all Parent Plans. There are no other Plans under which Parent has any material liability, whether or not previously sponsored by Parent or any predecessor of Parent. True and correct copies of all Parent Plans have been made available to the Company. Parent has never maintained, sponsored, contributed to, participated in or had any obligation to fund any of the following Plans or arrangements: (i) an employee benefit plan subject to Title IV of ERISA or Section 412 of the Code (e.g., defined benefit pension plans); (ii) a multiemployer plan as defined under Section 3(37) or 4001(a)(31) of ERISA or Section 414(f) of the Code; (iii) an employee benefit plan that provides medical or other welfare benefits to retirees except as required by ERISA, the Code or other applicable Law, including, but not limited to, the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended; (iv) a multiple employer plan within the meaning of Section 413(c) of the Code or Sections 4063, 4064 or 4066 of ERISA; (v) a MEWA within the meaning of Section 3(40)(A) of the Code; or (vi) a VEBA within the meaning of Code Section 501(c)(9); or (vii) a qualified defined contribution or defined benefit plan (including without limitation any plan under Section 401(k) of the Code). Neither the Parent nor any subsidiary, nor any fiduciary with respect to any Parent Plan is subject to any pending or threatened claim, dispute or proceeding brought by any participant, service provider or governmental entity involving any Parent Plan and to the Parent's Knowledge, no Parent Plan is the subject of any governmental inquiry, audit, investigation or proceeding. The Parent has made all contributions required to be made to any Parent Plan, and the liability for such contributions has

27

been accrued and reported on the Parent's financial statements. Each Parent Plan that is required to file annual returns on a Form 5500 have filed such reports with the applicable agencies.

       **(b)**    Each of the Parent Plans has been adopted and is, and to Parent's Knowledge, at all times has been, operated in material compliance with its terms and all applicable Laws (including, where applicable, ERISA and Code) and each Parent Plan that is intended to be tax-qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service as to its qualified status that takes into consideration all statutes and legal requirements with respect to which the service has required determination letters (and to the Parent's Knowledge, there is no reasonable basis for the loss of such tax qualified status). None of the Parent Plans (nor any Plans in which Parent employees participate) nor any trusts relating thereto have engaged in any transaction in connection with which Parent or any fiduciaries of any Plans or related trusts is or could be subject either to a civil penalty or other liability under Sections 502(i), 406 or 409 of ERISA or a Tax imposed by Section 4975 of the Code or other Laws, and to Parent's Knowledge, no event has occurred and no condition exists with respect to any Plans that would be reasonably likely to subject Parent to any other Tax or penalty under the Code or civil penalty or other liability under ERISA or other Laws. Neither Parent, nor any fiduciary with respect to any Parent Plan is subject to any pending or to Parent's Knowledge, threatened claim, dispute or proceeding brought by any participant, service provider or governmental entity involving any Parent Plan and no Parent Plan is the subject of any disclosed governmental inquiry, audit, investigation or proceeding. Parent has made all contributions required to be made to any Parent Plan, and the liability for such contributions has been accrued and reported on the Parent's financial statements. Each Parent Plan that is required to file annual returns on a Form 5500 have filed such reports with the applicable agencies.

       **(c)**    Except as set forth on <u>Schedule 3.14(c)</u>, the consummation of the transactions contemplated by this Agreement and the other Transaction Documents will not (i) entitle any current or former employee, officer, director or independent contractor of Parent to severance pay, unemployment compensation or any other material payment, (ii) accelerate the time of payment or vesting, or increase the amount of payments or compensation due any such individual or (iii) result in any prohibited transaction described in Section 406 of ERISA or Section 4975 of the Code for which an exemption is not available.

       **(d)**    Except as set forth on <u>Schedule 3.14(d)</u>, to the Knowledge of Parent, no Parent Plan or grant, award or right under such Parent Plan is a nonqualified deferred compensation plan within the meaning of Section 409A(d)(1) of the Code. Parent has made a reasonable, good faith attempt to comply with paragraphs (2), (3) and (4) of Section 409A, IRS Notice 2005-1, and Notice 2006-4 with respect to any non-qualified deferred compensation plan sponsored or maintained by Parent.

     **3.15**   <u>Employees</u>.

       **(a)**    <u>Schedule 3.15</u> contains a complete and accurate list of the following information for each current employee, leased employee, temporary employee, independent contractor and consultant of Parent, including each employee on leave of absence or inactive status: name; job title; date of hiring or engagement (and date of commencement of employment, if different); current base salary or consultant compensation and target annual bonus, if applicable.

Parent is not involved in any proceeding, audit, or inquiry related to a potential misclassification of an employee as a consultant or independent contractor arising under applicable wage and hour or tax withholding laws or statutes. At all times while engaged by Parent, all independent contractors and consultants of Parent were reasonably believed by Parent to be independent contractors to, and not employees of, Parent for purposes of all applicable federal and state Laws relating to wages and hours, all applicable federal and state income tax withholding requirements, and any other Law or Order implicating the relationship between Parent and any independent contractor or consultant. Each former employee of Parent whose employment was terminated by the Parent and who is receiving severance or termination pay has entered into an agreement with the Parent providing for the full release of any claims against Parent.

(b) To Parent's Knowledge, no officer, director, agent, employee, consultant or contractor of Parent is bound by any Contract that purports to limit the ability of such officer, director, agent, employee, consultant or contractor (i) to engage in or continue or perform any conduct, activity, duty or practice relating to the business of Parent or (ii) to assign to Parent or to any other Person any rights to any invention, improvement or discovery developed while acting in any capacity for or on behalf of Parent. No former or current employee of Parent is a party to, or is otherwise bound by, any Contract that in any way has materially adversely affected, affects or reasonably could be expected to materially affect the ability of Parent to conduct the business as heretofore carried on by Parent.

(c) There is no collective bargaining or similar agreement with any labor unions or associations representing employees of Parent. To Parent's Knowledge, no employee that intends to terminate his or her employment with Parent. To the Parent's Knowledge, there have been no claims of discrimination or harassment that have been made against the Parent or a Parent employee before a Governmental or Regulatory Authority regarding actions or omissions of a Parent employee during the course of his or her employment with Parent.

3.16    Insurance. Schedule 3.16 sets forth a complete and accurate list of all insurance policies carried by Parent and all insurance loss runs and workers' compensation claims received for the past two (2) policy years. Parent has delivered to the Company true, complete and correct copies of all current insurance policies, all of which are in full force and effect. All premiums due and payable under all such policies have been paid, and Parent is otherwise in compliance with the terms of such policies. There have been no written threatened terminations of, or written threatened material premium increases with respect to, any of such policies.

3.17    Brokers' and Finders' Fees. Except for the Banker's Fees, neither Parent nor Merger Sub has incurred, nor will either incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or investment bankers' fees or any similar charges in connection with this Agreement or any transaction contemplated hereby.

3.18    Taxes.

(a) Parent has timely filed all Tax Returns required to be filed, and such Tax Returns are true, correct and complete in all material respects.

29

(b)    Parent has paid in full all Taxes owed by it shown on any Tax Return. The charges, accruals and reserves for Taxes with respect to Parent (excluding any provision for deferred income taxes) reflected on the Financial Statements are adequate to cover all unpaid Taxes through the dates of the Parent Financial Statements. Parent does not have any Liability for unpaid Taxes accruing after the Balance Sheet Date except for Taxes arising in the ordinary course of business subsequent to the Balance Sheet Date.

(c)    Except as disclosed in Schedule 3.18, Parent has never had an interest in any "foreign business entity" as such term is defined in Section 6038 of the Code.

(d)    Parent withheld and paid over to the proper Governmental or Regulatory Authorities all Taxes required to have been withheld and paid over and complied in all material respects with all information reporting and backup withholding requirements, including maintenance of required records with respect thereto, in connection with amounts paid to any employee, independent contractor, creditor, or other third party and in connection with any amounts of income or gain allocated to any stockholder of Parent.

(e)    The Tax Returns of Parent have never been audited by any Governmental or Regulatory Authority nor is any such audit in process, pending or threatened (in writing). No deficiencies have been asserted (in writing) with respect to Taxes of Parent, and Parent has not received notice (in writing) nor expects to receive notice that it has not filed a Tax Return or paid Taxes required to be filed or paid by it. Parent is not a party to any action or proceeding for assessment or collection of Taxes, and no such event has been asserted or threatened (in writing) against Parent or any of Parent's assets. No waiver or extension of any statute of limitations is in effect with respect to Taxes or Tax Returns of Parent. Parent has not consented to extend to a date later than the date hereof the time in which any Tax may be assessed or collected by any Governmental or Regulatory Authority. To the Knowledge of Parent, no claim has ever been made by any Governmental or Regulatory Authority in a jurisdiction where Parent does not file Tax Returns that Parent is or may be subject to taxation by that jurisdiction. Schedule 3.18 includes a list of all jurisdictions in which Parent is required to either file a Tax Return or pay Taxes.

(f)    There are no Liens (other than Permitted Encumbrances) on the assets of Parent relating to or attributable to Taxes owing by Parent.

(g)    There is no basis for the assertion of any claim relating or attributable to Taxes owing by Parent, which if adversely determined, would result in any Lien (other than Permitted Encumbrances) on the assets of Parent or otherwise reasonably be expected to have a Material Adverse Effect.

(h)    None of Parent's assets is treated as "tax exempt use property" within the meaning of Section 168(h) of the Code.

(i)    There are no Contracts, plans or arrangements, including, but not limited to, the provisions of this Agreement or the other Transaction Documents, covering any employee or former employee of Parent that, individually or collectively, could give rise to the payment of any amount (or portion thereof) that would not be deductible pursuant to Sections 280G, 404 or 162 of the Code.

30

(j)     Parent is not, and has not been at any time, a party to a Tax sharing, Tax indemnity or Tax allocation agreement, and Parent has not assumed the Tax liability of any other Person under any Contract.

(k)     Parent has disclosed on its Tax Returns any Tax reporting position taken in any Tax Return which could result in the imposition of penalties under Section 6662 of the Code or any comparable provisions of state, local or foreign law.  The Parent has not consummated or participated in, and is not currently participating in any transaction which was or is a "Tax shelter" transaction as defined in Sections 6662 or 6111 of the Code or the Treasury Regulations promulgated thereunder.

(l)     Parent has never been a member of a consolidated, combined, unitary or aggregate group.

(m)     Parent does not have any Liability for the Taxes of any Person (other than Parent) under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or foreign law) as a transferee or successor, by Contract or otherwise.

(n)     Parent has never entered into an intercompany transaction resulting in deferred gain or loss within the meaning of Section 1.1502-13 of the Treasury Regulations.

(o)     Parent has not incurred a dual consolidated loss within the meaning of Section 1503 of the Code.

(p)     Parent is not a "United States real property holding corporation" within the meaning of Section 897 of the Code and has filed with the Internal Revenue Service all statements, if any, which are required under Section 1.897-2(h) of the Treasury Regulations.

(q)     Parent has not constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock qualifying for Tax-free treatment under Section 355 of the Code (i) in the two years prior to the date of this Agreement or (ii) in a distribution that could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in conjunction with the Merger.

3.19    Warranties; Product Complaints.  No product manufactured, acquired, distributed or sold by Parent is subject to any guarantee, warranty, right of return or other indemnity beyond Parent's applicable standard terms and conditions in effect at the time of sale.  Parent has no Knowledge of any reason why such claim expenses should significantly increase as a percentage of sales in the future.  Parent has not received any material complaints related to Parent's Products, including, but not limited to, complaints regarding security or functionality.

3.20    Obligation to Related Parties.  There are no obligations of Parent or Merger Sub to officers, directors, stockholders, or employees of Parent other than (a) for payment of salary for services rendered, (b) reimbursement for reasonable expenses incurred on behalf of Parent and (c) for other standard employee benefits made generally available to all employees (including stock option agreements outstanding under any stock option plan approved by the board of directors of Parent).  None of the officers, directors or, to the best of Parent's Knowledge, key employees or stockholders of Parent or any members of their immediate

31

families, is indebted to Parent or has any direct or indirect ownership interest in any Person with which Parent is affiliated or with which Parent has a business relationship, or any firm or corporation that competes with Parent, other than (i) passive investments in publicly traded companies (representing less than 1% of such company) which may compete with Parent and (ii) service as a board member of a company due to a person's affiliation with a venture capital fund or similar institutional investor in such company.  No officer, director or stockholder, or any member of their immediate families, is, directly or indirectly, interested in any material contract with Parent (other than such contracts as relate to any such person's ownership of capital stock or other securities of Parent).

**3.21**  _Disclosure_.  To Parent's Knowledge, no representation or warranty or other statement made by Parent in this Agreement, any other Transaction Document, the Disclosure Schedule, the Financial Statements or any certificate delivered pursuant to the transactions contemplated by this Agreement and the other Transaction Documents contains any untrue statement or omits to state a material fact necessary to make such representation or warranty or other statement, in light of the circumstances in which it was made, not misleading.

**3.22**  _Merger Sub_.  Merger Sub was formed for the sole purpose of effecting the transactions contemplated by this Agreement and has not engaged in any business activity other than in connection with its formation and the transactions contemplated by this Agreement.

## ARTICLE 4

## COVENANTS AND AGREEMENTS OF PARENT, MERGER SUB AND THE COMPANY

**4.1**  _Public Announcements_.  Neither the Company nor Parent nor Merger Sub will, without the prior consent of the other party, make, directly or indirectly, any public comment, statement, or communication with respect to, or otherwise disclose or permit the disclosure relating to this Agreement or the transactions contemplated hereby, except as required by Law or by rule or regulation of any securities exchange or market on which such party's securities are listed or quoted and after consultation with the other party.  Except as required by Law or by rule or regulation of any securities exchange or market on which such party's securities are listed or quoted, the timing and content of announcements concerning these matters, including any press releases, will be by mutual agreement of the Company and Parent.

**4.2**  _Qualification as Reorganization_.  Each of the parties agrees to make commercially reasonable efforts both prior to and following the Closing, to cause the Merger to qualify as a "reorganization" within the meaning of Section 368(a) of the Code and the regulations thereunder.  None of the Parties shall take any position on any federal, state or local income or franchise tax return, or take any other tax reporting position, that is inconsistent with the treatment of the Merger as a "reorganization" within the meaning of Section 368(a) of the Code.

**4.3**  _Employee Benefits_.  Following the Effective Time, Parent shall arrange for each participant in a Company Plan that is a group health, dental or vision plan, long-term disability, group life insurance, or qualified retirement plan (the "**_Company Participants_**") (including without limitation any eligible dependents of a participant who are participating in a Company

32

Plan at the Effective Time) who becomes a Parent employee (or an employee of any Parent subsidiary or affiliate) after the Effective Time to be eligible for at least comparable benefits in the aggregate as those provided to similarly situated employees of Parent subject to any eligibility requirements or exclusions as are applicable to the Parent employees, *provided, however,* that Parent shall not be required to offer any such benefit if the applicable costs or expenses materially exceed those for the Parent's employees. Each Company Participant shall, to the extent permitted by law and applicable tax qualification requirements, and subject to any applicable break in service or similar rule, receive credit including for eligibility to participate and vesting under Parent employee benefit plans (but not with respect to the accrual of benefits) for years of service with the Company (and its subsidiaries, affiliates, and predecessors) prior to the Effective Time (except where doing so would cause a duplication of benefits). If applicable, Parent shall use reasonable efforts to cause any and all pre-existing condition (or actively at work or similar) limitations, eligibility waiting periods and evidence of insurability requirements under any group health plans to be waived with respect to such Company Participants and their eligible dependents in accordance with applicable Laws and shall, if permitted by applicable insurers, provide them with credit for any co-payments, deductibles, and offsets (or similar payments) made during the plan year, including the Effective Time, for the purposes of satisfying any applicable deductible, out-of-pocket, or similar requirements under any Parent employee benefit plans or programs in which they are eligible to participate after the Effective Time. Company Participants are not intended to be third-party beneficiaries of this provision. Notwithstanding the above, Parent may maintain in effect any Company Plans (and Company Participants shall continue to remain eligible for coverage and benefits under the applicable terms of those Company Plans) for the remainder of calendar year 2006, notwithstanding that such coverage and benefits may not be comparable to those provided under Parent Plans.

## ARTICLE 5

## CONDITIONS TO PARENT'S AND MERGER SUB'S OBLIGATIONS

Parent's and Merger Sub's obligations to engage in the Merger are conditioned upon the satisfaction or waiver, on or prior to the Closing Date, of each of the following conditions:

**5.1**    Accuracy of Representations and Warranties. Each of the representations and warranties of the Company contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date except to the extent any such representation or warranty is expressly limited by its terms to another date or time (in which case such representation or warranty need only be true and correct as of such date or time), and Parent shall have received a certificate, dated the Closing Date, signed on behalf of the Company by the Chief Executive Officer of the Company to the foregoing effect.

**5.2**    Performance of Agreements. The Company shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date, and Parent shall have received a certificate, dated the Closing Date, signed on behalf of the Company by the Chief Executive Officer of the Company to the foregoing effect.

297864 v16/RE .

**5.3**    Good Standing and Other Certificates.    As of the Closing Date, the Company shall have delivered to Parent (a) a copy of the Company Charter, including all amendments thereto, certified by the Secretary of State of Delaware as of the Closing Date or any of the five preceding business days, (b) a certificate from (i) the Secretary of State of Delaware to the effect that the Company is in good standing in Delaware on the Closing Date, (ii) the Secretary of State Connecticut to the effect that the Company is duly qualified to do business as a foreign corporation and is in good standing in Connecticut on the Closing Date, (c) a copy of the bylaws of the Company, certified by the Secretary of the Company as being true and correct and in effect on the Closing Date, and (d) a copy of resolutions, certified as of the Closing Date by the Secretary of the Company, adopted by the board of directors and stockholders of the Company and authorizing the execution and delivery by the Company of this Agreement and the other Transaction Documents to which the Company is a party, the performance by the Company of its obligations hereunder and thereunder and the consummation by the Company of the transactions contemplated hereby and thereby.

**5.4**    No Litigation.    No action or proceedings shall have been instituted or threatened in writing before a court or other government body or by any public authority, and no claim shall have been asserted or threatened in writing to restrain or prohibit any of the transactions contemplated hereby, and Company shall have delivered to the Parent a certificate, dated the Closing Date, to such effect.

**5.5**    Opinion of the Company's Counsel.    The Company shall have furnished Parent with an opinion, dated and as of the Closing Date, of Wilson Sonsini Goodrich & Rosati, counsel to the Company, in a form reasonably acceptable to Parent.

**5.6**    Governmental and Other Approvals and Consents.    All Governmental or Regulatory Authority and other third party consents and approvals required by Parent to be obtained shall have been received, including any consents or approvals necessary to permit the consummation of the transactions contemplated by this Agreement and the other Transaction Documents.

**5.7**    Dissenters.    Holders of not more than 10% of the outstanding shares of capital stock of the Company (or an as-consented basis) (a) shall have voted against the Merger or not consented thereto in writing, and (b) shall have delivered before the Effective Time timely written notice of such holders' intent to exercise dissenters' rights for such shares in accordance with Delaware Law.

**5.8**    Recapitalization.    The Amended and Restated Certificate of Incorporation of Parent in the form of **EXHIBIT A** shall have been filed with the Secretary of State of Delaware and become effective.

**5.9**    Investor Questionnaires.    Parent shall have received executed investor questionnaires in the forms reasonably acceptable to Parent from the Company's United States and foreign stockholders.

297864 v16/RE .

**5.10**    Non-Competition Agreements; Release Agreements.  Each of the individuals set forth on Schedule 5.10 shall have executed and delivered to Parent a Non-Competition Agreement and Release Agreement, each in a form reasonably satisfactory to Parent.

**5.11**    Offer Letters; Proprietary Information and Inventions Assignment Agreements. Such individuals as Parent shall require in its sole discretion shall have executed and delivered to Parent an Offer Letter and a Proprietary Information and Inventions Assignment Agreement, each in a form reasonably satisfactory to Parent.

**5.12**    FIRPTA.  FIRPTA documentation, in form and substance acceptable to Parent, dated as of the Closing Date and executed by the Company, together with written authorization for Parent to deliver such documentation to the Internal Revenue Service on behalf of the Company after the Closing shall have been delivered to Parent.

**5.13**    Bridge Financing.  Parent shall, contemporaneously with the Closing, close a bridge financing with gross proceeds to Parent of at least $2,800,000.00 pursuant to a Note and Warrant Purchase Agreement in a form reasonably acceptable to Company (the "*Note and Warrant Purchase and Exchange Agreement*", and such transaction the "*Bridge Financing*").

**5.14**    Exchange of Certain Indebtedness.  $970,000 of indebtedness of the Company to Werner Paulus shall have been exchanged for promissory notes and warrants in the form issued pursuant to the Note and Warrant Purchase and Exchange Agreement in the amounts set forth therein.

**5.15**    Amendment to Certain Company Indebtedness.  $800,000 of indebtedness of Company to Werner Paulus (the "*Company Major Stockholder Indebtedness*") shall have been exchanged for promissory notes in a form reasonably acceptable to Parent and Werner Paulus, and all security interests retained by Werner Paulus shall have been released and all financing statements related thereto shall have been terminated.

**5.16**    New Paulus Loans.  The Company shall have issued to Werner Paulus a promissory note, in a form reasonably acceptable to Parent and Werner Paulus, with a principal amount of $800,000.

**5.17**    Indebtedness Extinguished.  All outstanding indebtedness of the Company to any of the Company's stockholders (other than $970,000 of indebtedness to Werner Paulus exchanged as set forth in Section 5.15 hereof and the Company Major Stockholder Indebtedness) shall have been extinguished, forgiven or otherwise canceled or converted into equity securities prior to the Effective Time.

**5.18**    Registration Rights Agreement.  The Registration Rights Agreement in a form reasonably acceptable to the Company and Parent (the "*Rights Agreement*") shall have been executed and delivered by the parties thereto.

**5.19**    Board Composition.  The Board of Directors of Parent immediately following the Merger shall consist of Steve Arnold, Antoinette Bush, Jean Case, Robert DiScipio, Tim DiScipio, Ed Fish, Miles Gilburn, Werner Paulus, William Raduchel and Nina Zolt.

297864 v16/RE .

**5.20**    Stockholder Agreement. The Stockholder Agreement in a form reasonably acceptable to the Company and Parent (the "*Stockholder Agreement*") shall have been executed and delivered by the parties thereto.

**5.21**    Option Matters. Parent shall have adopted a new option plan in a form reasonably acceptable to the Company and Parent pursuant to which 3,080,769 shares of Parent Common Stock shall be reserved for future issuance (the "*New Plan*").

**5.22**    Paulus Indemnification and Release Agreement.  Werner Paulus shall have entered into an indemnification agreement with Parent in a form reasonably acceptable to Parent and Werner Paulus.

**5.23**    Stockholder Approval. The principal terms of the Merger shall have been duly approved by the affirmative vote of stockholders of the Company holding a sufficient percentage of the outstanding shares of Company Stock necessary to approve the Merger under the Delaware Code and the Company Organizational Documents (the "*Requisite Stockholder Consent*").

**5.24**    Exchange Agreements.    Parent shall have received executed Exchange Agreements in the form attached as **EXHIBIT B**, executed by the Company and such Company Stockholders as Parent shall require in its sole discretion, whereby such persons shall exchange any and all right, title and interest in the Company for new, validly issued capital stock of the Company.

**5.25**    Carpenter Settlement Agreement.  Parent shall have received a fully executed settlement agreement executed by Paul Carpenter and the Company together with the fully executed agreements contemplated thereby, all in a form reasonably acceptable to Parent.

**5.26**    Closing Expenses.  The Company shall have paid the transaction fees and expenses in the amounts and to the parties set forth on a schedule to be mutually agreed by Parent and the Company on or before the Closing Date and shall have received payoff letters from such parties in a form reasonably acceptable to Parent.

## ARTICLE 6
## CONDITIONS TO THE COMPANY'S OBLIGATIONS

The Company's obligations to engage in the Merger are conditioned upon the satisfaction or waiver, on or prior to the Closing Date, of each of the following conditions:

**6.1**    Accuracy of Representations and Warranties.  Each of the representations and warranties of Parent and Merger Sub contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date except to the extent any such representation or warranty is expressly limited by its terms to another date or time (in which case such representation or warranty need only be true and correct as of such date or time), and the Company shall have received a certificate, dated the Closing Date, signed on behalf of Parent by the Chief Executive Officer of Parent to the foregoing effect.

36

**6.2**    Performance of Agreements.    Each of Parent and Merger Sub shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date, and the Company shall have received a certificate, dated the Closing Date, signed on behalf of Parent by the Chief Executive Officer of Parent to the foregoing effect.

**6.3**    Good Standing and Other Certificates.

**(a)**    Parent.    As of the Closing Date, the Parent shall have delivered to the Company (i) a copy of the Parent's certificate of incorporation, including all amendments thereto, certified by the Secretary of State of Delaware as of the Closing Date or any of the five preceding business days, (ii) a certificate from the Secretary of State of Delaware to the effect that Parent is in good standing in Delaware, and listing all Organizational Documents of the Parent on file as of the Closing Date or any of the five preceding business days, (iii) a certificate from the Department of Consumer and Regulatory Affairs of the District of Columbia to the effect that Parent is in good standing in the District of Columbia as of the Closing Date or any of the five preceding business days, (iv) a copy of the bylaws of Parent, certified by an officer of Parent as being true and correct and in effect on the Closing Date, and (v) a copy of resolutions, certified as of the Closing Date by an officer of Parent, adopted by the board of directors and stockholders of Parent and authorizing the execution and delivery by the Parent of this Agreement and the other Transaction Documents to which Parent is a party, the performance by Parent of its obligations hereunder and thereunder and the consummation by Parent of the transactions contemplated hereby and thereby.

**(b)**    Merger Sub.    As of the Closing Date, Merger Sub shall have delivered to the Company (i) a copy of Merger Sub's certificate of incorporation, including all amendments thereto, certified by the Secretary of State of Delaware as of the Closing Date or any of the five preceding business days, (ii) a certificate from the Secretary of State of Delaware to the effect that Merger Sub is in good standing in Delaware and listing all Organizational Documents of Merger Sub on file as of the Closing Date or any of the five preceding business days, (iii) a copy of the bylaws of Merger Sub, certified by an officer of Merger Sub as being true and correct and in effect on the Closing Date, and (iv) a copy of resolutions, certified as of the Closing Date by an officer of Merger Sub, adopted by the board of directors and stockholder of Merger Sub and authorizing the execution and delivery by Merger Sub of this Agreement and the other Transaction Documents to which Merger Sub is a party, the performance by Merger Sub of its obligations hereunder and thereunder and the consummation by Merger Sub of the transactions contemplated hereby and thereby.

**6.4**    No Litigation.    No action or proceedings shall have been instituted or threatened in writing before a court or other government body or by any public authority, and no claim shall have been asserted or threatened in writing to restrain or prohibit any of the transactions contemplated hereby, and Parent shall have delivered to Company a certificate, dated the Closing Date, to such effect.

**6.5**    Opinion of the Parent's Counsel.    Parent shall have furnished the Company with an opinion, dated and as of the Closing Date, of Cooley Godward LLP, counsel to Parent, in a form reasonably acceptable to the Company.

37

**6.6**    Governmental and Other Approvals and Consents.    All Governmental or Regulatory Authority and other third party consents and approvals required by Parent to be obtained shall have been received, including any consents or approvals necessary to permit the consummation of the transactions contemplated by this Agreement and the other Transaction Documents.

**6.7**    Bridge Financing.    Parent shall, contemporaneously with the Closing, close the Bridge Financing.

**6.8**    Exchange of Certain Indebtedness.    $970,000 of indebtedness of Company to Werner Paulus shall have been exchanged for promissory notes and warrants in the form issued pursuant to the Note and Warrant Purchase and Exchange Agreement in the amounts set forth therein.

**6.9**    Amendment to Certain Indebtedness.    $800,000 of indebtedness of Company to Werner Paulus shall have been exchanged for promissory notes, in forms reasonably acceptable to Parent and Werner Paulus, and all security interests retained by Werner Paulus shall have been released and all financing statements related thereto shall have been terminated.

**6.10**    New Paulus Loans.    The Company shall have issued to Werner Paulus a promissory note, in a form reasonably acceptable to Parent and Werner Paulus, with a principal amount $800,000.

**6.11**    Forgiveness of Indebtedness.    All outstanding indebtedness of Parent to its stockholders other than the Guaranteed Indebtedness shall have been forgiven or converted into equity securities prior to the Effective Time.

**6.12**    Rights Agreement.    The Rights Agreement shall have been executed and delivered by the parties thereto.

**6.13**    Board Composition.    The Board of Directors of Parent immediately following the Merger shall consist of Steve Arnold, Antoinette Bush, Jean Case, Robert DiScipio, Tim DiScipio, Ed Fish, Miles Gilburn, Werner Paulus, William Raduchel and Nina Zolt.

**6.14**    Stockholder Agreement.    The Stockholder Agreement shall have been executed and delivered by the parties thereto.

**6.15**    Option Matters.    Parent shall have adopted the New Plan.

**6.16**    Restated Certificate of Incorporation; Recapitalization.    The Restated Certificate of Incorporation of Parent in the form attached hereto as **EXHIBIT A** shall have been filed with the Secretary of State of the State of Delaware and shall be in full force and effect.

**6.17**    Stockholder Approval.    The principal terms of the Merger shall have been duly approved by the Requisite Stockholder Consent.

**6.18**    Services Agreement.    Parent shall have executed the Services Agreement between Parent and In2Books Non-profit in a form reasonably acceptable to Parent and the Company.

297864 v16/RE .

# ARTICLE 7

## SURVIVAL OF REPRESENTATIONS; ESCROW AND INDEMNITY

**7.1**    Survival of Representations.  All representations and warranties of the parties contained in this Agreement and all agreements, documents and instruments executed and delivered herewith shall (a) be deemed to have been relied upon by the party or parties to whom they are made, and shall survive the Closing regardless of any investigation on the part of such party or its representatives and (b) survive the Closing until May 28, 2008 (the "*Expiration Date*"), except the representations and warranties under Sections 2.1, 2.2, 2.3, 3.1, 3.2 and 3.3 (the "*Excluded Representations*") shall not expire until the applicable statute of limitations; provided, that any written claim for breach thereof made prior to such expiration date and delivered to the party against whom such indemnification is sought shall survive thereafter and, as to any such claim, such applicable expiration will not effect the rights to indemnification of the party making such claim.  Except with respect to any claim based on fraud or intentional misrepresentation, no claim for a breach of a representation or warranty may be made or brought by any party hereto after the expiration of the applicable survival period. All of the covenants of the parties contained herein shall survive the Closing.

**7.2**    Indemnification.

(a)    Subject to the provisions of this Article 7, from and after the Closing, Parent, the Surviving Corporation, Merger Sub, their respective Affiliates (excluding any Person who is a stockholder, officer, director or Affiliate of the Company immediately prior to the Effective Time) (each a "*Parent Indemnified Party*" and collectively the "*Parent Indemnified Parties*") shall be held harmless and indemnified from and against all liabilities, Taxes, fines, penalties, losses, diminution in value, damages, judgments, settlements, costs and expenses (including reasonable fees and expenses of counsel, consultants, experts and other professional fees) (collectively, "*Losses*") that the Parent Indemnified Parties or any of them may incur arising from (i) the breach of any representation or warranty of the Company in this Agreement, (ii) the breach of any representation, warranty or covenant of the Company's stockholders in any of the documents referred to in Section 5.9 hereof or (iii) any accounts payable or other liabilities or expenses incurred by or on behalf of the Company, other than to those parties and in those amounts set forth on a schedule to be mutually agreed by Parent and the Company on or before the Closing Date.

(b)    Subject to the provisions of this Article 7, from and after the Closing, the Company's stockholders and their respective Affiliates (excluding any Person who is a stockholder, officer, director or Affiliate of Parent immediately prior to the Effective Time) (each a "*Stockholder Indemnified Party*" and collectively the "*Stockholder Indemnified Parties*") shall be held harmless and indemnified from and against all Losses that the Stockholder Indemnified Parties or any of them may incur arising from (i) the breach of any representation or warranty of Parent or Merger Sub in this Agreement or (ii) the breach of any agreement or covenant of either

39

Parent or Merger Sub contained in this Agreement or any Transaction Document (collectively, the "***Parent Covenants***").

(c)    Notwithstanding anything to the contrary in this Agreement, other than in the case of (i) fraud or willful misconduct or (ii) Losses arising from a breach of any of the Excluded Representations, Parent Indemnified Parties and Stockholder Indemnified Parties shall be entitled to satisfy any rights to indemnification arising under Section 7.2(a) and 7.2(b), respectively solely pursuant to the adjustments to the Contingent Merger Consideration described in Section 7.5 hereof.

**7.3**    Indemnification Procedures.    Claims for indemnification under this Agreement shall be asserted and resolved as follows:

(a)    A Parent Indemnified Party claiming indemnification under this Agreement with respect to any claims asserted against such Parent Indemnified Party by a third party ("***Third Party Claim***") that could give rise to a right of indemnification under this Agreement shall promptly (but in no event after the Expiration Date, except in the case of any claim related to any of the Excluded Representations) notify in writing (a "***Claim Notice***") the Holder Representative of the Third Party Claim.  A Stockholder Indemnified Party claiming indemnification under this Agreement with respect to any Third Party Claim that could give rise to a right of indemnification under this Agreement shall promptly (but in no event after the Expiration Date except in the case of any claim related to any of the Excluded Representations) deliver a Claim Notice to the Holder Representative, and Holder Representative shall deliver a copy of such Claim Notice to Parent. Any Claim Notice hereunder shall describe in reasonable detail the nature of the Third Party Claim, a copy of all papers served with respect to such claim (if any), the Indemnified Party's best estimate of the amount of Losses attributable to the Third Party Claim and the basis of the Indemnified Party's request for indemnification under this Agreement. Failure to provide such Claim Notice shall not affect the right of any Indemnified Party's indemnification hereunder, except to the extent the indemnifying Party demonstrates actual and material prejudice as a result of such failure. As used herein, an "***Indemnified Party***" shall mean a Parent Indemnified Party or a Stockholder Indemnified Party, as applicable.

(b)    In the case of any Third Party Claim against a Stockholder Indemnified Party, if within ten (10) days after receiving a Claim Notice, Parent (i) gives written notice to the Holder Representative stating that Parent disputes and intends to defend against such claim, liability or expense at Parent's own cost and expense and (ii) provides assurance reasonably acceptable to the Holder Representative that such indemnification will be paid fully and promptly if required and such Stockholder Indemnified Party will not incur cost or expense during the proceeding, Parent shall have the right to defend the Stockholder Indemnified Party against such Third Party Claim. If the Parent, as applicable, notifies the Holder Representative that the Parent elects to assume the defense of the Third Party Claim, then the Parent shall have the right to defend such Third Party Claim with counsel selected by the Parent who is reasonably acceptable to the Holder Representative (it being agreed that Cooley Godward LLP shall be deemed reasonably acceptable), by all appropriate proceedings, which proceedings shall be prosecuted by the Parent to a final conclusion or settled at the discretion of the Parent in accordance with this Section 7.3(b). The Parent, as applicable, shall have full control of such defense and proceedings, including, any compromise or settlement thereof, provided that the Parent shall not enter into any settlement

40

agreement without the written consent of the Holder Representative, unless (i) the settlement agreement contains a complete and unconditional release by the third party asserting the claim to all Indemnified Parties that are the subject of such claim, and (ii) the settlement agreement does not contain any sanction or restriction upon the conduct of any business by the Stockholder Indemnified Party.  If reasonably requested by Parent, the Stockholder Indemnified Party and the Holder Representative agree, at the sole cost and expense of Parent, to cooperate with the Parent and its counsel in contesting any Third Party Claim which the Parent elects to contest, including the making of any related counterclaim against the Person asserting the Third Party Claim or any cross complaint against any Person.  The Stockholder Indemnified Party may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Parent pursuant to this Section 7.3(b), and the Stockholder Indemnified Party shall bear its own costs and expenses with respect to such participation.  Parent shall keep such Indemnified Party apprised of the status of the claim, liability or expense and any resulting suit, proceeding or enforcement action, shall furnish the Holder Representative with all documents and information that Holder Representative shall reasonably request on behalf of the Stockholder Indemnified Party and shall consult with such Stockholder Indemnified Party prior to acting on major matters, including settlement discussions.

(c)    If Parent fails to notify the Stockholder Indemnified Party within ten (10) days after receipt of any Claim Notice that the Parent elects to defend the Stockholder Indemnified Party pursuant to Section 7.3(b), then the Holder Representative, on behalf of the Stockholder Indemnified Party, shall have the right to defend, and be reimbursed via a dollar-for-dollar adjustment to Net Losses for its reasonable cost and expense (only if the Stockholder Indemnified Party is actually entitled to indemnification hereunder), the Third Party Claim by all appropriate proceedings, which proceedings shall be prosecuted diligently by the Holder Representative on behalf of the Indemnified Party to a final conclusion or settled. The Stockholder Indemnified Party shall have full control of such defense and proceedings; *provided however*, that the Stockholder Indemnified Party may not enter into any compromise or settlement of such Third Party Claim if indemnification is to be sought hereunder, without Parent's consent, which shall not be unreasonably withheld or delayed. Parent may participate in, but not control, any defense or settlement controlled by the Stockholder Indemnified Party pursuant to this Section 7.3(c), and Parent shall bear its own costs and expenses with respect to such participation.

(d)    In the event any Parent Indemnified Party should have a claim hereunder which does not involve a Third Party Claim, the Indemnified Party shall promptly (but in no event after the Expiration Date, except in the case of any claim related to any of the Excluded Representations) transmit to the Holder Representative a written notice (the "*Indemnity Notice*") describing in reasonable detail the nature of the claim, the Parent Indemnified Party's best estimate of the amount of Losses attributable to such claim and the basis of the Parent Indemnified Party's request for indemnification under this Agreement.  In the event any Stockholder Indemnified Party should have a claim hereunder which does not involve a Third Party Claim, the Holder Representative shall transmit to Parent prior to the Expiration Date (except in the case of any claim related to any of the Excluded Representations) an Indemnity Notice describing in reasonable detail the nature of the claim, the Stockholder Indemnified Party's best estimate of the amount of Losses attributable to such claim and the basis of the Stockholder Indemnified Party's request for indemnification under this Agreement.    Any Indemnity Notice related to a claim for misrepresentation or breach of warranty shall state in reasonable detail the alleged basis for the

41

breach of the representation or warranty with respect to which the claim is made. If the Holder Representative or Parent, as applicable, does not notify the Indemnified Party within thirty (30) days from its receipt of the Indemnity Notice that the Holder Representative or Parent, as applicable, disputes such claim, the indemnifying party shall be deemed to have accepted and agreed with such claim. If the Holder Representative or Parent, as applicable, has disputed such claim, such dispute shall be resolved in accordance with Section 7.4 hereof.

(e)     Parent, Merger Sub, the Surviving Corporation and the Holder Representative shall cooperate with each other in respect to resolving any claims. The Indemnified Parties shall provide the Holder Representative or Parent, as applicable, and its agents and representatives with reasonable access to their records, books, employees, agents and representatives during normal business hours in connection with the investigation and evaluation of any claim made from time to time.

7.4     Limitation on Liability.

(a)     Notwithstanding anything to the contrary in this Agreement, a Parent Indemnified Party shall not be entitled to indemnification under Sections 7.2(a)(i) or (ii) (other than with respect to the Excluded Representations) until the aggregate Losses incurred by the Parent Indemnified Parties exceeds $100,000 (the "*Threshold Amount*"), and then such Indemnified Party shall be entitled to indemnification for all of its Losses.

(b)     Notwithstanding anything to the contrary in this Agreement, a Stockholder Indemnified Party shall not be entitled to indemnification under Section 7.2(b)(i) or (ii) (other than with respect to the Excluded Representations) until the aggregate Losses incurred by the Stockholder Indemnified Parties exceeds the Threshold Amount, and then such Indemnified Party shall be entitled to indemnification for all of its Losses.

7.5     Indemnification; Payment Mechanics. No amounts shall be paid to satisfy any resolved indemnification claims under this Article 7 prior to the Expiration Date. Within five (5) business days following the Expiration Date, Parent shall deliver to the Holder Representative an accounting of all indemnification claims resolved prior to the Expiration Date, including a calculation of Net Losses. In the event that Holder Representative does not dispute such calculation in writing prior to the date five (5) business days following such delivery, such calculation shall be deemed final and binding on the parties. In the event that Holder Representative disputes such calculation in writing prior to the date five (5) business days following such delivery, such dispute shall be resolved in accordance with Section 9.3 hereof. For purposes of this Agreement, "*Net Losses*" shall mean the dollar value of resolved claims accruing to the Parent Indemnified Parties ("*Parent Losses*") plus the dollar value of unresolved claims by the Parent Indemnified Parties ("*Parent Reserves*"), less the dollar value of resolved claims accruing to the Stockholder Indemnified Parties ("*Stockholder Losses*"). "*Contingent Merger Consideration*" shall be equal to 462,115 shares of Parent Common Stock, plus or minus the quotient of (i) Net Losses; divided by (ii) the fair market value per share of Parent Common Stock established by the first independent valuation of Parent Common Stock following the Effective Time, regardless of the primary purpose for which such valuation is performed, it being understood that if the Parent Losses exceed the Stockholder Losses, then Net Losses will be a negative number and result in a reduction of the Contingent Merger Consideration. Upon the

42

subsequent resolution of any outstanding claims for indemnification made prior to but resolved following the Expiration Date, Parent shall deliver additional Contingent Merger Consideration equal to the additional Net Losses so resolved in accordance with the formula set forth in the preceding sentence. The parties agree that in any case, after resolution of all outstanding claims, the aggregate Contingent Merger Consideration shall be no less than zero, and no more than 924,230 shares of Parent Common Stock.

**7.6**     Sole Remedy.

    **(a)**     Other than with respect to the Excluded Representations or in the case of fraud or willful misconduct, the sole source of recovery for the indemnification obligations set forth in this Article 7 shall be the adjustment to Net Losses and the corresponding adjustment to Contingent Merger Consideration to be paid pursuant to the terms hereof.

    **(b)**     From and after the Closing, the Parent Indemnified Parties acknowledge and agree that the remedies provided for in this Article 7 shall be the Parent Indemnified Parties' exclusive remedy with respect to all breaches of the representations and warranties of the Company contained herein; provided that nothing shall be deemed to limit or restrict in any manner any rights or remedies that any Parent Indemnified Party has against any other party hereto based on (i) any fraud or intentional misrepresentation by such other party hereto, or (ii) any breach by the Company of any of its Excluded Representations. Notwithstanding the foregoing, in the case of clause (ii) of the immediately preceding sentence, the Parent Indemnified Parties shall be entitled to recovery from the Company stockholders on a several basis, with recovery in respect of such Losses from any Company stockholder limited to the total amount of such Losses multiplied by a fraction, (x) the numerator of which is equal to the amount of Merger Consideration received by such Company stockholder pursuant to the terms hereof and (y) the denominator of which is equal to the aggregate amount of Merger Consideration received by all Company stockholders pursuant to the terms hereof.

    **(c)**     From and after the Closing, the Stockholder Indemnified Parties acknowledge and agree that the remedies provided for in this Article 7 shall be the Stockholder Indemnified Parties' exclusive remedy with respect to all breaches of the representations and warranties of the Parent and Merger Sub contained herein; provided that nothing shall be deemed to limit or restrict in any manner any rights or remedies that any Stockholder Indemnified Party has against any other party hereto based on (i) any fraud or intentional misrepresentation by such party, or (ii) any breach by Parent of any of its Excluded Representations.

    **7.7**     Holder Representative; Power of Attorney.     Effective upon the vote of the Company's stockholders approving the Merger, and without further act of any stockholder, Polygon Management, Inc. was appointed by virtue of such approval as agent and attorney-in-fact (the "*Holder Representative*") for each stockholder of the Company (except such stockholders, if any, as shall have perfected their appraisal rights under the Delaware Code), for and on behalf of the stockholders of the Company, to give and receive notices and communications, to authorize settlement of claims by Parent Indemnified Parties, to object to such settlement, to agree to, negotiate, enter into settlements and compromises of, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such claims, and to take all actions necessary or appropriate in the judgment of the Holder

43

Representative for the accomplishment of the foregoing.  Such agency may be changed by the stockholders of the Company from time to time upon not less than thirty (30) days prior written notice to Parent; provided that the Holder Representative may not be removed unless Company stockholders receiving a majority of the Closing Merger Consideration agree to such removal and to the identity of the substituted agent.  Any vacancy in the position of Holder Representative may be filled by approval of the Company stockholders receiving a majority of the Closing Merger Consideration. No bond shall be required of the Holder Representative, and the Holder Representative shall not receive compensation for its services.  Notices or communications to or from the Holder Representative shall constitute notice to or from each of the stockholders of the Company.  Other than the Holder Representative, no stockholder shall have any right to intervene, take part in or otherwise delay any action related to the settlement of any claims for indemnification for Losses hereunder.

## ARTICLE 8

## TERMINATION

Parent or the Company may terminate this Agreement at any time by written notice to the other parties hereto.  Notwithstanding approval of this Agreement by the stockholders of Merger Sub and the Company, the parties hereto agree that termination of this Agreement shall constitute mutual termination and abandonment of the Merger and that, upon any such termination, none of Parent, Merger Sub or the Company shall have any further rights or obligations under or arising out of this Agreement.

## ARTICLE 9

## MISCELLANEOUS

**9.1** <u>Definitions of Certain Terms</u>.  As used in this Agreement, the following capitalized terms shall have the respective meanings set forth below:

"<u>AAA</u>" shall have the meaning set forth in Section 9.3(a).

"<u>AAA Rules</u>" shall have the meaning set forth in Section 9.3(a).

"<u>Accredited Investor</u>" shall mean each holder of Company Stock who is an "accredited investor", as such term is defined in Rule 501 promulgated under the Securities Act, and who shall have represented to such in an investor questionnaire provided to the Company.

"<u>Affiliate</u>" of a Person means any other Person which, directly or indirectly, controls or is controlled by or is under common control with, such Person.

"<u>Agreement</u>" shall have the meaning set forth in the preamble.

"<u>Balance Sheet Date</u>" shall have the meaning set forth in Section 2.6(a).

"<u>Banker's Fees</u>"  shall mean the fees of The Silverfern Group payable by reason of the consummation of the Merger.

297864 v16/RE  .

"Bridge Financing"  shall have the meaning set forth in Section 5.14.

"Cash Consideration" shall mean an amount equal to the quotient of (x) $3,814,350 divided by (y) the number of shares of Company Stock deemed outstanding immediately prior to the Closing as set forth on Schedule 1.6.

"Claim Notice" shall have the meaning set forth in Section 7.3(a).

"Closing" shall have the meaning set forth in Section 1.2.

"Closing Date" shall have the meaning set forth in Section 1.9.

"Code" shall mean the United States Internal Revenue Code of 1986 and all rules and regulations promulgated thereunder from time to time, in each case as amended.

"Common Stock Merger Consideration" shall have the meaning set forth in Section 1.6(a).

"Company" shall have the meaning set forth in the preamble.

"Company Business" means the business of the Company as currently conducted.

"Company Charter" shall have the meaning set forth in Section 2.1.

"Company Copyrights" shall have the meaning set forth in Section 2.11(a).

"Company Disclosure Schedules" shall have the meaning set forth in the introduction to Article 2.

"Company Intellectual Property Assets" means all Intellectual Property Assets owned by the Company. "Company Intellectual Property Assets" includes, without limitation, the Products, Company Patents, Company Marks, Company Copyrights and Company Trade Secrets.

"Company Major Stockholder Indebtedness"  shall have the meaning set forth in Section 5.15.

"Company Marks" shall have the meaning set forth in paragraph 2.11(a).

"Company Option" shall have the meaning set forth in paragraph 1.6(c).

"Company Participants" shall have the meaning set forth in paragraph 4.3.

"Company Patents" shall have the meaning set forth in paragraph 2.11(a).

"Company Plans" shall mean all Plans maintained by or contributed to by the Company (including any agreement, method or arrangement that applies to one person or individual, such as any employment agreements), or which otherwise cover any employees or former employees (including leased employees to the extent the Company has any obligation for the provision of benefits) of the Company and for which the Company has any liability or any other Plan as to

45

which the Company has any liability.  For purposes of clarity, the use of Company in this defined term shall include any of its Subsidiaries.

"Company Products" means those programs and/or services and related documentation designed, manufactured, marketed, sold and/or distributed by the Company and owned by the Company.  A complete list of the Products owned by the Company is provided on Schedule 2.11.

"Company Stock" shall have the meaning set forth in Section 1.6.

"Company Trade Secrets" shall have the meaning set forth in Section 2.11(a)(viii).

"Contingent Merger Consideration" shall have the meaning set forth in Section 7.5.

"Contract" shall have the meaning set forth in Section 2.4(a).

"Conversion Ratio" shall have the meaning set forth in Section 1.6(c)

"Copyrights" shall mean all copyrights in both published and unpublished works, including without limitation all compilations, databases and computer programs, manuals and other documentation and all copyright registrations and applications, and all derivatives, translations, adaptations and combinations of the above.

"Delaware Code" shall have the meaning set forth in Section 1.1.

"Dispute" shall have the meaning set forth in Section 9.4.

"Dissenting Shares" shall have the meaning set forth in Section 1.10.

"Effective Time" shall have the meaning set forth in Section 1.2.

"ERISA" shall mean the Federal Employee Retirement Income Security Act of 1974 and all rules and regulations promulgated thereunder from time to time, in each case as amended.

"Excluded Representations" shall have the meaning set forth in Section 7.1.

"Expiration Date" shall have the meaning set forth in Section 7.1.

"Financial Statements" shall have the meaning set forth in Section 2.6(a).

"GAAP" shall have the meaning set forth in Section 2.6(a).

"Governmental or Regulatory Authority" shall mean any instrumentality, subdivision, court, administrative agency, commission, official or other authority of the United States or any other country or any state, province, prefect, municipality, locality or other government or political subdivision thereof, or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

"Holder Representative" shall have the meaning set forth in Section 7.7.

46

297864 v16/RE .

"Indebtedness" shall have the meaning set forth in Section 2.9.

"Indemnified Party" or "Indemnified Parties" shall have the meaning set forth in Section 7.3(a).

"Indemnity Notice" shall have the meaning set forth in Section 7.3(d).

"Intellectual Property Assets" means: Patents, Marks, Copyrights, Trade Secrets, and goodwill, franchises, licenses, permits, consents, approvals, and claims of infringement against third parties.

"Knowledge" shall mean, (a) with respect to the Company, the actual knowledge of the following representatives of the Company: Jonathan Ewert, Tim DiScipio, Victoria McEachern, and the knowledge a similarly-situated person to the foregoing people would have reasonably had; and (b) with respect to Parent, the actual knowledge, after reasonably comprehensive inquiry, of the following representatives of the Parent: Ed Fish and Doug Wallace, and the knowledge a similarly situated person to the foregoing people would have reasonably had.

"Law" shall mean any national, federal, state, local or foreign law, rule, regulation, statute, ordinance, order, judgment, decree, permit, franchise, license or other governmental restriction or requirement of any kind.

"Lien" or "Liens" shall mean liens, security interests, options, rights of first refusal, claims, easements, mortgages, charges, indentures, deeds of trust, rights of way, restrictions on the use of real property, encroachments, security agreements, or any other encumbrances and other restrictions or limitations on use of real or personal property or irregularities in title thereto.

"Loss" or "Losses" shall have the meaning set forth in Section 7.2(a).

"Marks" shall mean all trade names, trade dress, logos, packaging design, slogans, Internet domain names, registered and unregistered trademarks and service marks and related registrations and applications for registration.

"Material Adverse Effect" shall mean any material adverse effect on the business, financial condition, results of operations, or prospects of the affected party, including without limitation any effect which prevents or impairs materially such party's performance of its obligations under, or the consummation of, this Agreement; provided that Material Adverse Effect for purposes of this Agreement shall not include the effect of the announcement or disclosure of the transactions contemplated herein.

"Merger" shall have the meaning set forth in the recitals.

"Merger Consideration" shall have the meaning set forth in Section 1.6(b).

"Merger Sub" shall have the meaning set forth in the preamble.

"Merger Sub Common Stock" shall have the meaning set forth in Section 1.7.

47

"MEWA" shall have the meaning set forth in Section 2.14(a).

"Net Losses" shall have the meaning set forth in Section 7.5.

"New Plan" shall have the meaning set forth in Section 5.21.

"Non-Accredited Investor" shall mean each holder of Company Stock who is not an Accredited Investor or who is a resident of France, New Zealand or Australia.

"Order" shall mean any judgment, order, injunction, decree, writ, permit or license of any Governmental or Regulatory Authority or any arbitrator.

"Organizational Document" shall mean any certificate or articles of incorporation, bylaw, board of directors' or stockholders' resolution, or other corporate document or action comparable to any of the foregoing currently in effect.

"Parent" shall have the meaning set forth in the preamble.

"Parent Balance Sheet Date" shall have the meaning set forth in Section 3.6(a).

"Parent Business" means the business of Parent as currently conducted and proposed to be conducted.

"Parent Common Stock" shall have the meaning set forth in the recitals.

"Parent Copyrights" shall have the meaning set forth in Section 3.11(a).

"Parent Covenants" shall have the meaning set forth in paragraph 8.2(b).

"Parent Disclosures Schedules" shall have the meaning set forth in the introduction to Article 3.

"Parent Financial Statements" shall have the meaning set forth in Section 3.6(a).

"Parent Indemnified Party" or "Parent Indemnified Parties" shall have the meaning set forth in Section 7.2(a).

"Parent Intellectual Property Assets" means all Intellectual Property Assets owned by Parent or used in the Parent Business. "Parent Intellectual Property Assets" includes, without limitation, the Parent Products, Parent Patents, Parent Marks, Parent Copyrights and Parent Trade Secrets.

"Parent Losses" shall have the meaning set forth in Section 7.5.

"Parent Marks" shall have the meaning set forth in Section 3.11(a).

"Parent Patents" shall have the meaning set forth in Section 3.11(a).

"Parent Plans" shall mean all Plans maintained by or contributed to by the Parent (including any agreement, method or arrangement that applies to one person or individual, such as any employment agreements), or which otherwise cover any employees or former employees (including leased employees to the extent the Parent has any obligation for the provision of benefits) of the Parent and for which the Parent has any liability or any other Plan as to which the Parent has any liability. For purposes of clarity, the use of Parent in this defined term shall include any of its Subsidiaries.

"Parent Products" means those programs and/or services and related documentation designed, manufactured, marketed, sold and/or distributed by Parent and owned by Parent. A complete list of the products owned by Parent is provided on Schedule 3.11.

"Parent Recapitalization" shall have the meaning set forth in the recitals.

"Parent Reserves" shall have the meaning set forth in Section 7.5

"Parent Trade Secrets" shall have the meaning set forth in Section 3.11(a)(viii).

"Patents" shall mean all patents, patent applications, patent rights, and inventions and discoveries and invention disclosures (whether or not patented).

"Per Share Closing Common Stock Merger Consideration" shall mean a number of shares of Parent Common Stock equal to the quotient of (x) 4,159,039 divided by (y) the number of shares of Company Stock deemed outstanding immediately prior to the Closing as set forth on Schedule 1.6.

"Per Share Contingent Merger Consideration" means a number of shares of Parent Common Stock equal to the quotient of (x) the Contingent Merger Consideration divided by (y) the number of shares of Company Stock deemed outstanding immediately prior to the Closing, as set forth on Schedule 1.6.

"Permits" shall mean all licenses, permits, authorizations, consents, approvals, Orders, filings or registrations with any court or administrative or Governmental or Regulatory Authority.

"Permitted Encumbrance" shall mean such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced (except as otherwise provided below): (i) Liens reflected in the Company's or Parent's balance sheet, as applicable; (ii) Liens consisting of zoning or planning restrictions, easements, permits and other restrictions or limitations on the use of real property or irregularities in title thereto which do not materially detract from the value of, or impair the use of, such property by the Company or Parent, as applicable, in the operation of their respective businesses; (iii) Liens for current Taxes, assessments or governmental charges or levies on property not yet due and delinquent or that are being contested in good faith; (iv) statutory encumbrances, such as materialmen's, mechanics', carriers', workmens' and repairmens' liens and other similar liens arising in the ordinary course of business for amounts that are not yet due and delinquent or that are being contested in good faith; (v) pledges or deposits to secure obligations under workers' compensation Laws or similar legislation  and (vi) any other Liens which, either individually or in the aggregate, do not

297864 v16/RE .

materially detract from the value or materially interfere with the use of the subject property by the Company or Parent, as applicable.

"Person" shall mean any individual, partnership, joint venture, corporation, trust, limited liability company, unincorporated organization, government (or subdivision thereof) or other entity.

"Plan" shall mean any bonus, deferred compensation, incentive compensation, stock purchase, restricted stock, stock option, severance, hospitalization or other medical, life or other insurance, employee welfare, supplemental unemployment benefit, profit-sharing, pension or retirement plan, program, agreement or arrangement or any other employee benefit plan, program, agreement, method or arrangement, including without limitation any "employee pension benefit plan" and any "employee welfare benefit plan" as those terms are defined in Section 3 of ERISA.

"Requisite Stockholder Consent" shall have the meaning set forth in Section 5.23.

"Rights Agreement" shall have the meaning set forth in Section 5.18.

"Securities Act" shall mean the United States Securities Act of 1933 and all rules and regulations promulgated thereunder from time to time, in each case as amended.

"Stock Plan" shall have the meaning set forth in Section 1.6(c).

"Stockholders Agreement" shall have the meaning set forth in Section 5.20.

"Stockholder Indemnified Party" or "Stockholder Indemnified Parties" shall have the meaning set forth in Section 7.2(b).

"Stockholder Losses" shall have the meaning set forth in Section 7.5.

"Subsidiary" shall mean, with respect to any Person, (a) any corporation more than fifty percent (50%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is owned by such Person directly or indirectly through one or more Subsidiaries of such Person and (b) any partnership, association, joint venture or other entity in which such Person directly or indirectly through one or more Subsidiaries of such Person has more than a fifty percent (50%) equity interest.

"Surviving Corporation" shall have the meaning set forth in Section 1.1.

"Tax(es)" shall mean any tax or similar governmental charge, impost or levy (including, without limitation, income taxes, franchise taxes, transfer taxes or fees, sales taxes, use taxes, gross receipts taxes, value added taxes, employment taxes, excise taxes, ad valorem taxes, property taxes, withholding taxes, payroll taxes, minimum taxes or windfall profit taxes) together with any related penalties, fines, additions to tax or interest imposed by the United States or any state, county, local or foreign government or subdivision or agency thereof.

"Tax Return(s)" shall mean any return (including any information return), report, statement, schedule, notice, form, estimate, or declaration of estimated tax relating to or required to be filed with any Governmental or Regulatory Authority in connection with the determination, assessment, collection or payment of any Tax.

"Third Party Claim" shall have the meaning set forth in Section 7.3(a).

"Third Party Rights" shall have the meaning set forth in Section 2.11(a)(iii).

"Threshold Amount" shall have the meaning set forth in Section 7.4(a).

"Trade Secrets" shall mean all know-how, trade secrets, confidential or proprietary information, research in progress, algorithms, data, designs, processes, formulae, drawings, schematics, blueprints, flow charts, models, strategies, prototypes, techniques, Beta testing procedures and Beta testing results.

"Transaction Documents" shall have the meaning set forth in Section 2.3.

"VEBA" shall have the meaning set forth in Section 2.14(a).

**9.2**    Specific Performance.  The parties acknowledge and agree that the other parties would be irreparably harmed if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any breach of this Agreement could not be adequately compensated in all cases by monetary damages alone. Accordingly, in addition to any other right or remedy to which such parties may be entitled at Law or in equity, they shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement, without posting any bond or other undertaking.

**9.3**    Arbitration.  Except for the right of any party to apply to a court of competent jurisdiction for a temporary restraining order, a preliminary injunction or other equitable relief to preserve the status quo or prevent irreparable harm, any controversy, dispute or claim arising out of or in connection with or relating to this Agreement or any of the other Transaction Documents, or the breach, termination or validity hereof or any transaction contemplated hereby or thereby (any such controversy, dispute or claim being referred to as a "***Dispute***") shall be finally settled as set forth below:

**(a)**    The Dispute shall be arbitrated by a panel of three arbitrators, one to be appointed by each party to the Dispute and the arbitrators so appointed will appoint the third arbitrator pursuant to the Commercial Arbitration Rules then in force (the "*AAA Rules*") of the American Arbitration Association (the "*AAA*"), in each case, within twenty (20) Business Days following receipt by the respondent(s) of a demand for arbitration in any such proceeding. The arbitration shall be conducted expeditiously in accordance with the AAA Rules. Any arbitration pursuant to this Section 9.3 shall take place in Fairfax County, Virginia.

**(b)**    At least one of the arbitrators shall be an attorney with no less than ten (10) years' experience in the practice of business law. None of the arbitrators shall have performed any

51

significant services for any of the parties or person controlled by any of the parties for a period of five (5) years prior to the date the demand for arbitration is received by the respondent(s). The arbitration panel shall have the ability to engage such consultants and experts as it deems necessary or appropriate to render a decision or award. In the event that any such persons required to participate in an arbitration proceeding are unable to attend in person, all required testimony, depositions or other communications may be conducted by means of telephone, video conference or other means of remote communications.

A final decision or award shall be rendered as soon as reasonably possible and, in any event, within ninety (90) days of the appointment of the panel of arbitrators; *provided, however*, that if the arbitrators determine by majority vote that fairness so requires, such ninety (90) day period may be extended by no more than one hundred eighty (180) additional days for good cause shown. The parties agree that the arbitrators shall have the right and power to shorten the length of any notice periods or other time periods provided in the AAA Rules and to implement Expedited Procedures under the AAA Rules in order to ensure that the arbitration process is completed within the time frames provided herein. The arbitration panel shall reach and render a decision or award that includes Findings of Fact and Conclusions of Law and shall be a Reasoned Award in writing, all as defined by the AAA Rules (concurred in by a majority of the members of the panel with respect to the appropriate award to be rendered or remedy to be granted pursuant to the Dispute). All arbitrations commenced pursuant to this Agreement or any of the other Transaction Documents while any other arbitration hereunder shall be in progress shall be consolidated and heard by the initially constituted panel of arbitrators. All decisions or awards of the arbitral panel shall be final, non-appealable and binding on all parties. Each party shall bear its own legal fees and expenses and all other fees and expenses incurred by it in connection with any Dispute, unless otherwise awarded by the arbitration panel to the prevailing party.

**9.4** <u>Governing Law</u>. The interpretation and construction of this Agreement, and all matters relating hereto, shall be governed by the Laws of the State of Delaware, without regard to the choice of Law principles thereof.

**9.5** <u>Further Assurances</u>. In addition to the actions, documents and instruments specifically required by this Agreement or any other Transaction Document to be taken or delivered on or before the Closing Date or from time to time thereafter, each of the parties to this Agreement shall, before and after the Closing Date, without further consideration, take such other actions and execute and deliver such other documents and instruments as another party hereto reasonably may request in order to effect and perfect the transactions contemplated by this Agreement and the other Transaction Documents.

**9.6** <u>Table of Contents; Captions</u>. The table of contents and the Article and Section captions used in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

**9.7** <u>Notices</u>. Notice or other communications required or permitted hereunder shall be deemed to have been sufficiently given (i) five (5) business days following deposit in the mails if sent by registered or certified mail, postage prepaid, (ii) when sent, if sent by facsimile transmission, if receipt thereof is confirmed by telephone, (iii) when delivered, if delivered

297864 v16/RE .

personally to the intended recipient and (iv) two (2) business days following deposit with a nationally recognized overnight courier service, in each case addressed as follows (or at such other address for a party as shall be specified by like notice):

If to the Parent or Merger Sub, to:

> In2Books, Inc.
> 1250 Connecticut Avenue
> Suite 201
> Washington, DC 20036
> Telephone: 202) 223-5300
> Facsimile: (202) 223-3020

with a copy to its counsel:

> Cooley Godward LLP
> One Freedom Square, Reston Town Center
> 11951 Freedom Drive
> Reston, VA 20190
> Attention:    Ryan E. Naftulin, Esq.
> Telephone: (703) 456-8121
> Facsimile: (703) 456-8100

If to the Company, to:

> ePALS Classroom Exchange, Inc.
> 353 Dalhouse Street, 3rd Floor
> Ottawa ON K1N 7G1
> Canada
> Attention: Jonathan Ewert, CEO
> Telephone: (203) 803-4710
> Facsimile: (203) 804-4711

with a copy to its counsel:

> Gordon Kushner, Esq.
> 2100 Reston Parkway, Suite 203
> Reston, VA 20191
> Telephone: (703) 737-0137
> Facsimile: (206) 424-9116

with a copy to its counsel:

> Wilson Sonsini Goodrich & Rosati
> 11921 Freedom Drive, Sixth Floor
> Reston, VA 20190
> Attention: Trevor J. Chaplick, Esq.

297864 v16/RE .

Telephone: (703) 734-3100
Facsimile: (703) 734-3199

If to Stockholder Representative:

Polygon Management, Inc.
12708 Leatherwood Lane
P.O. Box 178
Bow, WA 98232
Attention: Werner K. Paulus
Telephone: (360) 766-7000
Fax:        (360) 766-7010

with a copy to its counsel:

Laura Minton Breckenridge
Polygon Management, Inc.
12708 Leatherwood Lane
P.O. Box 178
Bow, WA 98232
Telephone: (360) 766-7000
Fax:        (360) 766-7010

or to such other address or number as shall be furnished in writing by any such party in such manner, and such notice or communication shall be deemed to have been given as of the date so delivered, sent by telecopier or mailed.

**9.8**    Assignment; Parties in Interest.  This Agreement may not be transferred, assigned, pledged or hypothecated by any party hereto without the other parties' prior written consent, other than by operation of Law.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

**9.9**    Counterparts.  This Agreement may be executed in two or more counterparts, all of which taken together shall constitute one instrument.  The facsimile transmission or retransmission of any original signed counterpart to this Agreement or any document or agreement contemplated hereby (including any amendment hereto or thereto) shall be deemed to be delivery of an original counterpart thereof for all purposes.

**9.10**   Entire Agreement.  This Agreement, together with the other documents referred to herein which form a part hereof, contains the entire understanding of the parties hereto with respect to the subject matter contained herein and therein.  This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.  All exhibits and schedules referred to in this Agreement are intended to be and hereby are specifically made a part of this Agreement.

297864 v16/RE .

**9.11**    Amendments.    This Agreement may not be changed, and any of the terms, covenants, representations, warranties and conditions cannot be waived, except pursuant to an instrument in writing signed by Parent and the Holder Representative, or, in the case of a waiver, by the party waiving compliance.

**9.12**    Severability.    If any term, provision, agreement, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, agreements, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto.    Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

**9.13**    Third Party Beneficiaries.    Each party hereto intends that this Agreement shall not benefit or create any right or cause of action in or on behalf of any Person or entity other than the parties hereto.

**9.14**    Waiver of Jury Trial.    Each of Parent, Merger Sub and the Company hereby waives, to the fullest extent permitted by applicable Law, any right it may have to a trial by jury in respect of any litigation as between the parties directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated hereby or disputes relating hereto.    Each of Parent and the Company (a) certifies that no representative, agent or attorney of the other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other party have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 9.14.

**9.15**    Interpretation.    The parties have participated jointly in the negotiation and drafting of this Agreement.    In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

*[signatures appear on next page]*

297864 v16/RE .

*[signature page to Merger Agreement]*

IN WITNESS WHEREOF, the Parent, Merger Sub and the Company have caused their respective names to be hereunto subscribed individually or by their respective officers thereunto duly authorized, as the case may be, all as of the day and year first above written.

**IN2BOOKS, INC.**

By: _____ /s/ Edmund Fish_____

Name: Edmund Fish

Title:  Chief Executive Officer

**I-EP ACQUISITION CORP.**

By: _____ /s/ Edmund Fish_____

Name: Edmund Fish

Title:  Chief Executive Officer

**EPALS CLASSROOM EXCHANGE, INC.**

By: _____ /s/ Jonathan Ewert_____

Name: Jonathan Ewert

Title:  Chief Executive Officer

# EXHIBIT "D"

**Tom Burchill**

| | |
|---|---|
| **From:** | Jonathan Ewert [jonathan@ewert.com] |
| **Sent:** | Tuesday, October 31, 2006 2:24 PM |
| **To:** | Tom Burchill; 'Michael Cytrynbaum'; bdiscipio1@comcast.net; TimEMG@aol.com; 'Werner Paulus' |
| **Cc:** | 'Gordon Kushner'; 'Victoria McEachern'; Bill Harrison |
| **Subject:** | FW: Board Ratification |

**Attachments:**    ePals Board ratification of certain actions_(PALIB2_3611667_1).DOC



ePals Board
ratification of ce...
                        All

A ratification of certain past actions is required for the purposes of Wilson Sonsini's
opinion. The attached draft of a written consent is being sent by WSGR to Cooley for
their review. Because this document is in draft form, please do not forward this draft to
anyone outside ePALS.

In the interests of speed and with the assumption that the attached wil be acceptable to
Cooley, we would like to obtain signature pages today. Kindly return a signed copy of the
attached (or simply a signature page) by fax to Victoria McEachern on 309-412-0018. No
cover page is required.

If there are any changes in the final document after review by Cooley, we will advise.

JPE

─────────────────────────────────────────

Jonathan Ewert
CEO
ePALS Classroom Exchange, Inc.
Tel:  203-803-4710
Fax:      203-803-4711
Url:  www.epalscorp.com

─────────────────────────────────────────

ePALS Classroom Exchange terms apply to this e-mail http://www.epalscorp.com/emailterms

-----Original Message-----
From: Starzak, Jocelyn [mailto:jstarzak@wsgr.com]
Sent: Tuesday, October 31, 2006 12:00 PM
To: Gordon Kushner
Cc: Kluger, Matthew; Jonathan@ewert.com; Chaplick, Trevor
Subject: Board Ratification


Gordon:

Attached is the Unanimous Written Consent of the Board of Directors
ratifying certain previous actions. If it is acceptable with you, we should
probably get Cooley to approve it as well before we get the Board to sign
it. Let me know if you would like to forward to them for review or if you
would prefer to do so.

Let me know if you have any questions or comments.

Best regards,
Jocelyn
<<ePals Board ratification of certain actions_(PALIB2_3611667_1).DOC>>

                                    1

Jocelyn Starzak
Wilson Sonsini Goodrich & Rosati
11921 Freedom Drive, Suite 600
Reston, VA 20190
(703) 734-3140 (direct dial)
(703) 734-3199 (fax)
jstarzak@wsgr.com <mailto:jstarzak@wsgr.com>

This email and any attachments thereto may contain private, confidential,
and privileged material for the sole use of the intended recipient. Any
review, copying, or distribution of this email (or any attachments thereto)
by others is strictly prohibited. If you are not the intended recipient,
please contact the sender immediately and permanently delete the original
and any copies of this email and any attachments thereto.

# EPALS CLASSROOM EXCHANGE, INC.

## ACTION BY UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF DIRECTORS

Pursuant to and in accordance with Section 141(f) of the Delaware General Corporation Law (the "**DGCL**") and the Bylaws of ePALS Classroom Exchange, Inc., a Delaware corporation (the "**Company**"), the undersigned, constituting all of the members of the Board of Directors of the Company (the "**Board**"), do hereby take the following actions and adopt the following resolutions by written consent, effective for all purposes as of the date set forth above:

### CONFIRMATION OF CAPITAL STOCK

**WHEREAS**: The Company issued shares of the Company's capital stock (the "**Capital Stock**") to the parties listed on **Exhibit A** hereto, which sets forth the type of capital stock, the name of the party (the "**Stockholder**"), the certificate number, the certificate date, and the number of shares held by such Stockholder.

**WHEREAS**: The Company entered into agreements between the Company and each Stockholder in connection with the issuance of the Capital Stock or the issuance of an instrument exercised for Capital Stock (the "**Capital Stock Agreements**").

**WHEREAS:** The Company previously received the consideration in payment (in the form of services previously rendered, cancellation of indebtedness or for cash) for such Capital Stock pursuant to the terms of the Capital Stock Agreements.

**WHEREAS**: The Board desires to ratify and confirm and otherwise hereby approve that such parties are Stockholders of the Company and to ratify and confirm and otherwise hereby approve in all respects the issuance of all Capital Stock set forth on **Exhibit A**, with each issuance ratified effective as originally intended and provided, and such approval and confirmation effective as of the date hereof.

**RESOLVED**: That the Board hereby ratifies and confirms and otherwise hereby approves in all respects the issuance of all Capital Stock set forth on **Exhibit A**, with each issuance ratified effective as originally intended and provided, and such approval and confirmation effective as of the date hereof.

ePALS Classroom Exchange, Inc. – Unanimous Written Consent of the Board of Directors

**RESOLVED FURTHER**:  That the Board hereby approves, ratifies and confirms in all respects the Capital Stock Agreements, with such ratification effective as originally intended and provided, and such approval and confirmation effective as of the date hereof.

**RESOLVED FURTHER**:  That the Board hereby approves, ratifies and confirms in all respects the reservation of a sufficient number of shares of Common Stock (as defined below) issuable upon conversion of shares of convertible Capital Stock, with such ratification effective as originally intended and provided, and such approval and confirmation effective as of the date hereof.

**RESOLVED FURTHER**:  That the Board hereby ratifies and confirms and otherwise hereby approves in all respects that the shares of Capital Stock set forth on **Exhibit A** were duly authorized, validly issued and are fully paid and nonassessable.

**RESOLVED FURTHER**:  That the Board hereby ratifies and confirms and otherwise hereby approves in all respects that the shares of Common Stock issuable upon conversion of shares of convertible Capital Stock, when issued in accordance with the terms of the Company's Amended and Restated Certificate of Incorporation, as amended from time to time (the "**Restated Certificate**"), will be validly issued, fully paid and nonassessable.

**RESOLVED FURTHER**:  That the Board hereby ratifies and confirms and otherwise hereby approves in all respects any assignment of the Capital Stock of the Company as reflected on the Company's stock ledger and ratifies and confirms the waiver of the provisions of Article XIV of the Company's Bylaws relating to the Company's right of first refusal on transfers of Capital Stock with respect to such assignments.

**RESOLVED FURTHER**: That all acts and deeds previously performed by any officer or under the direction of any officer of the Company, on or prior to the date hereof, within the authority conferred by the Board in connection with the foregoing are hereby ratified, confirmed and approved in all respects, with such ratification effective as originally intended and provided, and such approval effective as of the date hereof.

**RESOLVED FURTHER**: That the officers of the Company be, and each of them hereby is, authorized and directed to do or cause to be done all such acts or things, and to execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, notes, undertakings and certificates of any kind and nature whatsoever, in the name of and on behalf of the Company or otherwise, as appropriate to effectuate or perform the purposes and intent of the foregoing resolutions.

## REDEMPTION OF CERTAIN SHARES

**WHEREAS**:  The Company redeemed 7,500 shares of Series A Preferred Stock held in the name of David Willbrand upon the termination of Mr. Willbrand's employment with the Company (the "**Redemption**") and the payment to Mr. Willbrand of the fair market value of such shares.

-2-

**WHEREAS**: The Board desires to ratify and confirm and otherwise hereby approve the Redemption, effective as originally intended and provided, and such approval and confirmation effective as of the date hereof.

**RESOLVED**: That the Board hereby ratifies and confirms and otherwise hereby approves in all respects the Redemption, effective as originally intended and provided, and such approval and confirmation effective as of the date hereof.

**RESOLVED FURTHER**: That all acts and deeds previously performed by any officer or under the direction of any officer of the Company, on or prior to the date hereof, within the authority conferred by the Board in connection with the foregoing are hereby ratified, confirmed and approved in all respects, with such ratification effective as originally intended and provided, and such approval effective as of the date hereof.

**RESOLVED FURTHER**: That the officers of the Company be, and each of them hereby is, authorized and directed to do or cause to be done all such acts or things, and to execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, notes, undertakings and certificates of any kind and nature whatsoever, in the name of and on behalf of the Company or otherwise, as appropriate to effectuate or perform the purposes and intent of the foregoing resolutions.

### CERTIFICATES OF DESIGNATION

**WHEREAS**: The Company filed the following: (1) a Certificate of Designation for Series B Preferred Stock that was filed with the Secretary of State of the State of Delaware on December 31, 2001; (2) a Certificate of Designation for the Series B Preferred Stock that was filed with the Secretary of State of the State of Delaware on March 15, 2002; (3) a Certificate of Designation increasing the authorized number of shares of Series C Preferred Stock that was filed with the Secretary of State of the State of Delaware on May 19, 2003; and (4) a Certificate of Increase regarding the Certificate of Designation of the Series B-2 Preferred Stock that was filed with the Secretary of State of the State of Delaware on May 21, 2003 (collectively, the **"Certificates of Designation"**).

**WHEREAS**: The Board desires to ratify and confirm and otherwise hereby approve the filing of each of the Certificates of Designation, effective as originally intended and provided, and such approval and confirmation effective as of the date hereof.

**RESOLVED**: That, the Board hereby ratifies and confirms and otherwise hereby approves in all respects the Certificates of Designation, effective as originally intended and provided, and such approval and confirmation effective as of the date hereof.

**RESOLVED FURTHER**: That all acts and deeds previously performed by any officer or under the direction of any officer of the Company, on or prior to the date hereof, within the authority conferred by the Board in connection with the foregoing are hereby ratified, confirmed and approved

in all respects, with such ratification effective as originally intended and provided, and such approval effective as of the date hereof.

**RESOLVED FURTHER**: That the officers of the Company be, and each of them hereby is, authorized and directed to do or cause to be done all such acts or things, and to execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, notes, undertakings and certificates of any kind and nature whatsoever, in the name of and on behalf of the Company or otherwise, as appropriate to effectuate or perform the purposes and intent of the foregoing resolutions.

### CERTIFICATES OF INCREASE

**WHEREAS**: On September 30, 2003, the Company issued an aggregate of 396,139 shares of Series B-2 Preferred Stock to Matthew Fornari, Steven Persky, Paul Cantor & Chieko Takeuchi-Cantor, Four Star Financial Services, LLC and Paul DeRosa, thereby exceeding the authorized number of shares of Series B-2 Preferred Stock under the Company's Certificate of Incorporation.

**WHEREAS**: On June 12, 2006, the Company issued 200,000 shares of Series D Preferred Stock to Werner Paulus, thereby exceeding the authorized number of shares of Series D Preferred Stock under the Company's Certificate of Incorporation by 87,327.

**WHEREAS**: The Board hereby authorizes and approves the filing of (1) a Certificate of Designation for the Series D Preferred Stock increasing the authorized number of shares of Series D Preferred Stock to 7,100,000 (the "**Series D Certificate of Increase**"); and (2) a Certificate of Designation for the Series B-2 Preferred Stock increasing the authorized number of shares of Series B-2 Stock to 710,000 (the "**Series B-2 Certificate of Increase**", and together with the Series D Certificate of Increase, the "**Certificates of Increase**").

**WHEREAS**: The Board hereby authorizes and approves the filing of each of the Certificates of Increase, effective as originally intended and provided, and such approval and confirmation effective as of the date hereof.

**RESOLVED FURTHER**: That all acts and deeds previously performed by any officer or under the direction of any officer of the Company, on or prior to the date hereof, within the authority conferred by the Board in connection with the foregoing are hereby ratified, confirmed and approved in all respects, with such ratification effective as originally intended and provided, and such approval effective as of the date hereof.

**RESOLVED FURTHER**: That the officers of the Company be, and each of them hereby is, authorized and directed to do or cause to be done all such acts or things, and to execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, notes, undertakings and certificates of any kind and nature whatsoever, in the name of and on behalf of the Company or otherwise, as appropriate to effectuate or perform the purposes and intent of the foregoing resolutions, including, without limitation, the filing of the Series D Certificate of Increase and the Series B-2 Certificate of Increase with the Secretary of State of the State of Delaware.

### RATIFICATION OF PRIOR BOARD ACTIONS

**RESOLVED:**   The Board has reviewed its previous actions and has determined that all authorizations and approvals of and actions taken by the Board at all meetings of the Board or by unanimous written consent of the Board prior to the date hereof are hereby in all respects approved, ratified and confirmed with such ratification effective as originally intended and provided and such approval and confirmation effective as of the date hereof and all minutes of such meetings and unanimous written consents are hereby in all respects approved, adopted, ratified and confirmed with such ratification and adoption effective as originally intended and provided and such approval and confirmation effective as of the date hereof; *provided that*, to the extent that the approvals, adoptions, ratifications and confirmations set forth in this resolution conflict with the other resolutions set forth above in this Unanimous Written Consent of the Board of Directors, then this resolution shall be deemed superseded by such other resolutions set forth above.

*(signature page follows)*

**IN WITNESS WHEREOF,** the undersigned have executed this Action by Unanimous Written Consent of the Board of Directors as of the date first set forth above, which may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. This action shall be filed with the minutes of the proceedings of this Board and shall be effective as of the date first above written. Any copy, facsimile or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction be a complete reproduction of the entire original writing.

_____
Thomas Burchill

_____
Michael Cytrynbaum

_____
Robert DiScipio

_____
Tim DiScipio

_____
Werner Paulus

C:\Documents and Settings\TBurchill\Local Settings\Temporary Internet Files\OLK32\ePals Board ratification of certain actions_(PALIB2_3611667_1).DOC (16437)

**Exhibit A**

**Capital Stock Issuances**

| Name | Class of Stock | Certificate Number | Certificate Date | Number of Shares |
|------|----------------|--------------------|-----------------|------------------|
| BEACON | Common Stock | 20 | 8/15/2002 | 8,197 |
| Mark Avnet | Common Stock | 21 | 8/15/2002 | 3,279 |
| Kent Hawkins | Common Stock | 22 | 8/15/2002 | 16,393 |
| Thomas Burchill | Common Stock | 25 | 1/15/2003 | 38,006 |
| Corporate Insights, Inc. | Common Stock | 27 | 7/18/2003 | 17,094 |
| Hyperconnect Interactive | Common Stock | 31 | 1/31/2004 | 236,026 |
| Modern Media Communications | Common Stock | 34 | 1/31/2004 | 84,901 |
| Easton Media Group, LLC | Common Stock | 35 | 1/31/2004 | 111,324 |
| John Irving | Common Stock | 36 | 1/31/2004 | 180,613 |
| Tim DiScipio | Common Stock | 37 | 1/31/2004 | 501,097 |
| Erik Bateman | Common Stock | 38 | 2/15/2004 | 76,790 |
| Michael DiScipio | Common Stock | 39 | 2/15/2004 | 13,907 |
| Mark Tabah | Common Stock | 40 | 2/15/2004 | 77,398 |
| Karen Kaun | Common Stock | 41 | 2/15/2004 | 9,934 |
| Cooma Chelliah | Common Stock | 42 | 2/15/2004 | 9,934 |
| BEACON | Common Stock | 43 | 2/15/2004 | 8,197 |
| Thomas F. Burchill | Common Stock | 44 | 3/10/2004 | 165,924 |

| James Fornari | Common Stock | 45 | 3/18/2004 | 165,924 |
|---|---|---|---|---|
| Werner Paulus | Common Stock | 46 | 12/10/2004 | 662,252 |
| Padilla Bay | Common Stock | 47 | 12/10/2004 | 331,126 |
| Werner Paulus | Common Stock | 48 | 12/15/2004 | 331,126 |
| Jeffrey Horn | Common Stock | 56 | 7/7/2005 | 44,871 |
| Werner Paulus | Common Stock | 57 | 6/12/2006 | 2,700,270 |
| Werner Paulus | Common Stock | 58 | 6/12/2006 | 2,522,772 |
| Werner Paulus | Common Stock | 59 | 6/12/2006 | 135,014 |
| Robert DiScipio | Common Stock | 60 | 10/19/2006 | 285,924 |
| David Roscoe | Series A Preferred | PA68 | 9/14/2000 | 20,000 |
| Matthew Fornari | Series B-2 Preferred | PB9 | 6/6/2002 | 20,492 |
| Steven D. Persky | Series B-2 Preferred | PB10 | 6/6/2002 | 20,492 |
| Paul Cantor and Chieko Takeuchi-Cantor | Series B-2 Preferred | PB11 | 6/6/2002 | 20,492 |
| Four Star Financial | Series B-2 Preferred | PB12 | 6/6/2002 | 81,967 |
| Paul De Rosa | Series B-2 Preferred | PB13 | 6/6/2002 | 81,967 |
| Matthew Fornari | Series B-2 Preferred | PB14 | 11/13/2003 | 7,598 |
| Steven D. Persky | Series B-2 Preferred | PB15 | 11/13/2003 | 7,598 |
| Paul Cantor and Chieko Takeuchi-Cantor | Series B-2 Preferred | PB16 | 11/13/2003 | 7,598 |
| Four Star Financial | Series B-2 Preferred | PB17 | 11/13/2003 | 30,393 |

| | Preferred | | | |
|---|---|---|---|---|
| Paul DeRosa | Series B-2 Preferred | PB18 | 11/13/2003 | 30,393 |
| Matthew Fornari | Series B-2 Preferred | PB19 | 9/30/2003 | 36,013 |
| Steven D. Persky | Series B-2 Preferred | PB20 | 9/30/2003 | 36,013 |
| Paul Cantor and Chieko Takeuchi-Cantor | Series B-2 Preferred | PB21 | 9/30/2003 | 36,013 |
| Four Star Financial | Series B-2 Preferred | PB22 | 9/30/2003 | 144,050 |
| Paul De Rosa | Series B-2 Preferred | PB23 | 9/30/03 | 144,050 |
| Kent Hawkins | Series C Preferred | PC2 | 11/13/2002 | 11,236 |
| Kent Hawkins | Series C Preferred | PC2 | 11/13/2002 | 11,236 |
| Kent Hawkins | Series C Preferred | PC4 | 12/6/2002 | 11,236 |
| Kent Hawkins | Series C Preferred | PC6 | 1/6/2003 | 170,940 |
| Kent Hawkins | Series C Preferred | PC8 | 2/17/2003 | 4,274 |
| Werner Paulus | Series D Preferred | PD1 | 9/2/2003 | 4,238,320 |
| Werner Paulus | Series D Preferred | PD2 | 4/15/2004 | 1,324,503 |
| Padilla Bay, LLC | Series D Preferred | PD3 | 6/30/2004 | 662,252 |
| Werner Paulus | Series D Preferred | PD4 | 6/30/2004 | 662,252 |
| Werner K. Paulus | Series D Preferred | PD5 | 6/12/2006 | 200,000 |

**Exhibit B**

**Options**

| Holder | Number of Shares underlying Option | Exercise Price | Date of Grant | Vesting Commencement Date | Vesting Schedule |
|---|---|---|---|---|---|
| Ken O'Byrne | 10,000 | $0.1800 | 12/19/2001 | 10/22/2001 | 4 Year Vesting - 1 Year Cliff, then Quarterly |
| Silvia Blanchard | 3,560 | $0.1800 | 12/19/2001 | 12/19/2001 | 12 Months - December 2002 |
| Marcelo Burzstein | 11,160 | $0.1800 | 12/19/2001 | 12/19/2001 | 12 Months - December 2002 |
| Marty Christopher | 7,200 | $0.1800 | 12/19/2001 | 12/19/2001 | 12 Months - December 2002 |
| Osmani Gomez Caceres | 7,280 | $0.1800 | 12/19/2001 | 12/19/2001 | 12 Months - December 2002 |
| Patrick Lajeunesse | 9,800 | $0.1800 | 12/19/2001 | 12/19/2001 | 12 Months - December 2002 |
| Jeff Legault | 7,000 | $0.1800 | 12/19/2001 | 12/19/2001 | 12 Months - December 2002 |
| Jacky Little | 9,800 | $0.1800 | 12/19/2001 | 12/19/2001 | 12 Months - December 2002 |
| Steve Mulligan | 8,000 | $0.1800 | 12/19/2001 | 12/19/2001 | 12 Months - December 2002 |
| Ken O'Byrne | 3,200 | $0.1800 | 12/19/2001 | 12/19/2001 | 12 Months - December 2002 |
| Sheila Strickland | 8,160 | $0.1800 | 12/19/2001 | 12/19/2001 | 12 Months - December 2002 |
| Eilert Weiske | 11,164 | $0.1800 | 12/19/2001 | 12/19/2001 | 12 Months - December 2002 |
| Bob DiScipio | 100,000 | $0.0500 | 12/19/2001 | 12/19/2001 | Immediately - December 19, 2001 |
| Jonathan Ewert | 20,000 | $0.1800 | 12/19/2001 | 12/19/2001 | Immediately - December 19, 2001 |
| Marcelo Burstein | 10,400 | $0.5900 | 1/27/2003 | 1/27/2003 | 1/3 vest immediately; remaining amount |

C:\Documents and Settings\TBurchill\Local Settings\Temporary Internet Files\OLK32\ePals Board ratification of certain actions_(PALIB2_3611667_1).DOC (16437)

| | | | | | vests yearly in 2 equal installments over 2 years |
|---|---|---|---|---|---|
| Marty Christopher | 8,000 | $0.5900 | 1/27/2003 | 1/27/2003 | 1/3 vest immediately; remaining amount vests yearly in 2 equal installments over 2 years |
| Steve Mulligan | 10,000 | $0.5900 | 1/27/2003 | 1/27/2003 | 1/3 vest immediately; remaining amount vests yearly in 2 equal installments over 2 years |
| Osmani Gomez | 8,200 | $0.5900 | 1/27/2003 | 1/27/2003 | 1/3 vest immediately; remaining amount vests yearly in 2 equal installments over 2 years |
| Huan Goa | 8,000 | $0.5900 | 1/27/2003 | 1/27/2003 | 1/3 vest immediately; remaining amount vests yearly in 2 equal installments over 2 years |
| Patrick Lajeunesse | 12,000 | $0.5900 | 1/27/2003 | 1/27/2003 | 1/3 vest immediately; remaining amount vests yearly in 2 equal installments over 2 years |
| Jeff Legault | 10,000 | $0.5900 | 1/27/2003 | 1/27/2003 | 1/3 vest immediately; remaining amount vests yearly in 2 equal installments over 2 years |
| Silvia Blanchard | 6,400 | $0.5900 | 1/27/2003 | 1/27/2003 | 1/3 vest immediately; remaining amount vests yearly in 2 equal installments over 2 years |
| Ken O'Byrne | 9,000 | $0.5900 | 1/27/2003 | 1/27/2003 | 1/3 vest immediately; remaining amount |

C:\Documents and Settings\TBurchill\Local Settings\Temporary Internet Files\OLK32\ePals Board ratification of certain actions_(PALIB2_3611667_1).DOC (16437)

-11-

| | | | | | |
|---|---|---|---|---|---|
| | | | | | vests yearly in 2 equal installments over 2 years |
| Greg Marshall | 7,000 | $0.5900 | 1/27/2003 | 1/27/2003 | 1/3 vest immediately; remaining amount vests yearly in 2 equal installments over 2 years |
| Ryan Babchishin | 9,000 | $0.5900 | 1/27/2003 | 1/27/2003 | 1/3 vest immediately; remaining amount vests yearly in 2 equal installments over 2 years |
| Jacky Little | 12,000 | $0.5900 | 1/27/2003 | 1/27/2003 | 1/3 vest immediately; remaining amount vests yearly in 2 equal installments over 2 years |
| Sheila Strickland | 10,400 | $0.5900 | 1/27/2003 | 1/27/2003 | 1/3 vest immediately; remaining amount vests yearly in 2 equal installments over 2 years |
| Eilert Weiske | 8,257 | $0.5900 | 1/27/2003 | 1/27/2003 | 1/3 vest immediately; remaining amount vests yearly in 2 equal installments over 2 years |
| Robert DiScipio | 20,000 | $0.0001 | 3/5/2003 | 3/5/2003 | Immediately in full |
| Jonathan Ewert | 223,962 | $0.3750 | 9/10/2003 | 9/10/2003 | 1/4 immediately and 5% fully diluted shares as of January 15/04 |
| Skiff Wager | 15,894 | $0.3775 | 10/22/2003 | 12/31/2003 | 3,186 vest immediately; then 1,059 vest quarterly over 3 years beginning 12/31/03 |

# EXHIBIT "E"

October 12, 2006

To:      Board of Directors, ePals, Inc.

From:   Ed Fish CEO, In2Books, Inc.

Cc:      Miles Gilburne, co-Chair, In2Books

Re:      Continued closing problems and potential solution

---

We are writing this note in response to Werner's recent conversation with Miles asking that we think again about any potential avenue for moving our proposed transaction to closure. The proximate cause of this problem is, of course, the situation with Mr. Carpenter. And while that problem itself represents its own set of risks, delays resulting from the inability to close the transaction in a timely manner as anticipated have introduced additional issues, including:

- By not being able to appropriately fund (and therefore pursue) new business opportunities, despite the heroic efforts of the ePals sales team and Tim Discipio himself, we've lost a) about a quarter during a prime sales season for new and expanded ePals accounts and b) valuable time in building the combined business and locking down funding for it;
- Exacerbating the delay is the fact that competitive partnerships and announcements (such as BlackBoard with email provider Mirapoint) are being made in the areas of school-safe mail and blogs;
- Legal fees in the context of the transaction have increased dramatically and cash that could have been paying down debt in the merged entity is being used to float ePals operations;
- Some personnel have left ePals, replacements haven't been secured, and others remain at material risk. (I visited ePals earlier this week and came away quite impressed with both the current team and the efforts of ePals management to keep the team intact. Nonetheless, it is clear that current situation has taken and continues to take a considerable toll).

All of this raises concerns for our Board and the Board of our largest shareholder (the In2Books Foundation) about the combined company business model on a go-forward basis (at least in the shorter term) and the set of risks relating to the combined company in the absence of solving the Carpenter issue prior to close.

Our team has thought about Werner's question extensively over the past two days (and in the past couple of weeks of the Carpenter situation, of course), and has analyzed a variety of different potential approaches from the points of view of health of the merged entity on a go forward basis, legal and financial risk, fairness to ePals and In2Books employees and shareholders, simplicity in inception and execution, etc. We constructed and later rejected, for example, an expanded "escrow" of shares concept that could potentially collar some of the risks because it wasn't a complete solution and would raise a host of thorny issues such as control of defense and settlement, ratable voting trusts and the like.

What we have settled upon (and what we believe meets the criteria discussed above) is the following:

1. In2Books drops the requirement for completion of the Carpenter situation as a pre-condition to closing. The company takes over and prosecutes the action to its completion. 495,619 shares for Mr. Carpenter is included in the ePals cap table and converted like all other ePals shares. All legal fees relating to this matter following the closing, and any additional shares or other compensation that might be awarded to Mr. Carpenter would be the responsibility of the combined entity.

2. The conversion ratio is adjusted as reflected in the attached cap table summary (assuming conversion of the Bridge financing vehicle as described).

3. The debt to Paulus totaling $1.970M (current debt of $1.6M plus additional cleanup/expenses of $370k which we agreed to treat as debt in the combined entity) is treated as follows:

    • $970k of such amount is converted into the Bridge Financing vehicle;

    • The remainder of $1M is rolled into the debt of the combined company with payment at 3 years; bearing 5% interest per annum on principal; provided that any bank debt repayment made by company in advance of such time will be made pro rata with this debt.

    • As we've structured it in securing the Bridge financing from the In2Books' shareholders, the notes convert at the valuation of the company in a financing that raises $5M or more, on or before the anniversary date of the note (with 20% warrant coverage) – or in the absence of such a financing, at a $15M pre-money value for the combined entity. For purposes of the cap table above, we've assumed a $3.770M raise ($3.17M new money and $600k converted), the conversion at the $15M valuation, and pro rata participation of I2B shareholders in the Bridge and Paulus – reflected in attached cap table).

We trust that you will recognize the forward-looking nature of our proposal in this difficult situation and our genuine desire to complete this transaction on terms that are fair, recognize the substantial efforts and value involved, and create a proper context for the success of the combined entity.

We look forward to discuss this proposal with you in more depth, but please do not hesitate to contact either Miles or me if we can be helpful in advance of that meeting.

Epalsmcm.1012b

| In2Books | Merged Shares | % Merged | Bridge Convert Shares | % Post Convert |
|---|---|---|---|---|
| **Preferred** | | | | |
| ZG Ventures, LLC | 929,407 | 6.93% | 1,559,235 | 9.06% |
| Alps Investment LLC | 263,736 | 1.97% | 442,462 | 2.57% |
| Mitchell Kapor Foundation | 234,198 | 1.75% | 392,906 | 2.28% |
| James H. Zukin | 131,868 | 0.98% | 221,231 | 1.29% |
| William N. Melton | 131,868 | 0.98% | 221,231 | 1.29% |
| Jack Davies | 117,099 | 0.87% | 196,453 | 1.14% |
| Morino Institute | 117,099 | 0.87% | 196,453 | 1.14% |
| Appleton Partners, Inc. | 105,495 | 0.79% | 176,985 | 1.03% |
| Fuyu Ventures LLC | 105,495 | 0.79% | 176,985 | 1.03% |
| Nancy Peretsman | 105,495 | 0.79% | 176,985 | 1.03% |
| Raul Fernandez | 105,495 | 0.79% | 176,985 | 1.03% |
| John Kao | 105,495 | 0.79% | 176,985 | 1.03% |
| VVJ Raduchel Revocable Trust | 105,495 | 0.79% | 176,985 | 1.03% |
| Yoseph Vardi | 105,495 | 0.79% | 176,985 | 1.03% |
| Michael R. Klein | 105,495 | 0.79% | 176,985 | 1.03% |
| Ed Fish | 105,495 | 0.79% | 176,985 | 1.03% |
| Doug Wallace | 105,495 | 0.79% | 176,985 | 1.03% |
| A. Daniel Jesselson 12/18/80 Trust | 79,121 | 0.59% | 132,739 | 0.77% |
| Michael G. Jesselson 4/8/71 Trust | 79,121 | 0.59% | 132,739 | 0.77% |
| Richard Hanlon | 79,121 | 0.59% | 132,739 | 0.77% |
| Robert W. Pittman | 52,747 | 0.39% | 88,492 | 0.51% |
| Frank Loy | 52,747 | 0.39% | 88,492 | 0.51% |
| Stephen D. Arnold | 52,747 | 0.39% | 88,492 | 0.51% |
| Landon V. Butler, Jr. | 52,747 | 0.39% | 88,492 | 0.51% |
| Joan Lesser | 52,747 | 0.39% | 88,492 | 0.51% |
| Vradenburg Family Trust | 52,747 | 0.39% | 88,492 | 0.51% |
| Phillip E. Himelstein | 52,747 | 0.39% | 88,492 | 0.51% |
| Franklin D. Raines | 52,747 | 0.39% | 88,492 | 0.51% |
| Linda T. Dozier | 52,747 | 0.39% | 88,492 | 0.51% |
| **Total Preferred** | 3,692,308 | 27.55% | 6,194,464 | 36.00% |
| | | | | |
| **Common** | | | | |
| In2Books, Inc. (Nonprofit) | 4,000,000 | 29.84% | 4,000,000 | 23.25% |
| | | | | |
| **Total I2B Shares** | 7,692,308 | 57.39% | 10,194,464 | 59.25% |

| ePals | Merged Shares | % Merged | Bridge Convert Shares | % Post Convert |
|---|---|---|---|---|
| Werner Paulus Controlled | 1,967,375 | 14.7% | 2,834,193 | 16.5% |
| Easton Media Group | 433,205 | 3.2% | 433,205 | 2.5% |
| DiScipio Family | 369,186 | 2.8% | 369,186 | 2.1% |
| Easton Media Group | 344,694 | 2.6% | 344,694 | 2.0% |
| Padilla Bay | 233,741 | 1.7% | 233,741 | 1.4% |
| 103-7 LLC | 128,985 | 1.0% | 128,985 | 0.7% |
| James Fornai | 111,985 | 0.8% | 111,985 | 0.7% |
| All others | 1,459,418 | 10.9% | 1,459,418 | 8.5% |
| **Total Shares** | 4,615,385 | 34.4% | 5,915,408 | 34.4% |

**Notes:**
- ePals total shares includes Carpenter at 495,619 pre-convert shares
- does not include Savidis convert
- does not include 285K Warrant to Paulus (expired Sept)
- Top 6 Shareholders ownership % at merger closing in original structure

| | |
|---|---|
| In2Books Non-Profit | 28.0% |
| Werner Paulus | 16.6% |
| ZG Investments | 6.3% |
| DiScipio Family | 3.1% |
| Easton Media | 2.9% |
| Alps Invest | 1.8% |

| Summary Cap | Merged Shares | % Merged | w/ Bridge Convert | % |
|---|---|---|---|---|
| Common Non-profit | 4,000,000 | 29.84% | 4,000,000 | 23.25% |
| I2B Investors | 3,692,308 | 27.55% | 6,194,464 | 36.0% |
| ePals Shareholders | 4,615,385 | 34.43% | 5,915,408 | 34.4% |
| I2B & ePals Grants (pre-mer) | 1,096,716 | 8.18% | 1,096,716 | 6.4% |
| **Total** | 13,404,409 | 100.00% | 17,206,589 | 100.00% |

3

**Confidential**
Subject to Non-Disclosure Agreement

# EXHIBIT "F"

[DRAFT]

November 12, 2006

To:      Board of Directors, ePals, Inc.

From:  Ed Fish CEO, In2Books, Inc.

Cc:      Miles Gilburne, co-Chair, In2Books

Re:      Path to close

---

As you know, over the past week we've been engaged with the ePal's team in figuring out if there is a path to closing our merger in spite of the most recent set of issues concerning ePals corporate governance execution, which in most instances relates to capitalization documentation and procedures, and debt conversion. We don't need to discuss delays and problems attendant to these issues – because all parties are frustrated.

On our end, we need to figure out this weekend if a resolution is practical and feasible so that by our Board meeting this Wednesday we have a clear path forward. Our preference is that the path include ePals for all the reasons we have discussed and that continue to incent us to solve these issues.  Tim Discipio, Michael Cytrynbaum and others from the ePals team have given advice and I've endeavored to keep them in the loop.

To this end, we've had numerous conversations with Paul Carpenter and his attorney this weekend to ascertain the potential for moving forward.  To resolve the final element remaining for a clear path to closure, namely settlement with Paul Carpenter regarding his debt and ownership level in ePals, we are only able to proceed to closure with all parties agreeing to a settlement.

The good news is that we are able to resolve the Carpenter situation if we focus on the present circumstances and the future – and agree to the following terms. (We believe we've taken a practical approach in light of all the circumstances.) There are debt and equity components.

- In2Books will issue notes to Carpenter for $500k at the time of merger. Terms pari pasu with Miles and with Vern. (1/2 in 3 year note; 1/2 convertible). We will need to offset this debt in the manner described below.
- ePals must convert Carpenter to 2.1 million shares prior to merger (this can be accomplished through the nearly 500k shares already accounted for and additional shares to reach this total)

Given resolution of the above, clean up as we've agreed on all the other matters, and confirmation that we not in the aggregate incur more costs than originally agreed to back in August to execute the merger, we can move ahead. This means that:

1.    The conversion ratio at merger will be as agreed in October:

|  | Percentage Total Shares |
|---|---|
| I2B Total Shares | 50.0% |
| ePals Total Shares | 30.0% |
| Employee Pool (granted and un-granted) | 20.0% |
| Totals | 100% |

2.  We will offset the new $500k of indebtedness of In2Books in the proposal above by removing our funding of the $475k in deal expenses.  We will instead use those proceeds in the short term to fund the business and extend our cash as we ramp into the model and a Series B financing round. This use of cash better serves all investors given the lost time.

- For completeness, our understanding is that "deal expenses" were originally to be covered by a combination of $475k from In2Books at closing, $370k in funding provided by Mr. Paulus (which we will continue to treat as previously agreed), and forgiveness by Mr. Paulus of his Accounts Payable balance owed to him by ePals. Any balances in excess of these amounts were to be paid by ePals shareholders one-off from the merged company.

3.   Finally, to solve the issues relating to due authorization, etc. we have incurred additional legal expense (and certainly devoted substantial time from our Senior team including Miles) that we believe can and should have been completed far in advance of our discussions.  Legal expenses to Cooley expended to deal with these issues will need to be paid by ePals.

*****

We trust that you understand the consistency and logic that we are applying to the above proposal. The changes enable us to get the deal done, and are consistent with our intended spending objectives in support of this deal in its originally agreed upon form. We also think that ample justification exists on the ePals end for reducing expenses, but that is a decision for ePals and its Board.

Please do not hesitate to contact me if I can explain any aspect of the above.  We truly hope that we can push this deal over the last yard or two and focus on collectively building a great business.